KEKER & VAN NEST, LLP
MICHAEL H. PAGE - #154913
ASHOK RAMANI - #200020
KHARI J. TILLERY - #215669
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Third-Party Google Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VISTO CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RESEARCH IN MOTION LIMITED, et al.,<br><br>Defendant. | Misc. Civil Case No. 3:08-mc-80031-JSW (JL)<br><br>Court of Original Jurisdiction<br>U.S. Dist. Ct.<br>E. District Texas<br>Marshall Division<br>Case No. 2-06-CV-181 TJW<br><br>**DECLARATION OF KHARI J. TILLERY IN SUPPORT OF THIRD PARTY GOOGLE'S REPLY IN SUPPORT OF MOTION TO QUASH SUBPOENA, OR IN THE ALTERNATIVE, FOR PROTECTIVE ORDER, AND OPPOSITION TO MOTION TO COMPEL**<br><br>Date:      May 7, 2008<br>Time:     9:30 a.m.<br>Judge:    Magistrate Judge Larson |

416045.01

1     I, KHARI J. TILLERY, declare and state as follows:

2     1.    I am an attorney licensed to practice law in the State of California and am an

3 associate with Keker & Van Nest, LLP, counsel for third party Google Inc.  I make the following

4 statements of my personal knowledge, have knowledge of the facts set forth herein and, if called

5 as a witness, could and would testify competently thereto.

6     2.    Attached hereto as **Exhibit A** is a true and correct copy of an email from Steve

7 Pollinger to me, dated April 1, 2008, with Visto Corporation's proposed declaration attached

8 thereto.

9     3.    Attached hereto as **Exhibit B** is a true and correct copy of a letter from me to

10 Geoffrey L. Smith, dated March 4, 2008.

11     4.    Attached hereto as **Exhibit C** is a true and correct copy of the complaint in *Visto*

12 *Corporation v.* Research In Motion Limited and Research In Motion Corporation, Eastern

13 District of California Case No. 2-06-CV-181-TJW.

14     I declare under penalty of perjury under the laws of the State of California that the

15 foregoing is true and correct, and that this declaration was executed on April 23, 2008, at San

16 Francisco, California.

17

18                  /s/ *Khari J. Tillery*

19                   KHARI J. TILLERY

20

21

22

23

24

25

26

27

28

1

DECLARATION OF KHARI J. TILLERY IN SUPPORT OF THIRD PARTY GOOGLE'S REPLY IN SUPPORT
OF MOTION TO QUASH SUBPOENA, OR IN THE ALTERNATIVE, FOR PROTECTIVE ORDER,
AND OPPOSITION TO MOTION TO COMPEL
MISC. CIVIL CASE NO.  CV-08-80031-MISC-JLW

416045.01

# EXHIBIT 'A'

## Khari Tillery

| | |
|---|---|
| **From:** | spollinger@McKoolSmith.com |
| **Sent:** | Tuesday, April 01, 2008 7:24 AM |
| **To:** | Khari Tillery |
| **Cc:** | gsmith@McKoolSmith.com; mrobson@McKoolSmith.com |
| **Subject:** | Visto/RIM - first draft of Google Declaration |
| **Attachments:** | Google Declaration.DOC |

**Khari,**

**Per our telephone conversation yesterday, attached is the draft declaration of Google.  We look forward to receiving Google's revisions to the declaration by Wednesday of this week.**

**<<Google Declaration.DOC>>**

*Steve Pollinger*
McKool Smith, P.C.
Suite 1700
300 West 6th Street
Austin, Texas 78701
Direct (512) 692-8702
Fax (512) 692-8744
spollinger@mckoolsmith.com
www.mckoolsmith.com

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| VISTO CORPORATION, | |
| Plaintiff and Counterclaim-Defendant, | |
| vs. | **Civil Action No. 2:06-CV-181 (TJW)** |
| | **JURY TRIAL DEMANDED** |
| RESEARCH IN MOTION LIMITED and RESEARCH IN MOTION CORPORATION, | |
| Defendants and Counterclaim-Plaintiffs. | |

### DECLARATION OF GOOGLE INC.

NOW COMES, Google Inc. ("Google") and makes the following Declaration for admission into evidence in the above-identified case. Google has personal knowledge of the matters set forth herein and knows them to be true and correct.

1.      The information set forth below is "CONFIDENTIAL-ATTORNEYS' EYES ONLY" pursuant to Paragraphs 3.3. and 4.3 of the Protective Order entered by United States District Court Judge T. John Ward on April 2, 2007, in the above-captioned case.

2.      Google e-mail accounts (known as Gmail) are serviced by Google e-mail servers located in the United States and positioned within at least one firewall. All of Google e-mail servers, including its POP, SMTP, and IMAP and e-mail notification servers are located in the United States and are positioned within at least one firewall at their respective locations.

3.      Google email accounts (Gmail accounts) can be synchronized with BlackBerry enabled handhelds through systems and services provided by Research in Motion ("RIM"). The only protocols used for performing such synchronization are POP3/SSL, SMTP/SSL,

IMAP/SSL, and Google's HTTP/SSL based custom subscription and notification protocol.  All network communications between RIM and Google with regard to such synchronization occurs over port 995 for POP3/SSL, ports 465 and 587 for SMTP/SSL, port 993 for IMAP/SSL and port 443 for Google's HTTP/SSL based custom subscription and notification protocol.

4.     Google provides no customizations or specialized software or implementations beyond POP3/SSL, SMTP/SSL, IMAP/SSL, and Google's HTTP/SSL based custom subscription and notification protocol to support access to RIM email accounts in conjunction with services provided to users by RIM, nor is it using any software provided by RIM to support access to Google email accounts in conjunction with services provided to users by RIM.

5.     Since October 1, 2005, approximately ____ U.S. Google e-mail accounts have been synchronized through RIM's BlackBerry Internet Service.  The attached Ex. A lists the approximate number of U.S. Google e-mail accounts synchronized through RIM's BlackBerry Internet Service on a monthly / daily basis since October 1, 2005.  As of the date that this agreement was signed, there are ____ Google e-mail accounts registered to perform synchronization with RIM BlackBerry enabled handhelds, of which approximately ____ are United States registered e-mail accounts.  Since October 1, 2005, there have been ____ Google e-mail accounts registered to perform synchronization with RIM BlackBerry enabled handhelds, of which approximately ____ are United States registered e-mail accounts.

6.     Google and the undersigned declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  This declaration was executed on April ____, 2008, in Mountain View, California.

Signature: _____

Name and Title:_____

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

**EXHIBIT 'B'**

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

KHARI J. TILLERY
KTILLERY@KVN.COM

March 4, 2008

**VIA FACSIMILE & U.S. MAIL**

Geoffrey L. Smith, Esq.
McKool Smith
300 West 6th Street, Suite 1700
Austin, TX 78701

Re:    *Subpoena in Visto Corporation v. Research In Motion Limited and Research In Motion Corporation, No. 2-06-CV-181 (E.D. Tex)*

Dear Mr. Smith:

It was a pleasure speaking with you on Friday. And thank you again for agreeing to extend our time to respond to the subpoena until March 10, 2008. I am writing now to confirm the details of our conversation.

You told us that the patents at issue in the *Visto v. RIM* litigation teach a system of synchronizing various data components of a user's account (email, calendar, etc.) between a server behind a firewall and handheld devices (e.g., smart phones). And it is your belief that RIM has software and/or hardware that synchronizes these data components between Google servers and RIM's BlackBerry handheld devices, and that Google may have information about this software and/or hardware.

During our conversation, we also discussed each of the seven document requests in the subpoena. The following is our understanding of what Visto is hoping to receive from Google with respect to each of the requests.

Request No. 1:  Visto is not concerned about the specific location of Google's servers, but only whether some of the servers are located within the United States.

Request No. 2:  Visto wants to know the total number of Google users that synchronize their data with RIM devices. As an example, you thought there might be a per customer synchronizing fee agreement between RIM and Google. As we explained, however, no such agreement exists.

412530.01

Geoffrey L. Smith, Esq.
March 4, 2008
Page 2


    <u>Request No. 3</u>:  Visto wants design documents describing the software and/or hardware interface between RIM and Google, if any.

    <u>Request No. 4</u>:  Visto would like documents relating to software and/or hardware provided by RIM for instillation at Google, if any, but is not interested in RIM devices used by Google employees.

    <u>Requests Nos. 5-6</u>:  We could not understand from the subpoena what you meant by the term "protocol," as used in Requests Nos. 5-6, and you explained that this was a reference to email protocols such as Internet Message Access Protocol (IMAP) and Post Office Protocol (POP).

    <u>Request No. 7</u>:  You described this request as a "catch-all" request meant to capture any documents evidencing system configurations, if any, that allow Google servers to communicate with RIM's BlackBerry Internet Service (or BlackBerry Web Client), such as a firewall port.

    Finally, you told us that you requested these same documents from RIM, but have not received a single responsive document.  Nonetheless, you have neither moved to compel production of these documents from RIM nor noticed a 30(b)(6) deposition of RIM on these topics.

    I will call you on March 5, 2008 to further discuss the subpoena and Google's response. In the meantime, if you have any questions or concerns, please do not hesitate to call me.

                Very truly yours,

                Khari J. Tillery

KJT/dbm

cc:    Michael Page, Esq.
       Ashok Ramani, Esq.

**EXHIBIT 'C'**

RECEIVED
U.S. DISTRICT
2006 APR 28  PM 5: 27
TX EASTERN-MARSHALL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

*April 28, 2006* 5:20PM

TX EASTERN-MARSHALL

VISTO CORPORATION,                                      §
                                                       §       Case No. **2 - 0 6 C V - 1 8 1**
            Plaintiff,                                 §
                                                       §
      v.                                               §
                                                       §       **Jury Trial Demanded**
RESEARCH IN MOTION LIMITED, and                        §
RESEARCH IN MOTION CORPORATION,                        §
                                                       §
            Defendants                                 §

BY

### ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Visto Corporation ("Visto") alleges as follows for its Complaint against Defendants Research In Motion Limited and Research In Motion Corporation (collectively, "RIM"):

### PARTIES

1.      Visto is a corporation organized and existing under the laws of the State of Delaware with a place of business at 101 Redwood Shores Parkway, 4th Floor, Redwood City, California 94065

2.      Research In Motion Limited is a corporation organized and existing under the laws of Ontario, Canada with a principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada N2L 3W8, which is doing business and infringing Visto's patents in the Eastern District of Texas and elsewhere in the United States.

3.      Research In Motion Corporation is a corporation organized and existing under the laws of the State of Delaware and registered to do business in the State of Texas with a

Page 1

place of business at 122 West John Carpenter Parkway, Suite 430, Irving, Texas 75039, which is doing business and infringing Visto's patents in the Eastern District of Texas and elsewhere in the United States. Research In Motion Corporation is the United States distributor of Research In Motion Limited products and services.

## JURISDICTION AND VENUE

4.    This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271 *et seq.*

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

6.    RIM has sufficient contacts with the Eastern District of Texas to subject it to the personal jurisdiction of this Court for purposes of this Complaint, including, without limitation, acts of infringement of Visto's patents committed by RIM within this District.

7    Venue is proper in the Marshall Division of the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b)-(c) and 28 U.S.C. § 1400(b).

## GENERAL ALLEGATIONS

8.    Established in 1996, Visto is a leading provider of personal and corporate wireless messaging solutions to mobile operators for personal and corporate use. Visto's inventions enable the deployment of a complete mobility solution, which provides secure access to and synchronization of the most widely used personal information management ("PIM") data over any network and on a broad array of mobile devices, such as personal digital assistants ("PDAs"), smartphones, and the like. Visto has expended considerable resources in inventing and developing its inventions and protecting its rights therein.

9.    Visto holds all right, title, and interest in and to United States Patent No

Page 2

6,085,192, entitled "System And Method For Securely Synchronizing Multiple Copies Of A Workspace Element In A Network" ("'192 patent"), which was duly and properly issued by the United States Patent and Trademark Office ("USPTO") on July 4, 2000 in the name of Daniel J. Mendez et al. A copy of the '192 patent is attached as Exhibit A to this Complaint. A Reexamination Certificate for the '192 patent was duly and properly issued by the USPTO on November 22, 2005. A copy of the Reexamination Certificate of the '192 patent is attached as Exhibit B to this Complaint.

    10.    Visto holds all right, title, and interest in and to United States Patent No. 6,151,606, entitled "System And Method For Using A Workspace Data Manager To Access, Manipulate And Synchronize Network Data" ("'606 patent"), which was duly and properly issued by the USPTO on November 21, 2000 in the name of Daniel J. Mendez. A copy of the '606 patent is attached as Exhibit C to this Complaint.

    11    Visto holds all right, title, and interest in and to United States Patent No. 6,023,708, entitled "System And Method For Using A Global Translator To Synchronize Workspace Elements Across A Network" ("'708 patent"), which was duly and properly issued by the USPTO on February 8, 2000 in the name of Daniel J Mendez et al. A copy of the '708 patent is attached as Exhibit D to this Complaint.

    12    Visto holds all right, title, and interest in and to United States Patent No 6,708,221, entitled "System And Method For Globally And Securely Accessing Unified Information In A Computer Network" ("'221 patent"), which was duly and properly issued by the USPTO on March 16, 2004 in the name of Daniel J Mendez et al A copy of the '221 patent is attached as Exhibit E to this Complaint. The '192 patent, '606 patent, '708 patent, and '221 patent are hereinafter referred to collectively as the "Patents-in-Suit".

Page 3

13. RIM provides products and services that enable access to and/or synchronization of data in secure network environments (collectively, the "Accused Products"), including without limitation the products currently sold by RIM under the name BLACKBERRY®.

14. RIM infringes the Patents-in-Suit directly, contributorily and/or by active inducement by importing, manufacturing, using, marketing, distributing, selling, and/or supporting the Accused Products.

15. Upon information and belief, RIM's infringement of the Patents-in-Suit has been and continues to be willful.

### COUNT I
### Infringement of U.S. Patent No. 6,085,192

16. Visto incorporates paragraphs 1 through 15 as though fully restated herein.

17. RIM has infringed and continues to infringe the '192 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

18. RIM has contributorily infringed and/or induced others to infringe and continues to contributorily infringe and/or to induce others to infringe the '192 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

19. Upon information and belief, RIM's infringement of the '192 patent has been and continues to be willful.

20. RIM's acts have caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to Visto for which Visto has no adequate remedy at law. Unless preliminarily and permanently enjoined by this Court, RIM will continue to so infringe

Page 4

the '192 patent.

## COUNT II
### Infringement of U.S. Patent No. 6,151,606

21. Visto incorporates paragraphs 1 through 20 as though fully restated herein.

22. RIM has infringed and continues to infringe the '606 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

23. RIM has contributorily infringed and/or induced others to infringe and continues to contributorily infringe and/or to induce others to infringe the '606 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

24. Upon information and belief, RIM's infringement of the '606 patent has been and continues to be willful.

25. RIM's acts have caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to Visto for which Visto has no adequate remedy at law. Unless preliminarily and permanently enjoined by this Court, RIM will continue to so infringe the '606 patent.

## COUNT III
### Infringement of U.S. Patent No. 6,023,708

26. Visto incorporates paragraphs 1 through 25 as though fully restated herein.

27. RIM has infringed and continues to infringe the '708 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

28. RIM has contributorily infringed and/or induced others to infringe and

Page 5

continues to contributorily infringe and/or to induce others to infringe the '708 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

29. Upon information and belief, RIM's infringement of the '708 patent has been and continues to be willful.

30. RIM's acts have caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to Visto for which Visto has no adequate remedy at law. Unless preliminarily and permanently enjoined by this Court, RIM will continue to so infringe the '708 patent.

**COUNT IV**
**Infringement of U.S. Patent No. 6,708,221**

31. Visto incorporates paragraphs 1 through 30 as though fully restated herein.

32. RIM has infringed and continues to infringe the '221 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

33. RIM has contributorily infringed and/or induced others to infringe and continues to contributorily infringe and/or to induce others to infringe the '221 patent in this District and elsewhere in the United States by RIM's manufacture, importation, sale, offering for sale, and/or use of the Accused Products without authority or license of Visto.

34. Upon information and belief, RIM's infringement of the '221 patent has been and continues to be willful

35. RIM's acts have caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to Visto for which Visto has no adequate remedy at law.

Page 6

Unless preliminarily and permanently enjoined by this Court, RIM will continue to so infringe the '221 patent.

## PRAYER FOR RELIEF

WHEREFORE, Visto prays:

1.    That RIM and its parents, affiliates, subsidiaries, officers, agents, servants, employees, attorneys, successors, and assigns, and all those persons in active concert or participation with them, or any of them, be preliminarily and permanently enjoined and restrained from making, importing, using, offering for sale, selling, or causing to be sold any product falling within, or designed to conduct a method falling within, the scope of any claim of the Patents-in-Suit, or otherwise infringing or contributing to or inducing infringement of any claim of the Patents-in-Suit;

2.    That RIM and its parents, affiliates, subsidiaries, officers, agents, servants, employees, attorneys, successors, and assigns, and all those persons in active concert or participation with them, or any of them, be ordered to destroy or offer up to Visto for destruction any and all products within the scope of any claim of the Patents-in-Suit that are within RIM's possession, custody, or control;

3.    That Visto be awarded its actual damages, including lost profits and price erosion, but in no case less than a reasonable royalty, to be assessed by or under the Court's discretion, adequate to compensate Visto for RIM's infringement of the Patents-in-Suit;

4.    That Visto be awarded pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

5    That the Court order an accounting for damages;

6.    That the Court declare this to be an exceptional case pursuant to 35 U.S.C.

Page 7

§ 285 and award Visto its attorneys' fees;

7.    That the Court award enhanced damages pursuant to 35 U.S.C. § 284 due to the willful and wanton nature of RIM's infringement of the Patents-in-Suit;

8.    That Visto be awarded costs of court; and

9.    That Visto be awarded such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Visto demands a trial by jury on all issues triable of right by a jury.

DATED: April 28, 2006              Respectfully submitted,

                                   _Sam Baxter_

                                   Sam F. Baxter, Lead Attorney
                                   State Bar No. 01938000
                                   McKOOL SMITH, P.C.
                                   505 East Travis Street, Suite 105
                                   Marshall, TX 75670
                                   Telephone: (903) 927-2111
                                   Facsimile: (903) 927-2622

                                   Of Counsel:

                                   Ronald S. Katz
                                   Robert D. Becker
                                   J. Bruce McCubbrey
                                   Shawn G. Hansen
                                   MANATT, PHELPS & PHILLIPS, LLP
                                   1001 Page Mill Road, Building 2
                                   Palo Alto, CA 94304
                                   Telephone: (650) 812-1300
                                   Facsimile: (650) 213-0260

                                   *Attorneys for Plaintiff*
                                   VISTO CORPORATION

Page 8

Visto v. RIM
Original Complaint For Patent Infringement
20153191.1

# EXHIBIT A



US006085192A

# United States Patent [19]

## Mendez et al.

| | |
|---|---|
| [11] Patent Number: | 6,085,192 |
| [45] Date of Patent: | Jul. 4, 2000 |

[54] **SYSTEM AND METHOD FOR SECURELY SYNCHRONIZING MULTIPLE COPIES OF A WORKSPACE ELEMENT IN A NETWORK**

[75] Inventors: **Daniel J. Mendez**, Mountain View; **Mark D. Riggins**, San Jose; **Prasad Wagle**, Santa Clara; **Christine C. Ying**, Foster City, all of Calif.

[73] Assignee: **RoamPage, Inc.**, Mountain View, Calif.

[21] Appl. No.: **08/835,997**

[22] Filed: **Apr. 11, 1997**

[51] Int. Cl.7 .................................................. **G06F 17/30**

[52] U.S. Cl. ........................... 707/10; 707/203; 707/104; 707/1; 707/9; 707/10

[58] Field of Search ............................ 707/203, 104, 707/1, 9, 10

[56]                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,582 | 5/1989 | Miller et al. | 707/104 |
| 4,875,159 | 10/1989 | Cary et al | 364/200 |
| 5,263,157 | 11/1993 | Janis | 707/9 |
| 5,386,564 | 1/1995 | Shearer et al. | 395/650 |
| 5,581,749 | 12/1996 | Hossain et al | 707/1 |
| 5,600,834 | 2/1997 | Howard | 395/617 |
| 5,613,012 | 3/1997 | Hoffman et al. | 382/115 |
| 5,627,658 | 5/1997 | Connors et al | 358/407 |
| 5,666,553 | 9/1997 | Crozier | 395/803 |
| 5,682,524 | 10/1997 | Freund et al. | 395/605 |
| 5,684,990 | 11/1997 | Boothby | 707/203 |
| 5,701,423 | 12/1997 | Crozier | 395/335 |
| 5,706,502 | 1/1998 | Foley et al | 707/10 |
| 5,710,918 | 1/1998 | Lagarde et al | 395/610 |
| 5,715,403 | 2/1998 | Stefik | 705/44 |
| 5,721,908 | 2/1998 | Lagarde et al | 395/610 |
| 5,721,914 | 2/1998 | DeVries | 395/615 |
| 5,745,360 | 4/1998 | Leone et al | 364/140 |
| 5,757,916 | 5/1998 | MacDoran et al. | 380/25 |
| 5,778,346 | 7/1998 | Frid-Nielsen et al | 395/208 |
| 5,790,425 | 8/1998 | Wagle | 364/551.01 |
| 5,790,790 | 8/1998 | Smith et al. | 395/200.36 |
| 5,799,318 | 8/1998 | Cardinal et al. | 707/104 |

### OTHER PUBLICATIONS

Network Firewalls, Bellovin et al, IEEE Communications Magazine, pp. 50–57, Sep 1994

IpAccess—An Internet Service Access System for Firewall Installations, Steffen Stempel, 1995 IEEE, pp. 31–41, Feb 1995

Web traffic characterization: an assessment of the impact of caching documents from NCSA's web server, Braun et al, Computer Networks and ISDN Systems, V. 28, pp 37–51, Jul. 1995.

Security for Infinite Networks, Nelson et al., Aug. 1995 IEEE, pp. 11–19.

DEsigning an Academic Firewall: Policy, Practice, and Experience with SURF, Greenwald et al , Proceedings of SNDSS '96, Feb. 1996 IEEE, pp. 79–92.

(List continued on next page.)

*Primary Examiner*—Wayne Amsbury
*Assistant Examiner*—Shahid Alam
*Attorney, Agent, or Firm*—Graham & James LLP

[57]                    **ABSTRACT**

A system includes a general synchronization module at the client site for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified. The system further includes a synchronization agent at a global server for operating outside the first firewall and for forwarding to the general synchronization module second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified. A synchronization-start module is maintained at the client site for operating within the first firewall and for securely initiating the general synchronization module and the synchronization agent when predetermined criteria have been satisfied. The system further includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, and means for storing the preferred version at the first store and at the second store

25 Claims, 6 Drawing Sheets



**6,085,192**

Page 2

## OTHER PUBLICATIONS

C–HTTP—The Development of a Secure, Closed HTTP–based Network on the Internet, Kiuchi et al., Proceedings of SNDSS '96, Feb. 1996 IEEE, pp. 64–75.

Establishing Firewall Policy, S. Cobb, Director of Special Projects National Computer Security Associations, Florida Office, ISBN#0–7803–3268–7, Jun. 1996, pp. 198–205.

Web site entitled "Bookmark Translator 2.0: This Utility transform Microsoft Internet Explore's bookmarks in the format valid for Netscape Navigator and viceversa," Enzo Marinacci, Rome~ Jul. 1997, URL=http://www.bns.it/em-ware/BookmarkTranslator–uk.htm, pp. 1–4

Article by Bellovin et al , entitled: "Network Firewalls"Published by IEEE Communications Magizine Sep. 1994, pp.50–57

Article by Steffen Stempel, entitled: "IPAccess–An Internet Service Access System for Firewall Installations"Published by IEEE Communications Magazine a Feb 16, 1995, pp.31–41.

Article by Braun et al , entitled:"Web Traffic Characteriza-tion: an assessment of the impact of caching documents from NCSA's web server"Published by Elservier Science B.V. 1995 pp. 37–51.

Article by Nelson et al., entitled: "Security for Infinite Networks"Published by IEEE Communications Magazine on Aug. 22, 1995, pp.11–19.

Article by Greenwald et al , "Designing an Academic Fire-wall: Policy, Pratice, and Experience with SURF"Published by IEEE Communications Magazine on Feb. 22, 1996, pp. 79–92.

Article by Kiuchi et al , entitled: "C–HTTP–The Develop-ment of a Secure, Closed HTTP–based Network on the Internet"Published by IEEE Proceedings of SNDSS on Feb. 22, 1996, pp 64–75

Article by S. Cobb, entitled: "Establishing Firewall Policy-"Published by National Computer Security Assn. on Jun 25–27, 1996, pp. 198–205.



FIG. 1



FIG. 2



FIG. 3



FIG. 4



126

Synchronization
Agent



Communications
Module
505

General
Synchronization
Module
510

FIG. 5



FIG. 6

6,085,192

**1**

# SYSTEM AND METHOD FOR SECURELY SYNCHRONIZING MULTIPLE COPIES OF A WORKSPACE ELEMENT IN A NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is related to co-pending patent application entitled "System and Method for Globally Accessing Computer Services," Ser. No 08/766,307, now pending, filed on Dec. 13, 1996, by inventors Mark D. Riggins, F. Stanley Bailes, Hong Q. Bui, David J. Cowan, Daniel J. Mendez, Mason Ng, Sean Michael Quinlan, Prasad Wagle, Christine C. Ying, Christopher R. Zuleeg and Joanna A Aptekar-Strober; and to co-pending patent application entitled "System and Method for Enabling Secure Access to Services in a Computer Network," Ser. No. 08/841,950, now pending, filed on Apr. 8, 1997, by inventor Mark Riggins, both of which are hereby incorporated by reference. These related applications have been commonly assigned to RoamPage, Inc

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to computer networks, and more particularly to a system and method for securely synchronizing multiple copies of a workspace element such as a file in a secure network.

### 2. Description of the Background Art

Data consistency is a significant concern for computer users. For example, when maintaining multiple independently-modifiable copies of a document, a user risks using an outdated version. Further, by the time the user notices the inconsistency, interparty miscommunication or data loss may have resulted. The user must then spend more time attempting to reconcile the inconsistent versions

The problem of data inconsistency is exacerbated when multiple copies of a document are maintained at different network locations. For example, due to network security systems such as conventional firewall technology, a user may have access only to a particular one of these network locations. Without access to the other sites, the user cannot confirm that the version on the accessible site is the most recent draft

Therefore, a system and method are needed for providing users with data consistency, and more particularly for synchronizing multiple copies of a workspace element such as a document in the secure network environment.

## SUMMARY OF THE INVENTION

The present invention provides a system and method for synchronizing multiple copies of a workspace element in a secure network environment. The secure network environment includes a global server connected to multiple clients. Using the present system and method, the clients automatically synchronize workspace data between multiple sites, independent of whether the sites are protected by site firewalls

The present system includes a general synchronization module at the client site for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified. The system further includes a synchronization agent at the global server for operating outside the first firewall and for forwarding to the general synchronization module second version information which indicates whether an independently-

**2**

modifiable copy of the first workspace element has been modified. A synchronization-start module. at the client site operates within the first firewall and initiates the general synchronization module and the synchronization agent when predetermined criteria have been satisfied. The system further includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, and means for storing the preferred version at the first store and at the second store.

The system further handles the case when both the workspace element and the copy have been modified independently since the last date and time of synchronization. Accordingly, a content-based synchronization module performs a responsive action such as determined a preferred version or storing both the first workspace element and the copy at both the first store and at the second store

The present method includes the steps of generating first examination results by examining first version information, which indicates whether a first workspace element stored at a first store within a firewall has been modified; and generating second examination results by examining second version information which indicates whether an independently-modifiable copy of the first workspace element, the copy being stored at a second store outside the firewall, has been modified. The present method further includes the steps of initiating synchronization from within the firewall when predetermined criteria have been satisfied; generating a preferred version from the first workspace element and from the copy based on the first and second examination results; and storing the preferred version at the first store and at the second store.

The system and method advantageously use a trusted third party to enable the synchronization of workspace data among multiple sites. Accordingly, a client user who maintains a work site, a home site, an off-site and the global server site can synchronize the workspace data or portions thereof among all four sites. Further, the predetermined criteria (which controls when the synchronizationstart module initiates synchronization) may be set so that the general synchronization module synchronizes the workspace data upon user request, at predetermined times during the day such as while the user is commuting, or after a predetermined user action such as user log-off or user log-on. Because the system and method operate over the Internet, synchronization can occur over any distance. Since synchronization is initiated from within the firewall, the typical firewall, which prevents in-bound communications, does not act as an impediment to workspace data synchronization Also, since the user's preferences may be previously set, the present system and method may operate unattended by the client user

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating a secure data-synchronizing network in accordance with the present invention;

FIG 2 is a block diagram illustrating details of a FIG. 1 service server;

FIG. 3 is a block diagram illustrating details of the FIG. 1 desktop computer;

FIG. 4 is a block diagram illustrating details of the FIG 3 base system;

FIG. 5 is a block diagram illustrating details of the FIG. 1 synchronization agent; and

FIG. 6 is a flowchart illustrating a method for synchronizing multiple copies of a workspace element in a secure network.

6,085,192

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG 1 is a block diagram illustrating a secure data-synchronizing network 100, comprising a first site such as a remote computer terminal 105 coupled via a communications channel 110 such as the Internet to a global server 120. The global server 120 is in turn coupled via a communications channel 125 such as the Internet to a second site such as a corporate Local Area Network (LAN) 135. The global server 120 is protected by a global firewall 115, and the corporate LAN 135 is protected by a corporate firewall 130.

The corporate LAN 135 includes a corporate signal bus 140 coupling the corporate firewall 130 to an e-mail server 145 having e-mail data 165, to a file server 150 having file data 170, to a calendar server 155 having calendar data 175 and to a desktop computer 160 having user data 180. It will be appreciated that the e-mail data 165, file data 170, calendar data 175 and user data 180 or portions thereof may be stored at different locations such as locally on the desktop computer 160. It will be further appreciated that the e-mail data 165, file data 170, calendar data 175 and user data 180 are exemplary and collectively referred to herein as "work-space data" 185. Those skilled in the art will recognize that "workspace data" may include other types of data such as application programs. It will be further appreciated that the e-mail data 165, file data 170, calendar data 175 and user data 180 may each be divided into workspace elements, wherein each workspace element is identified by particular version information 255 (described below with reference to FIG 2). Accordingly, each e-mail, file, calendar, etc. may be referred to as "a workspace element in workspace data."

An independently modifiable copy of the workspace data 185, referred to herein as workspace data 123, is stored on the global server 120 for easy access by a user from the remote terminal 105. Being a copy, the workspace data 123 includes independently modifiable copies of each workspace element in workspace data 185 and an independently modifiable copy of version information 255 (FIG. 2), referred to herein as version information 124.

Network 100 further comprises synchronization means, which includes a base system 190 stored within the corporate LAN 135 and for example on the desktop computer 160 and further includes a synchronization agent 126 stored outside the corporate firewall 130 and preferably on the global server 120. The base system 190 and the synchronization agent 126 cooperate to synchronize the workspace data 185 with the workspace data 123 Generally, the base system 190 manages the workspace data 185 within the corporate LAN 135 and the synchronization agent 126 manages the workspace data 123 within the global server 120. As described in greater detail below with reference to FIG. 4, the base system 190 preferably initiates and controls data synchronization. Other components and functions of the global server 120 are described in the cross-referenced patent applications which are herein incorporated by reference.

The remote terminal 105 may include a smart telephone or a Personal Data Assistant (PDA) such as the PalmPilot system by the U.S. Robotics, Inc. Although not shown, the remote terminal 105 may include a second base system similar to the base system 190, which is described with greater detail with reference to FIG. 4. Accordingly, the second base system on the remote terminal 105 would cooperate with the synchronization agent 126 to synchronize the workspace data stored on the remote terminal 105 with the workspace data 123 stored on the global server 120. As

4

with the corporate LAN, the second base system on the remote terminal 105 would preferably initiate and control data synchronization with the global server 120 for the same reasons discussed below Workspace data on the remote terminal 105 would thus be synchronized with the work-space data 123 and with the workspace data 185.

FIG. 2 is a block diagram illustrating details of a service server 200, wherein each of the e-mail server 145, the file server 150, the calendar server 155 and the desktop computer 160 is an instance thereof. Service server 200 includes a Central Processing Unit (CPU) 205 such as a Motorola Power PC® microprocessor or an Intel Pentium® microprocessor. An input device 210 such as a keyboard and mouse and an output device 215 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 220 to CPU 205. A communications interface 225 (such as an Ethernet port), a data storage device 230 (such as read only memory or a magnetic disk), and Random-Access Memory (RAM) 235 are further coupled via signal bus 220 to the CPU 205

An operating system 240 includes a program for controlling processing by the CPU 205, and is typically stored in the data storage device 230 and loaded into the RAM 235 for execution. A service engine 245 includes a program for performing a particular service such as maintaining an e-mail data base, a calendar data base, a bookmarks data base or another file data base, and may be also stored in the data storage device 230 and loaded into the RAM 235 for execution To perform a service, the service engine 245 operates on service data 250 (e.g., the e-mail data 165, the file data 170, the calendar data 175 or the user data 180), which is typically stored in the data storage device 250 The service data 250 includes version information 255 indicating the date and time of the last modification The service engine 245 operates to update the version information 255 whenever modifications are made. It will be appreciated that the portion of memory in the data storage device 250 which contains the service data 250 is referred to as the service "store."

FIG. 3 is a block diagram illustrating details of the desktop computer 160, which includes a CPU 305, an input device 310, an output device 315, a communications interface 325, a data storage device 330 and RAM 335, each coupled to a signal bus 320.

An operating system 340 includes a program for controlling processing by the CPU 305, and is typically stored in the data storage device 330 and loaded into the RAM 335 for execution A desktop service engine 345 (i.e., a particular service engine 245, FIG. 2) includes a service program for managing user data 180 (i.e., particular service data 250, FIG. 2) which includes version information 350 (i.e., particular version information 255, FIG. 2). The desktop service engine 345 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution The user data 180 may be stored in the data storage device 330. As stated above with reference to FIG. 1, the base system 1 90 operates to synchronize the workspace data 185 (which includes user data 180) with the workspace data 123. The base system 190 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution.

FIG. 4 is a block diagram illustrating details of the base system 190, which includes a communications module 405, a user interface module 410, a locator module 415, a synchronization-start ("synch-start") module 420, a general synchronization module 425 and a content-based synchronization module 430. For simplicity, each module is illustrated as communicating with one another via a signal bus 440.

6,085,192

| 5 | 6 |

The communications module 405 includes routines for compressing data, and routines for communicating via the communications interface 325 (FIG. 3) with the synchronization agent 126 (FIG. 1). The communications module 405 may further include routines for applying Secure Socket Layer (SSL) technology and user identification and authentication techniques (i.e., digital certificates) to establish a secure communication channel through the corporate firewall 130 and through the global firewall 126. Examples of communications modules 405 may include TCP/IP stacks or the AppleTalk® protocol

The user interface 410 includes routines for communicating with a user, and may include a conventional Graphical User Interface (GUI). The user interface 410 operates in coordination with the other desktop computer 160 components as described herein.

The locator module 415 includes routines for identifying the memory locations of the workspace elements in the workspace data 185 and the memory locations of the workspace elements in the workspace data 123. Workspace element memory location identification may be implemented using intelligent software, i.e., preset memory addresses or the system's registry, or using dialogue boxes to query a user. Accordingly, the locator module 415 determines the memory addresses of the workspace elements in the e-mail data 165, the workspace elements in the file data 170, the workspace elements in the calendar data 175 and the workspace elements in the user data 180 as well as the memory addresses of the corresponding workspace elements in the workspace data 123. It will be appreciated that the locator module 415 may perform workspace element memory location identification upon system boot-up or after each communication with the global server 120 to maintain updated memory locations of workspace elements.

The synchronization-start module 420 includes routines for determining when to initiate synchronization of workspace data 123 and workspace data 185. For example, the synchronization-start module 420 may initiate data synchronization upon user request, at a particular time of day, after a predetermined time period passes, after a predetermined number of changes, after a user action such as user log-off or upon like criteria. The synchronization-start module 420 initiates data synchronization by instructing the general synchronization module 425 to begin execution of its routines. It will be appreciated that communications with synchronization agent 126 preferably initiate from within the corporate LAN 1135, because the typical corporate firewall 130 prevents in-bound communications and allows outbound communications.

The general synchronization module 425 includes routines for requesting version information 124 from the synchronization agent 126 (FIG. 1) and routines for comparing the version information 255 against a last synchronization signature 435 such as a last synchronization date and time to determine which versions have been modified. The general synchronization module 425 further includes routines for comparing the version information 124 and the version information 255 to determine if only one or both versions of a particular workspace element have been modified and routines for performing an appropriate synchronizing responsive action. Appropriate synchronizing responsive actions may include forwarding the modified version (as the preferred version) of a workspace element in workspace data 185 or forwarding just a compilation of the changes to the other store(s). Other appropriate synchronizing responsive actions may include, if reconciliation between two modified versions is needed, then instructing the content-based syn-

chronization module 430 to execute its routines which are described below.

It will be appreciated that the synchronization agent 126 preferably examines the version information 124 and forwards only the version information 124 determined to be modified since the last synchronization signature 435. This technique makes efficient use of processor power and avoids transferring unnecessary data across the communications channel 125. The general synchronization module 425 in the corporate LAN 135 accordingly compares the received version information 124 with the version information 255 to determine if reconciliation is needed. Upon completion of the data synchronization, the general synchronization module 425 updates the last synchronization signature 435.

The content-based synchronization module 430 includes routines for reconciling two or more modified versions in workspace data 123, 185 of the same workspace element. For example, if the original and the copy of a user workspace element have both been modified independently since the last synchronization, the contentbased synchronization module 430 determines the appropriate responsive action. The content-based synchronization module 430 may request a user to select the preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or by integrating the changes into a single preferred version which replaces each modified version at both stores

FIG. 5 is a block diagram illustrating details of the synchronization agent 126, which includes a communications module 505 (similar to the communications module 405 described above with reference to FIG. 4) and a general synchronization module 510 (similar to the general synchronization module 425 described above also with reference to FIG. 4). The communications module 505 includes routines for compressing data, and routines for communicating via the communications channel 125 with the base system 190. The communications module 505 may further include routines for establishing a secure communications channel through the global firewall 126 and through the corporate firewall 130.

The general synchronization module 510 includes routines for comparing the version information 124 with the last synchronization signature 435, and routines for forwarding to the general synchronization module 425 version information 124 determined to be modified. The general synchronization module 510 may either maintain its own last synchronization signature 435 copy (not shown). Alternatively, the request to synchronize from the base system 190 may include a copy of the last synchronization signature 435. The general synchronization module 510 further includes routines for receiving preferred versions of workspace data 185 workspace elements from the general synchronization module 425, and routines for forwarding preferred versions of workspace data 123 workspace elements to the general synchronization module 425.

FIG. 6 is a flowchart illustrating a method 600 for synchronizing multiple copies of workspace data 123, 185 in a secure network 100. Method 600 begins with locator module 415 in step 605 identifying the memory locations of the workspace elements in workspace data 123, 185. As stated above, workspace element memory location identification may be implemented using intelligent software or dialogue boxes. The user interface module 410 in step 610 enables selection of the workspace elements in workspace data 123, 185 to be synchronized by the general synchronization module 425.

6,085,192

7

The synchronization-start module 420 in step 615 determines whether predetermined criteria have been met which indicate that synchronization of the workspace elements selected in step 610 should start. If not, then method 600 loops back to step 615. Otherwise, the communications module 405 and communications module 505 in step 617 establish a secure communications channel between the global server 120 and the desktop computer 160 The general synchronization module 510 in step 620 compares the version information 124 of each of the selected workspace elements in workspace data 123 against the last synchronization signature 435 to determine modified workspace elements, and forwards the version information 124 of workspace elements determined to be modified to the general synchronization module 425. Further, the general synchronization module 425 in step 620 compares the version information 255 of each selected workspace element in the workspace data 185 against the last synchronization signature 435 to locate modified workspace elements. In this embodiment, a workspace element has been modified if the date and time of last modification is after the date and time of last synchronization.

If no modified workspace elements in workspace data 123 or in workspace data 185 are located, then the general synchronization modules 425 and 510 in step 650 update the last synchronization signature 435 and method 600 ends. Otherwise, the general synchronization module 425 in step 625 determines whether more than one version of the same workspace element has been modified since the last synchronization

If only one version has been modified, then the corresponding general synchronization module 425 or 510 in step 630 forwards the updated preferred version of the workspace element to the other store, and then in step 635 determines whether all workspace elements selected in step 610 have been examined. If so, then method 600 jumps to step 650. Otherwise, then method 600 returns to step 620.

If more than one version has been modified, then the general synchronization module 425 in step 640 instructs the content-based synchronization module 430 to reconcile the modified versions. Reconciliation may include requesting instructions from the user or, based on preselected preferences, performing responsive actions such as storing both versions at both stores.

General synchronization module 425, 510 in step 645 sends the preferred version of the workspace element or just a compilation of the changes to the other store. That is, if the preferred version is a workspace element in the workspace data 185, then general synchronization module 425 sends the preferred version or the changes to general synchronization module 510 to update the outdated workspace element in the workspace data 123. If the preferred version is a workspace element in the workspace data 123, then the general synchronization module 510 sends the preferred version or the changes to the general synchronization module 425 to update the outdated workspace element in the workspace data 185. Method 600 then jumps to step 635.

The foregoing description of the preferred embodiments of the invention is by way of example only, and other variations of the above-described embodiments and methods are provided by the present invention. For example, although the global server 120 is illustrated as a single device, the global server 120 may include several computers networked together. Although not described in great detail, the remote terminal 105 can synchronize copies of workspace elements stored on it with workspace elements of

8

workspace data 123 stored on the global server 120. Components of this invention may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. The embodiments described herein have been presented for purposes of illustration and are not intended to be exhaustive or limiting. Many variations and modifications are possible in light of the foregoing teaching. The system is limited only by the following claims.

What is claimed is:

1. A computer-based method comprising the steps of:

(a) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

(b) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

(c) initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;

(d) generating a preferred version from the first workspace element and from the copy based on the first and second examination results; and

(e) storing the preferred version at the first store and at the second store

2. The method of claim 1 wherein the second store is on a global server outside the firewall and which is protected by a global firewall.

3. The method of claim 1 wherein the first version information includes the date and time the first workspace element was last modified and the second version information includes the date and time the copy was last modified.

4. The method of claim 3 wherein generating the first examination results includes the step of comparing the first version information against a date and time of last synchronization.

5. The method of claim 3 wherein generating the second examination results includes the step of comparing the second version information against a date and time of last synchronization

6. The method of claim 1 further comprising, before generating the first examination results, the step of updating the first version information whenever the first workspace element is modified

7. The method of claim 1 further comprising, before generating the second examination results, the step of updating the second version information whenever the copy is modified

8. The method of claim 1 wherein if only one of the first workspace element and the copy has been modified, then the step of generating includes selecting the one as the preferred version.

9. The method of claim 1 further comprising the step of locating the first workspace element, the first version information, the copy and the second version information

10. A system comprising:

a general synchronization module for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified;

a synchronization agent for operating outside the first firewall and for forwarding to the general synchronization module second version information which indi-

6,085,192

9

cates whether an independently modifiable copy of the first workspace element has been modified;

a synchronization-start module for operating within the first firewall and for initiating the general synchronization module and the synchronization agent when predetermined criteria have been satisfied;

means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information; and

means for storing the preferred version at the first store and the second store.

11. The system of claim 10 further comprising a communications module for communicating through the first firewall.

12. The system of claim 10 wherein the synchronization agent and the second store are on a global server which is protected by a global firewall.

13. The system of claim 12 further comprising a communications module for communicating through the first firewall and through the global firewall.

14. The system of claim 10 wherein the first version information includes the date and time the first workspace element was last modified and the second version information includes the date and time the copy was last modified.

15. The system of claim 14 wherein the general synchronization module compares the first version information against a date and time of last synchronization.

16. The system of claim 14 wherein the synchronization agent compares the second version information against the date and time of last synchronization.

17. The system of claim 10 further comprising means for updating the first version information whenever the first workspace element is modified.

18. The system of claim 10 further comprising means for updating the second version information whenever the copy is modified.

19. The system of claim 10 wherein if only one of the first workspace element and the copy has been modified, then the means for generating selects the one as the preferred version.

20. The system of claim 10 further comprising a locator module for locating the first store, the first workspace element, the first version information, the second store, the copy and the second version information

21. A system comprising:

first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied;

means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results; and

means for storing the preferred version at the first store and at the second store.

22. A computer-readable storage medium storing program code for causing a computer to perform the steps of:

(a) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

10

(b) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

(c) initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;

(d) generating a preferred version from the first workspace element and from the copy based on the first and second examination results; and

(e) storing the preferred version at the first store and at the second store.

23. A computer-based method comprising the steps of:

(a) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

(b) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

(c) initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;

(d) determining based on the first and second examination results that both the first workspace element and the copy have been modified; and

(e) storing the first workspace element and the copy at the first store and at the second store.

24. A system comprising:

first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied;

means for determining based on the first and second examination results that both the first workspace element and the copy have been modified; and

means for storing both the first file and the copy at the first store and at the second store.

25. A system comprising:

a global server for operating outside a firewall and including memory for storing first workspace data and corresponding first version information; and

a synchronization agent for managing the first workspace data and the corresponding first version information and for communicating with remote clients; and

a remote client for operating within the firewall and including memory for storing second workspace data and corresponding second version information;

means for cooperating with the synchronization agent to synchronize the first workspace data with the second workspace data by examining the first version information and the second version information; and

a synchronization-start module for initiating workspace data synchronization between the global server and the remote client

* * * * *

# EXHIBIT B



US006085192C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5234th)

# United States Patent
Mendez et al.

(10) **Number:** US 6,085,192 C1
(45) **Certificate Issued:** Nov. 22, 2005

(54) **SYSTEM AND METHOD FOR SECURELY SYNCHRONIZING MULTIPLE COPIES OF A WORKSPACE ELEMENT IN A NETWORK**

(75) Inventors: **Daniel J. Mendez**, Mountain View, CA (US); **Mark D. Riggins**, San Jose, CA (US); **Prasad Wagle**, Santa Clara, CA (US); **Christine C. Ying**, Foster City, CA (US)

(73) Assignee: **Visto Corporation**, Redwood Shores, CA (US)

**Reexamination Request:**
No. 90/007,093, Jun 18, 2004

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 6,085,192 |
| Issued: | Jul. 4, 2000 |
| Appl No.: | 08/835,997 |
| Filed: | Apr. 11, 1997 |

(51) Int. Cl.7 ............................................. G06F 17/30
(52) U.S. Cl. .................... 707/10; 707/1; 707/9; 707/10; 707/104; 707/203
(58) Field of Search ........................ 707/1–4, 9–10, 707/203, 200, 101, 102, 103 R; 715/511; 709/201–202, 248–249

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,652,698 | A | 3/1987 | Hale et al. |
| 4,714,995 | A | 12/1987 | Materna et al. |
| 4,882,752 | A | 11/1989 | Lindman et al |
| 4,897,781 | A | 1/1990 | Chang et al. |
| 4,916,738 | A | 4/1990 | Chandra et al. |
| 5,048,085 | A | 9/1991 | Abraham et al. |
| 5,150,407 | A | 9/1992 | Chan |
| 5,220,603 | A | 6/1993 | Parker |
| 5,265,159 | A | 11/1993 | Kung |
| 5,333,266 | A | 7/1994 | Boaz et al. |
| 5,388,255 | A | 2/1995 | Pytlik |
| 5,392,390 | A | 2/1995 | Crozier |
| 5,420,927 | A | 5/1995 | Micali |
| 5,425,102 | A | 6/1995 | Moy |

| | | | |
|---|---|---|---|
| 5,434,918 | A | 7/1995 | Kung et al |
| 5,483,596 | A | 1/1996 | Rosenow et al. |
| 5,491,752 | A | 2/1996 | Kaufman et al. |
| 5,495,533 | A | 2/1996 | Linehan et al |
| 5,510,777 | A | 4/1996 | Pilc et al. |
| 5,544,320 | A | 8/1996 | Konrad |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2191505 | 6/1997 |
| CA | 2210763 | 1/1999 |

(Continued)

OTHER PUBLICATIONS

US 5,373,559, 12/1994, Kaufman et al. (withdrawn)
Rao, Venka & Aline, Mary, "Burrowing through firewalls," Dec 1996, pp 1–5.*

(Continued)

*Primary Examiner*—Alford W. Kindred

(57) **ABSTRACT**

A system includes a general synchronization module at the client site for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified. The system further includes a synchronization agent at a global server for operating outside the first firewall and for forwarding to the general synchronization module second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified. A synchronization-start module is maintained at the client site for operating within the first firewall and for securely initiating the general synchronization module and the synchronization agent when predetermined criteria have been satisfied The system further includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, and means for storing the preferred version at the first store and at the second store



# US 6,085,192 C1
### Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,544,322 A | 8/1996 | Cheng et al. |
| 5,572,643 A | 11/1996 | Judson |
| 5,588,132 A | 12/1996 | Cardoza |
| 5,604,788 A | 2/1997 | Tett |
| 5,623,601 A | 4/1997 | Vu |
| 5,627,997 A | 5/1997 | Bray et al. |
| 5,632,011 A | 5/1997 | Landfield et al. |
| 5,634,053 A | 5/1997 | Noble et al |
| 5,644,354 A | 7/1997 | Thompson et al |
| 5,647,002 A | 7/1997 | Brunson |
| 5,652,884 A | 7/1997 | Palevich |
| 5,657,390 A | 8/1997 | Elgamal et al. |
| 5,664,207 A | 9/1997 | Crumpler et al. |
| 5,666,530 A | 9/1997 | Clark et al. |
| 5,675,782 A | 10/1997 | Montague et al. |
| 5,678,039 A | 10/1997 | Hinks et al |
| 5,680,542 A | 10/1997 | Mulchandani |
| 5,682,478 A | 10/1997 | Watson et al. |
| 5,684,951 A | 11/1997 | Goldman et al |
| 5,684,984 A | 11/1997 | Jones et al |
| 5,687,322 A | 11/1997 | Deaton |
| 5,701,400 A | 12/1997 | Amado |
| 5,706,427 A | 1/1998 | Tabuki |
| 5,710,922 A | 1/1998 | Alley et al |
| 5,713,019 A | 1/1998 | Keaten |
| 5,717,925 A | 2/1998 | Harper et al |
| 5,721,779 A | 2/1998 | Funk |
| 5,727,202 A | 3/1998 | Kucala |
| 5,729,735 A | 3/1998 | Meyering |
| 5,742,668 A | 4/1998 | Pepe et al. |
| 5,752,059 A | 5/1998 | Holleran et al |
| 5,752,246 A | 5/1998 | Rogers et al |
| 5,754,830 A | 5/1998 | Butts et al |
| 5,758,150 A | 5/1998 | Bell et al. |
| 5,758,354 A | 5/1998 | Huang et al |
| 5,758,355 A | 5/1998 | Buchanan |
| 5,764,902 A | 6/1998 | Rothrock |
| 5,765,171 A | 6/1998 | Gehani et al |
| 5,768,510 A | 6/1998 | Gish |
| 5,784,463 A | 7/1998 | Chen et al. |
| 5,784,464 A | 7/1998 | Akiyama et al. |
| 5,787,172 A | 7/1998 | Arnold |
| 5,790,974 A | 8/1998 | Tognazzini |
| 5,794,252 A | 8/1998 | Mosher |
| 5,799,086 A | 8/1998 | Sudia |
| 5,802,530 A | 9/1998 | Van Hoff |
| 5,812,398 A | 9/1998 | Nielsen |
| 5,812,668 A | 9/1998 | Weber |
| 5,812,773 A | 9/1998 | Norin |
| 5,815,683 A | 9/1998 | Vogler |
| 5,818,935 A | 10/1998 | Maa |
| 5,828,840 A | 10/1998 | Cowan et al. |
| 5,832,483 A | 11/1998 | Barker |
| 5,835,087 A | 11/1998 | Herz et al. |
| 5,835,601 A | 11/1998 | Shimbo et al. |
| 5,845,282 A | 12/1998 | Alley et al. |
| 5,857,201 A * | 1/1999 | Wright et al. ......... 707/104.1 |
| 5,862,325 A | 1/1999 | Reed et al. |
| 5,862,346 A | 1/1999 | Kley et al. |
| 5,870,544 A | 2/1999 | Curtis |
| 5,870,759 A | 2/1999 | Bauer et al. |
| 5,870,765 A | 2/1999 | Bauer et al. |
| 5,878,230 A | 3/1999 | Weber et al. |
| 5,909,689 A | 6/1999 | Van Ryzin |
| 5,924,103 A | 7/1999 | Ahmed et al. |
| 5,928,329 A | 7/1999 | Clark et al |
| 5,943,676 A | 8/1999 | Boothby |
| 5,951,652 A | 9/1999 | Ingrassia, Jr et al. |
| 5,961,590 A | 10/1999 | Mendez et al. |
| 5,966,714 A | 10/1999 | Huang et al |
| 5,968,131 A | 10/1999 | Mendez et al. |
| 5,974,238 A | 10/1999 | Chase, Jr. |
| 5,982,898 A | 11/1999 | Hsu et al. |
| 5,987,609 A | 11/1999 | Hasebe |
| 5,999,932 A | 12/1999 | Paul |
| 5,999,947 A | 12/1999 | Zollinger et al. |
| 6,006,017 A | 12/1999 | Joshi et al. |
| 6,006,274 A * | 12/1999 | Hawkins et al. ......... 709/248 |
| 6,020,885 A | 2/2000 | Honda |
| 6,021,427 A | 2/2000 | Spagna et al. |
| 6,023,700 A | 2/2000 | Owens et al. |
| 6,023,708 A | 2/2000 | Mendez et al. |
| 6,034,621 A | 3/2000 | Kaufman |
| 6,052,735 A | 4/2000 | Ulrich et al. |
| 6,073,165 A | 6/2000 | Narasimhan et al. |
| 6,094,477 A | 7/2000 | Nada et al. |
| 6,108,691 A | 8/2000 | Lee et al. |
| 6,108,709 A | 8/2000 | Shinomura et al. |
| 6,118,856 A | 9/2000 | Paarsmarkt et al. |
| 6,125,281 A | 9/2000 | Wells et al. |
| 6,131,096 A | 10/2000 | Ng et al. |
| 6,131,116 A | 10/2000 | Riggins et al. |
| 6,138,146 A | 10/2000 | Moon et al. |
| 6,151,606 A | 11/2000 | Mendez |
| 6,154,844 A | 11/2000 | Touboul et al. |
| 6,169,986 B1 | 1/2001 | Bowman et al. |
| 6,182,118 B1 | 1/2001 | Finney et al. |
| 6,212,529 B1 | 4/2001 | Boothby et al. |
| 6,249,805 B1 | 6/2001 | Fleming |
| 6,295,541 B1 | 9/2001 | Bodnar et al. |
| 6,304,881 B1 | 10/2001 | Halim et al. |
| 6,311,186 B1 | 10/2001 | Melampy et al. |
| 6,324,542 B1 | 11/2001 | Wright, Jr. et al. |
| 6,334,140 B1 | 12/2001 | Kawamata |
| 6,343,313 B1 | 1/2002 | Salesky et al. |
| 6,389,455 B1 | 5/2002 | Fuisz |
| 6,438,583 B1 | 8/2002 | McDowell et al. |
| 6,446,090 B1 | 9/2002 | Hart |
| 6,477,545 B1 | 11/2002 | LaRue |
| 6,510,455 B1 | 1/2003 | Chen et al |
| 6,564,218 B1 | 5/2003 | Roth |
| 6,631,416 B2 | 10/2003 | Bendinelli et al. |
| 6,697,942 B1 | 2/2004 | L'Heureux et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0801478 | 10/1997 |
| EP | 0820028 | 1/1998 |
| JP | 02000003314 | 1/2000 |
| WO | WO 96/17306 | 6/1996 |
| WO | WO 97/04389 | 2/1997 |
| WO | WO 97/24678 | 7/1997 |
| WO | WO 97/35265 | 9/1997 |
| WO | WO 99/05620 | 2/1999 |
| WO | WO 99/45451 | 9/1999 |
| WO | WO 00/22543 | 4/2000 |
| WO | 2002/0138599 | 9/2002 |
| WO | 2002/0174372 | 11/2002 |

## OTHER PUBLICATIONS

IntelliLink Corporation, ItelliLink for Windows Release 3.0, "User's Guide" 1994, Nashua, NH.

Lotus Development Corporation, Lotus Notes Release 4, "Application Developer's Guide" 1995, Cambridge, MA

Lotus Development Corporation, Lotus Notes Release 3.3 North American Server Edition, "Lotus Notes, the Groupware Standard" 1994, Cambridge, MA.

Sams Publishing, Dahl, Andrew, "Lotus Notes 4 Administrator's Survival Guide," 1996, Indianapolis, IN

**US 6,085,192 C1**
Page 3

Sams Publishing, Tamura, et al., "Lotus Notes 4 Unleashed," 1996, Indianapolis, IN

Advisor Publications—Lotus Notes Advisor, Pyle, Hugh, "The Notes Architecture," 1995.

Advisor Publications—Lotus Notes Advisor, Augun, Audry, "Integrating Lotus Notes with Enterprise Data," 1996.

Advisor Publications—Lotus Notes Advisor, Opyt, Barbara and Dale, Robert, "Use the Internet as Your Lotus Notes WAN," 1996.

Lotus Development Corporation, Lotus Notes Knowledge Base, "What is the Notes Replicator?" 1995, Cambridge, MA.

Lotus Development Corporation, Lotus Notes Knowledge Base, "Firewall Security Overview and How Firewalls Relate to Lotus Notes" 1996, Cambridge, MA.

Network Computing, Frenkel, Garry, "Pumping for Info: Notes and Database Integration," 1996.

IBM Corporation, Hawker et al., "Secrets to Running Lotus Notes: The Decisions No One Tells You How to Make," 1996, Research Triangle Park, NC.

Radosevich, Linda, "Users want unified mail directories," Computerworld, Aug. 30, 1993, p. 12.

Bruno, Charles, "Firm pushes E-mail limits beyond rivals'," Network World, Aug. 12, 1991, pp. 33, 53.

Sliwa, Carol and Cole, Barb, "MESA declares a groupware detente," Network World, Aug. 5, 1996, p. 29.

Grosse, Eric, "Repository Mirroring," ACM Transactions on Mathematical Software, vol. 21, No. 1, Mar., 1995, pp. 89–97.

Schilit, Bill N. and Theimer, Marvin M., "Disseminating Active Map Information to Mobile Hosts," IEEE Network, Sep./Oct. 1994, pp. 22–32.

Levy, Eliezer and Silberschatz, Abraham, "Distributed File Systems: Concepts and Examples," ACM Computing Surveys, vol. 22, No. 4, Dec. 1990, pp. 321–374.

Rymer, John R., "The Muddle in the Middle," Byte, Apr. 1996, pp. 67–70.

Baum, David, "Intranet Politics and Technologies," Byte, May 1997, pp. 88A–88H.

Udell, Jon, "Push Me, Pull You," Byte, Sep. 1996, pp. 117–120.

Kador, John, "The Ultimate Middleware," Byte, Apr. 1996, pp. 79–83.

Brown, Mark, "Using Netscape 2," Que Corporation, 1995, pp. 885–907.

Kramer, Douglas, "The Java Platform," Javasoft, May 1996, pp. 1–25.

Package java.applet; java.net, http://www-nrg.ee lbl gov/j4/apibook/javaf.htm, javam.htm, Apr. 22, 1996.

Servlet Tutorial, http://mech postech ac kr/Java/java sun-.com/products/jeeves/currentrelease/doc/servlet_tutorial/servlet_tutorial.html

Freier et al., entitled "The SSL Protocol, Version 3.0," Netscape Communications, dated Nov. 18, 1996, pp 1–59, Downloaded from URL=http://www.home.netscape.com/eng/ss13/draft302.txt.

Java Servlet Application Programming Interface White Paper, http://mech.postech ac kr/Java/java.sun.com/products/jeeves/CurrentRelease/doc/api.html, Aug. 1996, pp. 1–6.

Singhal, M., "Update transport: A new technique for update synchronization in replicated database systems," IEEE Transactions on Software Engineering, vol 16, No. 12, Dec 1990, pp 1325–1336.

Rao, H. & Skarra, A., "A transparent service for synchronized replication across loosely-connected file systems," IEEE Transactions on Software Engineering, Apr. 1995, pp 110–117.

Crispin, M., "Internet Message Access Protocol—RFC 1730 Version 4," Dec. 1994, pp 1–52, http://www.faqs.org/rfcs/rfc1730.html.

Rao, Venkat & Aline, Mary, "Burrowing through firewalls," Dec. 1996, pp 1–5, http://java.sun.com/developer/technica-lArticles/InnerWorkings/Burrowing/.

Brown, Margaret J., "The Visto Briefcase Pro Puts Your PIM On The Internet," Aug. 13, 1998, 1 page, URL:http://www.zdnet.com/zdnn/stories/zdnn_display/0,3440,341892,00.html

Tanenbaum, Andrew, "Computer Networks," Third Edition, Prentice-Hall, 1996, see entire document.

Knudsen, Jonathan, "Java Cryptography," O'Reilly, 1998, p 79–91, 112, 160.

Verisign Press Release, "Verisign Enhances Digital IDS to Enable Universal Website Login and One-step Registration," <www.verisign.com/press/product/isv.html>, especially 2nd paragraph

Crispin, M., "IMAP4 Compatibility With IMAP2BIS", Network Working Group RFC 2061, Dec. 1996, XP002154026, <URL:http://www.imc.org/rfc2061>, retrieved Nov 28, 2000, p. 1, last paragraph.

"Configuration of a wireless-connected mobile computer," IBM Technical Disclosure Bulletin, US, IBM Corp., New York, vol. 38, No. 4, Apr 1, 1995, pp. 15–17, XP000516057, ISSN: 0018–8689, the whole document.

Mason, Justin, "Tunneling over HTTP," Dec. 11, 1996, pp 1–2 http://www.netsys.com/firewalls/firewalls-9612/0488 html

Elgamal, Taher, "The Secure Sockets Layer Protocol (SSL)," agenda for the Danvers IETF meeting, Apr. 1995, pp 1–5—http://www.ietf.cnri.reston va.us/proceedings/95apr/sec/cat.elgamal slides html

Gray, Terry, "Message Access Paradigms and Protocols," revised Sep. 28, 1995, pp 1–11 http://www.imap.org/imap.vs.pop.html.

Ouellette, Tim, "Data for everyone, bills for none?," Computerworld, Mar. 17, 1997, pp 43, 46.

Research Disclosure: "Provide Auto-Forwarding Based On Criteria Selected by the User"; Oct. 1, 1989; 1 page; No. 306; Kenneth Mason Publications; XP000085405; ISSN 0374–4353.

Chan, M.C. et al., "Application of Compaction Technique to Optimizing Wireless Email Transfer," IEEE Wireless Communications and Networking Conference 1999, p. 1535 Section A

Crispin, M., "Internet Message Access Protocol Version 4rev1," 1996 Section 2.3.1.1

Jaeger and Prakash, "Implementation of a Discretionary Access Control Model for Script-based Systems," IEEE Jun. 1995.

Adams, Charlotte, "Multilevel Secure Networking Charges Ahead," Federal Computer Week, Apr 12, 1993.

Kohl, John, "The Evolution of the Kerberos Authentication Service," 1991

Young et al., "Deniable Password Snatching: On the Possibility of Evasive Electronic Espionage," 1997, IEEE, pp. 224–235.

# US 6,085,192 C1
Page 4

Abel, Amee, "E-mail anywhere," May 1998, Time, pp. 1–4.

Gray, Emmett, "Fetch–O–Matic by Emmett Gray," http://www.filmscouts.com/software/fomguide.asp, Version 2.5, 2001

Satyanarayanan, M., "Integrating Security in a Large Distributed System," ACM Transactions on Computer Systems, vol. 7, No. 3, Aug. 1989, pp. 247–280

Kistler, James J and Satyanarayanan, M., "Disconnected Operation in the Coda File System," ACM Transactions on Computer Systems, vol. 10, No. 1, Feb. 1992, pp. 3–25.

Hills, Alex and Johnson, David B., "Wireless Data Network Infrastructure at Carnegie Mellon University," IEEE Personal Communications, 3(1), Feb. 1996.

Satyanarayanan, Mahadev, "Mobile Information Access," IEEE Personal Communications, Feb. 1996, pp. 26–33.

Satyanarayanan, Mahadev et al., "Coda: A Highly Available File System for a Distributed Workstation Environment," IEEE Transactions on Computers, vol. 39, No. 4, Apr. 1990, pp. 447–459.

Satyanarayanan, Mahadev, "Scalable, Secure, and Highly Available Distributed File Access," Computer, May 1990, pp. 9–21.

Mummert, Lily B. et al., "Exploiting Weak Connectivity for Mobile File Access," SIGOPS '95, Dec. 1995, pp. 143–155.

Terry, Douglas B. et al., "Managing Update Conflicts in Bayou, a Weakly Connected Replicated Storage System," SIGOPS '95, Dec. 1995, pp. 172–183

Demers, Alan et al., "The Bayou Architecture: Support for Data Sharing among Mobile Users," Proceedings of the Workshop on Mobile Computing Systems and Applications, Santa Cruz, California, Dec. 1994, pp. 2–7

Petersen, Karin et al., "Bayou: Replicated Database Services for World–wide Applications," Proceedings Seventh ACM SIGOPS European Workshop (EuroSIGOPS '96), Connemara, Ireland, Sep. 1996, pp. 275–280

Crocker, David H., "RFC822: Standard for ARPA Internet Text Messages," http://www.w3.org/Protocols/rfc822/.

Theisen, Tim, "AFS distributed filesystem FAQ (1/2)," posted to uwisc.general newsgroup, Jul. 25, 1994.

Theisen, Tim, "AFS distributed filesystem FAQ (2/2)," posted to uwisc.general newsgroup, Jul. 25, 1994.

Schubert, Eric, "Re: telnet/internet and . . . ," posted to comp.sys.hp.mpe newsgroup, Jun. 30, 1995.

Glazman, Daniel, "SOFTWARE: HHTPtool [sic] 1 1, a file transfer utility over HTTP using PUT and GET," posted to comp.infosystems.www.announce newsgroup, May 17, 1995

Glazman, Daniel, "SOFTWARE: HTTPtool v1.0 for Windows3.x, file transfer utility over HTTP," posted to comp.infosystems.www.announce newsgroup, Mar. 21, 1996.

Angus, Jeffrey G., "Sales force automation has a Gold-Mine," Computerworld, Oct. 7, 1996, p. 59.

Salamone, Salvatore, "Middle(ware) Management," Byte, Apr. 1996, pp. 71–76.

Nance, Barry, "Balance the Load with Transaction Server," Byte, Jun. 1997, pp. 81–84.

Francett, Barbara, "Replication on the Run," Software Magazine, Aug. 1996, pp. 63–66.

Darling, Charles B., EDA/SQL Loses a Little and Gains a Lot, Datamation, May 1, 1996, p. 12.

Varney, Sarah E., "Arm your salesforce with the Web," Datamation, Oct. 1996, pp. 72–74.

Fulcher, Jim, "Is it or isn't it?," Manufacturing Systems, Oct. 1996, pp. 56–61.

Lamb, John and Cusato, Tony, "LAN–Based Office for the Enterprise, A Case Study," Proceedings, 19th Conference on Local Computer Networks, Minneapolis, Minnesota, Oct. 2–5, 1994, pp. 440–447

Kawell Jr., Leonard et al., "Replicated Document Management in A Group Communication System," presented at the Second Conference on Computer–Supported Cooperative Work, Portland, Oregon, Sep. 26–28, 1988, as printed in Groupware: Software for Computer–Supported Cooperative Work, IEEE Computer Society Press, pp. 226–235.

Hong, Jack et al., "Personal Electronic Notebook with Sharing," Proceedings of the Fourth Workshop on Enabling Technologies: Infrastructure for Collaborative Enterprises, Berkeley Springs, West Virginia, Apr. 20–22, 1995, pp 88–94

Mace, Scott, "DataSync 2.0 enhances synchronization of data," InfoWorld, Jun. 6, 1994, p 28

Mace, Scott, "Database replication products debut," Info-World, Nov 15, 1993, p. 19.

Gryphon, Robert, "DataSync line matches up," InfoWorld, May 23, 1994, p. 161.

Patterson, John R. et al., "Notification Servers for Synchronous Groupware," Proceedings, ACM 1996 Conference on Computer Supported Cooperative Work, Boston, Massachusetts, Nov. 16–20, 1996, pp. 122–129.

Zhao, Jian and Hoppe, H. Ulrich, "Supporting Flexible Communication in Heterogeneous Multi–User Environments," 1994 IEEE, pp. 442–449.

Gong, Li, "Enclaves: Enabling Secure Collaboration Over the Internet," IEEE Journal on Selected Areas in Communications, vol. 15, No. 3, Apr. 1997, pp. 567–575.

Bruno, Lee, "Directory Services Tie It All Together," Data Communications, Mar. 1997, pp. 75–83.

Guy, Richard G. et al., "Implementation of the Ficus Replicated File System," Proceedings of the Summer 1990 USENIX Conference, Anaheim, California, Jun. 11–15, 1990, pp. 63–70.

Page, Thomas W. Jr. et al., "Management of Replicated Volume Location Data in the Ficus Replicated Data System," Conference Proceedings, USENIX Summer 1991 Technical Conference, Nashville, Tennessee, Jun. 10–14, 1991, pp. 17–29

Reiher, Peter et al., "Resolving File Conflicts in the Ficus File System," Conference Proceedings, USENIX Summer 1994 Technical Conference, Boston, Massachusetts, Jun 6–10, 1994, pp. 183–195.

Walker, Bruce et al., "The LOCUS Distributed Operating System," Proceedings of the Ninth ACM Symposium on Operating Systems Principles, Bretton Woods, New Hampshire, Oct. 10–13, 1983, pp 49–70.

Parker, D. Stott Jr. et al., "Detection of Mutual Inconsistency in Distributed Systems," IEEE Transactions on Software Engineering, vol. SE–9, No. 3, May 1983, pp. 240–246.

Ceri, Stefano et al., "The Case for Independent Updates," Second Workshop on the Management of Replicated Data, Monterey, California, Nov. 12–13, 1992, pp. 17–19.

Downing, Alan R. et al., "OSCAR: A System for WeakConsistency Replication," Proceedings, Workshop on the Management of Replicated Data, Houston, Texas, Nov 8–9, 1990, pp. 26–30.

# US 6,085,192 C1
Page 5

Siegel, Alex et al., "Deceit: A Flexible Distributed File System," Proceedings of the Summer 1990 USENIX Conference, Anaheim, California, Jun. 11–15, 1990, pp. 51–61.

Chutani, Sailesh, "The Episode File System," Conference Proceedings, USENIX Winter 1992 Technical Conference, San Francisco, California, Jan. 20–24, 1992, pp. 43–59.

Seltzer, Margo, "An Implementation of a Log–Structured File System for UNIX," Conference Proceedings, USENIX Winter 1993 Technical Conference, San Diego, California, Jan. 25–29, 1993, pp. 307–326.

Vahalia, Uresh, "Metadata Logging in an NFS Server," Conference Proceedings, USENIX 1995 Technical Conference on UNIX and Advanced Computing Systems, New Orleans, Louisiana, Jan. 16–20, 1995, pp. 265–276.

Lotus Development Corporation, InterNotes Web Publisher Release 4, "InterNotes Web Publisher Guide" 1996, Cambridge, MA.

Lotus Development Corporation, Lotus Notes Release 4, "Database Manager's Guide" 1995, Cambridge, MA.

Lotus Development Corporation, Lotus Notes Release 4, "Administrator's Guide" 1995, Cambridge, MA.

Lotus Development Corporation, Lotus Notes Release 4, "Deployment Guide" 1995, Cambridge, MA.

IBM Lotus Technical Library, Lotus Documentation, "Lotus Notes Internet Cookbook for Notes Release 3", Jan. 16, 1996, pp. 1–26 http://www–12.lotus.com/ldd/doc/domino_notes/cookbook/cbookv4.nsf/e12503289bf7b3a385256.

John Wiley & Sons, Inc.—Wiley Computer Publishing, Falkner, Mike, "How to Plan, Develop, and Implement Lotus Notes in Your Organization" 1996, USA4.

McGraw–Hill, Lamb, John P and Lew, Peter W., "Lotus Notes Network Design for Notes Release 3 and 4", 1996, Quebecor–Fairfield, PA.

Lotus Notes, "Overview—What is Lotus NotesPump?", including "Notes Pump 1.0 Release Notes"

Lotus Development Corporation, Lotus Notes Release 3.1, The groupware standard, "Site and System Planning Guide" 1994, Cambridge, MA.

Lotus Development Corporation, Lotus Notes Release 3.1, The groupware standard, "Administrator's Guide Server for NetWare, OS/2, and UNIX" 1994, Cambridge, MA.

IBM Lotus Technical Library, Lotus Documentation, "Lotus Notes Internet Cookbook for Notes Release 4", Date: Feb. 14, 1996, pp. 1–30 http://www–12.lotus.com/ldd/doc/domino_notes/cookbook/cbookv4.nsf/e12503289bf7b3a385256.

* cited by examiner

US 6,085,192 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

### THE PATENT IS HEREBY AMENDED AS
### INDICATED BELOW

Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.

ONLY THOSE PARAGRAPHS OF THE SPECIFICATION AFFECTED BY AMENDMENT ARE PRINTED HEREIN.

Column 4, lines 20–38:

An operating system 240 includes a program for controlling processing by the CPU 205, and is typically stored in the data storage device 230 and loaded into the RAM 235 for execution. A service engine 245 includes a program for performing a particular service such as maintaining an e-mail data base, a calendar data base, a bookmarks data base or another file data base, and may be also stored in the data storage device 230 and loaded into the RAM 235 for execution. To perform a service, the service engine 245 operates on service data 250 (e.g., the e-mail data 165, the file data 170, the calendar data 175 or the user data 180), which is typically stored in the data storage device [250] *230*. The service data 250 includes version information 255 indicating the date and time of the last modification. The service engine 245 operates to update the version information 255 whenever modifications are made. It will be appreciated that the portion of memory in the data storage device [250] *230* which contains the service data 250 is referred to as the service "store."

Column 4, lines 44–59:

An operating system 340 includes a program for controlling processing by the CPU 305, and is typically stored in the data storage device 330 and loaded into the RAM 335 for execution. A desktop service engine 345 (i.e., a particular service engine 245, FIG. 2) includes a service program for managing user data 180 (i.e., particular service data 250, FIG. 2) which includes version information 350 (i.e., particular version information 255, FIG. 2). The desktop service engine 345 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution. The user data 180 may be stored in the data storage 330. As stated above with reference to FIG. 1, the base system [1 90] *190* operates to synchronize the workspace data 185 (which includes user data 180) with the workspace data 123. The base system 190 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution.

Column 5, lines 35–49:

The synchronization-start module 420 includes routines for determining when to initiate synchronization of workspace data 123 and workspace data 185. For example, the synchronization-start module 420 may initiate data synchronization upon user request, at a particular time of day, when a predetermined time period passes, after a predetermined number of changes, after a user action such as user log-off or upon like criteria. The synchronization-start module 420 initiates data synchronization by instructing the general synchronization module 425 to begin execution of its routines. It will be appreciated that communications with synchronization agent 126 preferably initiate from within the

**2**

coporate LAN [1135] *135*, because the typical cooporate firewall 130 prevents in-bound communications and allows out-bound communications.

Column 6, lines 15–27:

The content-based synchronization module 430 includes routines for reconciling two or more modified versions in workspace data 123, 185 of the same workspace element. For example, if the original and the copy of a user workspace element have both been modified independently since the last synchronization, the [contentbased] *content-based* synchronization module 430 determines the appropriate responsive action. The content-based synchronization module 430 may request a user to select the preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or by integrating the changes into a single preferred version which replaces each modified version at both stores.

Column 6, lines 28–41:

FIG. 5 is a block diagram illustrating details of the synchronization agent 126, which includes a communications module 505 (similar to the communications module 405 described above with reference to FIG. 4) and a general synchronization module 510 (similar to the general synchronization module 425 described above also with reference to FIG. 4). The communications module 505 includes routines for compressing data, and routines for communicating via the communications channel 125 with the base system 190. The communications module 505 may further include routines for establishing a secure communications channel through the global firewall [126] *115* and through the corporate firewall 130.

Column 6, lines 42–56:

The general synchronization module 510 includes routines for comparing the version information 124 with the last synchronization signature 435, and routines for forwarding to the general synchronization module 425 version information 124 determined to be modified. The general synchronization module 510 may [either] maintain its own last synchronization signature 435 copy (not shown). Alternatively, the request to synchronize from the base system 190 may include a copy of the last synchronization signature 435. The general synchronization module 510 further includes routines for receiving preferred versions of workspace data 185 workspace elements from the general synchronization module 425, and routines for forwarding preferred versions of workspace data 123 workspace elements to the general synchronization module 425.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claim 19 is cancelled.

Claims 1–2, 6–8, 10–11 and 21–25 are determined to be patentable as amended.

Claims 3–5, 9, 12–18 and 20, dependent on an amended claim, are determined to be patentable.

1. A computer-based method comprising the steps of:
    (a) *establishing a communications channel through a firewall using an HTTP port or an SSL port;*
    (b) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within [a] *the* firewall has been modified;
    [(b]*c*) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store *on a smart phone* outside the firewall;

US 6,085,192 C1

3

([c]*d*) initiating steps ([a]*b*) and ([b]*c*) from within the firewall *through the communications channel* when predetermined criteria have been satisfied;

([d]*e*) *generating a preferred version from the first work-space element and from the copy based on the first and second examination results, wherein if only one of the first workspace element and the copy has been modified, then the step of generating includes selecting the one as the preferred version; and*

([e]*f*) *storing the preferred version at the first store and at the second store.*

2. [The method of claim 1] *A computer-based method comprising the steps of:*

(a) *generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;*

(b) *generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;*

(c) *initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied,*

(d) *generating a preferred version from the first work-space element and from the copy based on the first and second examination results; and*

(e) *storing the preferred version at the first store and at the second store,*

wherein the second store is on a global server outside the firewall and which is protected by a global firewall.

6. [The method of claim 1 further comprising,] *A computer-based method comprising the steps of:*

(a) *generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;*

(b) *generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;*

(c) *initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;*

(d) *generating a preferred version from the first work-space element and from the copy based on the first and second examination results;*

(e) *storing the preferred version at the first store and at the second store; and*

before generating the first examination results, the step of updating the first version information whenever the first workspace element is modified.

7 [The method of claim 1 further comprising,] *A com-puter based method comprising the steps of:*

(a) *generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;*

(b) *generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;*

(c) *initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;*

4

(d) *generating a preferred version from the first work-space element and from the copy based on the first and second examination results;*

(e) *storing the preferred version at the first store and at the second store; and*

before generating the second examination results, the step of updating the second version information whenever the copy is modified.

8 [The method of claim 1] *A computer-based method comprising the steps of:*

(a) *generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;*

(b) *generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;*

(c) *initiating steps (a) and (b) from within the firewall when predetermined criteria have been satisfied;*

(d) *generating a preferred version from the first work-space element and from the copy based on the first and second examination results;*

(e) *storing the preferred version at the first store and at the second store; and*

wherein if only one of the first workspace element and the copy has been modified, then the step of generating includes selecting the one as the preferred version.

10 A system comprising:

*a communications channel through a firewall comprising one of an HTTP port and an SSL port;*

a general synchronization module for operating within [a] *the* first firewall and for examining first version infor-mation to determine whether a first workspace element *at a first store* has been modified;

a synchronization agent for operating outside the first firewall and for forwarding to the general synchroni-zation module second version information which indi-cates whether an independently modifiable copy of the first workspace element *at a second store on a smart phone* has been modified;

a synchronization-start module for operating within the first firewall and for initiating the general synchroni-zation module and the synchronization agent when predetermined criteria have been satisfied;

means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, *wherein if only one of the first workspace element and the copy has been modified, then the means for generating selects the one as the preferred version;* and

means for storing the preferred version at the first store and at the second store.

11. The system of claim 10 further comprising a commu-nications module for communicating through the first firewall, *wherein the first firewall is positioned between a trusted network and the Internet.*

21 A system comprising:

first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

US 6,085,192 C1

second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store *on a smart phone* outside the firewall;

*means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified;*

means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied;

means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results; and

means for storing the preferred version at the first store and at the second store.

22. A computer-readable storage medium storing program code for causing a computer-*based system* to perform the steps of:

(a) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall *positioned between a trusted network and the Internet* has been modified;

(b) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store *on a smart phone* outside the firewall;

(c) initiating steps (a) and (b) from within the firewall *through an Internet communications channel* when predetermined criteria have been satisfied;

(d) generating a preferred version from the first workspace element and from the copy based on the first and second examination results, *wherein if only one of the first workspace element and the copy has been modified, then selecting the one as the preferred version;* and

(e) storing the preferred version at the first store and at the second store.

23. A computer-based method comprising the steps of:

(a) *establishing a secure communications channel through a firewall using an HTTP port or an SSL port;*

(b) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within [a] *the* firewall has been modified;

(c) *before generating the first examination results, the step of updating the first version information whenever the first workspace element is modified;*

([b]*d*) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace

element has been modified, the copy being stored at a second store outside the firewall;

([c]*e*) initiating steps ([a]*b*) and ([b]*d*) from within the firewall when predetermined criteria have been satisfied;

([d]*f*) determining based on the first and second examination results that both the first workspace element and the copy have been modified; and

([e]*g*) storing both the first workspace element and the copy at the first store and at the second store, *wherein the second store comprises a smart phone.*

24. A system comprising:

first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified;

second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store outside the firewall;

*means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified;*

means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied;

means for determining based on the first and second examination results that both the first workspace element and the copy have been modified; and

means for storing both the first [file] *workspace element* and the copy at the first store and at the second store, *wherein the second store comprises a smart phone.*

25. A system comprising:

a global server for operating outside a firewall and including memory for storing first workspace data and corresponding first version information; and

a synchronization agent for managing the first workspace data and the corresponding first version information and for communicating with remote clients; [and]

*means for updating the first version information whenever the first workspace element is modified;*

a remote client for operating within the firewall and including memory for storing second workspace data and corresponding second version information;

means for cooperating with the synchronization agent to synchronize the first workspace data with the second workspace data by examining the first version information and the second version information; and

a synchronization-start module for initiating workspace data synchronization between the global server and the remote client.

* * * * *

# EXHIBIT C

US006151606A

# United States Patent [19]

Mendez

[11] **Patent Number:** 6,151,606

[45] **Date of Patent:** Nov. 21, 2000

| | | | |
|---|---|---|---|
| 5,701,423 | 12/1997 | Crozier | 395/335 |
| 5,706,502 | 1/1998 | Foley et al. | 707/10 |

(List continued on next page.)

[54] **SYSTEM AND METHOD FOR USING A WORKSPACE DATA MANAGER TO ACCESS, MANIPULATE AND SYNCHRONIZE NETWORK DATA**

[75] Inventor: **Daniel J. Mendez**, Menlo Park, Calif.

[73] Assignee: **Visto Corporation**, Mountain View, Calif

[21] Appl. No.: **09/008,354**

[22] Filed: **Jan. 16, 1998**

[51] Int. Cl.⁷ ............... G06F 17/30
[52] U.S. Cl. ............... 707/201; 707/8; 707/10; 707/202; 707/203
[58] Field of Search ............... 707/8, 10, 202, 707/203, 506, 511; 709/103, 201, 204, 224, 228, 302, 303; 706/14, 45; 345/302, 340; 320/257, 463; 705/35; 395/500 32

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,582 | 5/1989 | Miller et al. | 707/104 |
| 4,875,159 | 10/1989 | Cary et al | 364/200 |
| 4,897,781 | 1/1990 | Chang | 364/200 |
| 5,263,157 | 11/1993 | Janis | 707/9 |
| 5,386,564 | 1/1995 | Shearer et al. | 707/500 |
| 5,392,390 | 2/1995 | Crozier | 395/161 |
| 5,572,643 | 11/1996 | Judson | 395/793 |
| 5,581,749 | 12/1996 | Hossain et al. | 707/1 |
| 5,600,834 | 2/1997 | Howard | 395/617 |
| 5,613,012 | 3/1997 | Hoffman et al | 382/115 |
| 5,623,601 | 4/1997 | Vu | 395/187.01 |
| 5,627,658 | 5/1997 | Connors et al | 358/407 |
| 5,634,053 | 5/1997 | Noble et al | 707/4 |
| 5,647,002 | 7/1997 | Brunson | 380/49 |
| 5,652,884 | 7/1997 | Palevich | 395/651 |
| 5,666,530 | 9/1997 | Clark et al. | 395/617 |
| 5,666,553 | 9/1997 | Crozier | 395/803 |
| 5,678,039 | 10/1997 | Hinks et al. | 395/604 |
| 5,680,542 | 10/1997 | Mulchandani | 395/183.04 |
| 5,682,524 | 10/1997 | Freund et al. | 395/605 |
| 5,684,990 | 11/1997 | Boothby | 707/203 |
| 5,687,322 | 11/1997 | Deaton | 705/14 |
| 5,701,400 | 12/1997 | Amado | 706/45 |

OTHER PUBLICATIONS

Article by Bellovin et al., entitled: "Network Firewalls" Published by IEEE Communications Magazine Sep. 1994, pp. 50–57.

Article by Steffen Stempel, entitled: "IPAccess––An Internet Service Access System for Firewall Installations" Published by IEEE Communications Magazine Feb. 16, 1995, pp. 31–41.

(List continued on next page.)

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Diane D. Mizrahi
*Attorney, Agent, or Firm*—Graham & James LLP

[57] **ABSTRACT**

A system includes a communications module for downloading workspace data from a remote site, an application program interface coupled to the communications module for communicating with a workspace data manager to enable manipulation of the downloaded workspace data and thereby create manipulated data, and a general synchronization module coupled to the communications module for synchronizing the manipulated data with the workspace data stored at the remote site. An instantiator requests the workspace data manager to provide an interface for enabling manipulation of the downloaded workspace data. The workspace data manager may create another instance of the interface or may provide access to its only interface to enable manipulation of the data. A data reader may translate the downloaded workspace data from the format used by the remote site to the format used by the workspace data manager. Upon logout, a de-instantiator synchronizes the data with the global server and deletes the workspace data. The system handles the situation where the data stored at the remote site has not changed and therefore includes the downloaded data, and the situation the data stored at the remote site has been modified and therefore is different than the downloaded data.

**21 Claims, 6 Drawing Sheets**



**6,151,606**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,710,918 | 1/1998 | Lagarde et al. | 395/610 |
| 5,713,019 | 1/1998 | Keaten | 395/610 |
| 5,715,403 | 2/1998 | Stefik | 705/44 |
| 5,717,925 | 2/1998 | Harper et al. | 395/613 |
| 5,721,908 | 2/1998 | Lagarde et al. | 395/610 |
| 5,721,914 | 2/1998 | DeVries | 707/104 |
| 5,729,735 | 3/1998 | Meyering | 395/610 |
| 5,745,360 | 4/1998 | Leone et al. | 364/140 |
| 5,757,916 | 5/1998 | MacDoran et al. | 380/25 |
| 5,758,150 | 5/1998 | Bell et al. | 395/610 |
| 5,758,354 | 5/1998 | Huang et al. | 707/201 |
| 5,758,355 | 5/1998 | Buchanan | 707/201 |
| 5,765,171 | 6/1998 | Gehani et al. | 707/203 |
| 5,778,346 | 7/1998 | Frid-Nielsen et al. | 395/208 |
| 5,790,425 | 8/1998 | Wagle | 364/551.01 |
| 5,790,790 | 8/1998 | Smith et al. | 395/200.36 |
| 5,799,318 | 8/1998 | Cardinal et al. | 707/104 |
| 5,832,483 | 11/1998 | Barker | 707/8 |
| 5,862,325 | 1/1999 | Reed | 395/200.31 |
| 5,870,759 | 2/1999 | Bauer et al. | 707/201 |
| 5,951,652 | 9/1999 | Ingrassia et al. | 709/248 |
| 5,966,714 | 10/1999 | Huang et al. | 707/201 |
| 5,999,947 | 12/1999 | Zollinger et al. | 707/203 |

### OTHER PUBLICATIONS

Article by Braun et al., entitled: "Web Traffic Characterization: an assessment of the impact of caching documents from NCSA's web server" Published by Elsevier Science B.V. 1995 pp. 37–51

Article by Nelson et al., entitled: "Security for Infinite Networks" Published by IEEE Communications Magazine on Aug. 22, 1995, pp. 11–19.

Article by Greenwald et al., entitled: "Designing an Academic Firewall: Policy, Pratice, and Experience with SURF" Published by IEEE Communications Magazine on Feb. 22, 1996, pp. 79–92.

Article by Kiuchi et al., entitled: "C–HTTP—The Development of a Secure, Closed HTTP–based Network on the Internet" Published by IEEE Proceedings of SNDSS on Feb. 22, 1996, pp. 64–75

Article by S. Cobb, entitled: "Establishing Firewall Policy" Published by National Computer Security Assn. on Jun. 25–27, 1996, pp. 198–205.

Margaret J. Brown, "The Visto Briefcase Pro Puts Your PIM On The Internet", URL:http://www.zdnet.com/zdnn/stories/zdnn__display/0,3440,341892,00.html, Aug. 13, 1998, 1 page

Web site entitled "Bookmark Translator 2.0: This Utility transform Microsoft Internet Explore's bookmarks in the format valid for Netscape Navigator and viceversa," Enzo Marinacci, Rome–Jul. 1997, URL=http://www.bns.it/emware/BookmarkTranslator–uk.htm, pp. 1–4.



FIG. 1
(NETWORK SYSTEM)



FIG. 6

FIG. 2
(HOME/WORK CLIENT)

FIG. 3
(GLOBAL SERVER)



FIG. 4
(REMOTE CLIENT)

FIG. 5



FIG. 7
(ASSISTANT)

(SYNCHRONIZE)

| | |
|---|---|
| COMMUNICATIONS MODULE | 705 |
| LOCATOR MODULES | 710 |
| GENERAL SYNCHRONIZATION MODULE | 715 |
| CONTENT–BASED SYNCHRONIZATION MODULE | 720 |
| SECURITY MODULE | 725 |
| INSTANTIATOR | 730 |
| DATA READER | 735 |
| PIM API | 740 |
| DE–INSTANTIATOR | 745 |

700

(BORROW ME)

U.S. Patent          Nov. 21, 2000          Sheet 5 of 6          6,151,606



FIG. 8
(BORROW ME)



*FIG. 9*

6,151,606

1

## SYSTEM AND METHOD FOR USING A WORKSPACE DATA MANAGER TO ACCESS, MANIPULATE AND SYNCHRONIZE NETWORK DATA

### PRIORITY REFERENCES

This application claims priority of and hereby incorporates by reference U.S. patent application Ser. No. 08/766,307 pending, entitled "System and Method for Globally Accessing Computer Services," filed on Dec. 13, 1996, by inventors Mark D. Riggins, et al; U.S. patent application Ser. No. 08/841,950 pending, entitled "System and Method for Enabling Secure Access to Services in a Computer Network," filed on Apr. 8, 1997, by inventor Mark D. Riggins; U.S. patent application Ser. No. 08/865,075, and now U.S. Pat. No. 6,023,708 entitled "System and Method for Using a Global Translator to Synchronize Workspace Elements Across a Network," filed on May 29, 1997, by inventors Daniel J. Mendez, et al; U.S. patent application Ser. No. 08/835,997 pending, entitled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network," filed on Apr. 11, 1997, by inventors Daniel J. Mendez, et al; U.S. patent application Ser. No. 08/897,888 pending, and now U.S. Pat. No. 5,961,590, entitled "System and Method for Synchronizing Electronic Mail Across a Network," filed on Jul. 22, 1997, by inventors Daniel J. Mendez, et al; U.S. patent application Ser. No. 08/899,277, entitled "System and Method for Using an Authentication Applet to Identify and Authenticate a User in a Computer Network," filed on Jul. 23, 1997, by inventor Mark D. Riggins; and U.S. patent application Ser. No. 08/903,118 pending, entitled "System and Method for Globally and Securely Accessing Unified Information in a Computer Network," filed on Jul. 30, 1997, by inventors Daniel J. Mendez, et al.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

This invention relates generally to computer networks, and more particularly provides a system and method for using a workspace data manager to access network data.

#### 2. Description of the Background Art

Data accessibility and consistency are significant concerns for computer users. For example, when a roaming user, i.e., a user who travels to a remote location, needs to review or manipulate data such as an e-mail or prepared document, the roaming user must either carry the data to the remote location or access a workstation remotely. Maintaining a true copy of a database is a cumbersome process. Accordingly, system designers have developed an array of techniques for connecting a remote terminal across a computer network to the workstation storing the data.

To guarantee readability of the downloaded data, the user must carry a laptop computer containing all the applications needed to present and enable manipulation of the downloaded data, or find a network-connected computer that contains the needed application programs. Further, when maintaining multiple independently modifiable copies of particular data, a user risks using an outdated version. By the time the user notices an inconsistency, interparty miscommunication or data loss may already have resulted. The user must then spend more time reconciling the inconsistent versions.

The problems of data accessibility and inconsistency are exacerbated when multiple copies of a document are main-

2

tained at different network locations. For example, due to network security systems such as conventional firewall technology, a user may have access only to a particular one of these network locations. Without access to the other sites, the user cannot confirm that the version on the accessible site is the most recent draft.

### SUMMARY OF THE INVENTION

The present invention provides a system for using a workspace data manager to access, manipulate and synchronize workspace data. A workspace data manager may include a Personal Information Manager (PIM), a word processing program, a spreadsheet program, or any application program that enables manipulation of workspace data. Workspace data includes at least one workspace element, such as an e-mail, a day of calendar data, a word document, a bookmark, a sheet of spreadsheet data, or a portion thereof. Workspace data may include e-mails, calendar data, word documents, bookmarks, spreadsheet data, or portions thereof

The system includes a communications module for downloading workspace data from a remote site, an application program interface coupled to the communications module for communicating with a workspace data manager to enable manipulation of the downloaded workspace data and thereby create manipulated data, and a general synchronization module coupled to the communications module for synchronizing the manipulated data with the workspace data stored at the remote site. An instantiator requests the workspace data manager to provide an interface for enabling manipulation of the downloaded workspace data. The workspace data manager may create another instance of the interface or may provide access to its only interface to enable manipulation of the data. A data reader translates the downloaded workspace data from the format used by the remote site to the format used by the workspace data manager. For example, data stored at the global server site in a canonical format may be translated to Organizer™, Outlook™ or other workspace element manager format. Upon logout, a de-instantiator initiates synchronization and deletes the data stored locally. It will be appreciated that the system handles the situation where the data stored at the remote site has not changed and therefore includes the downloaded data, and the situation the data stored at the remote site has been modified and therefore is different than the downloaded data.

The present invention further provides a method of using a workspace data manager to enable access, manipulate and synchronize workspace data. The method comprises the steps of downloading data from a remote site, requesting a workspace data manager to enable manipulation of the data and thereby create manipulated data, and synchronizing the manipulated data with the data stored at the remote site.

The system and method of the present invention advantageously enable the use of an integral interface, instead of using an interface for the synchronization software, an interface for the workspace data manager and an interface for the communication engine downloading the workspace data. Accordingly, the user need not become familiar with multiple interfaces. The user need only find a remote site that includes a workspace data manager that includes assistant-like functionality. Assistant-like functionality includes services for interfacing between the workspace data manager and the global server. Because the system and method substitute the global data for the local data, or create an instance for the global data, the system and method further advantageously enable a workspace data manager to provide

6,151,606

| 3 | 4 |

an interface for manipulating workspace data without compromising the local data.

Further, the system and method advantageously provide a simple graphical user interface for enabling borrowing of the workspace data manager and synchronization of manipulated data. The system and method also advantageously delete downloaded data and all interfaces from the local client, so that no traces are left on the local client for unprivileged users to review. Using the technology described in the applications incorporated by reference above, the system and method of the present invention further enable access and synchronization of data across different workspace data manager formats and across network firewalls.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating a network system, in accordance with the present invention;

FIG. 2 is a block diagram illustrating details of the home or work client of FIG. 1;

FIG. 3 is a block diagram illustrating details of the global server of FIG. 1;

FIG 4 is a block diagram illustrating details of the remote client of FIG. 1;

FIG. 5 is a block diagram illustrating details of an assistant of FIG. 1;

FIG. 6 illustrates a personal information manager interface;

FIG. 7 illustrates a second personal information manager interface incorporating an assistant interface;

FIG. 8 is a flowchart illustrating a method of accessing network data from a remote site in accordance with the present invention; and

FIG. 9 is a flowchart illustrating a method of synchronizing network data from a remote site.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 is a block diagram illustrating a network system 100 for using a workspace data manager to access, manipulate and synchronize workspace data in accordance with the present invention. A workspace data manager may include a Personal Information Manager (PIM), a word processing program, a spreadsheet program, or any application program that enables manipulation of workspace data. Workspace data includes at least one workspace element, such as an e-mail, a day of calendar data, a word document, a bookmark, a sheet of spreadsheet data, or a portion thereof. Workspace data may include e-mails, calendar data, word documents, bookmarks, spreadsheet data, or portions thereof. Although the network system 100 is described with reference to PIM's, one skilled in the art will recognize that the system 100 will work with any workspace data manager

Network system 100 includes a global server 105 coupled via a computer network 125 to a work client 110, to a home client 115 and to a remote client 120. The global server 105 includes a synchronization agent 130 and workspace data 135. The work client 110 includes a base system 140 and workspace data 145. The home client 115 includes a base system 150 and workspace data 155.

Each of the base system 140 and the base system 150 cooperate with the synchronization agent 130 to synchronize workspace data 135, workspace data 145 and workspace data 155 between the work client 110, the home client 115

and the global server 105 Synchronization of workspace data 135, 145 and 155 is described in detail in the patent applications incorporated by reference above. However, a brief example of synchronization is provided for completeness

First, the base system 140 on the work client 110 site negotiates a secure communications channel via any firewalls with the synchronization agent 130, for example, using Secure Sockets Layer (SSL) technology. The base systems 140 examines version information and if necessary the content of a workspace to determine the most updated version. The most updated version is then stored at the client 110 site and at the global server 105 site. The base system 140 repeats these operations for all workspace elements selected for synchronization. Second, the base system 150 on the home client 115 site uses similar steps to synchronize its workspace data 155 with the workspace data 135 on the global server 105 site. Accordingly, the most updated versions of the workspace data 135, 140 and 145 are stored at all three sites.

Each of the work client 110, the home client 115 and the remote client 120 includes a respective workspace data manager, e.g., a Personal Information Manager (PIM) 160, 165 and 170 such as Outlook™ 98 developed by Microsoft Corporation, Organizer 97 developed by Lotus Development Corporation or Sidekick 98 developed by Starfish Software. Each PIM 160, 165 and 170 includes an assistant 175, 180 and 185 that adds data access and synchronization functions to the PIM 160, 165 and 170. Accordingly, a user can transparently use an assistant 175, 180 or 185 via a PIM 160, 165 or 170 to access workspace data 135 from the global server 105, to present and enable manipulation of downloaded workspace data 135, and to synchronize manipulated downloaded data 135 with the workspace data 135 stored on the global server 105. Components and operations of the assistant 175, 180 or 185 are described in detail with reference to FIGS 7–9.

FIG 2 is a block diagram illustrating details of a data-synchronizing client 200, in a generic embodiment which exemplifies each of the work client 110 and the home client 115. The client 200 includes a processor 205, such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor, coupled to a communications channel 210. The client 200 further includes an input device 215 such as a keyboard and mouse, an output device 220 such as a Cathode Ray Tube (CRT) display, data storage 230 such as a magnetic disk, and internal storage 235 such as Random-Access Memory (RAM), each coupled to the communications channel 210 A communications interface 225 couples the communications channel 210 to the computer network 125.

An operating system 240 controls processing by processor 205, and is typically stored in data storage 230 and loaded into internal storage 235 (as illustrated) for execution. A base system 250, which cooperates with the synchronization agent 130 for synchronizing local workspace data 245 with workspace data 135, also may be stored in data storage 230 and loaded into internal storage 235 (as illustrated) for execution by processor 205. The local workspace data 245 exemplifies workspace data 145 or workspace data 150, and may be stored in data storage 230.

A PIM 255 includes an assistant 260, which enables a user to download workspace data 135 from the global server 105, and to use the PIM 255 for displaying and manipulating the workspace data 135. The assistant 260 further enables the PIM 255 to synchronize the manipulated data 135 with the

6,151,606

5

workspace data 135 on the global server 105. The PIM 255 exemplifies each of the application data 175 on the work client 110 and the assistant 180 on the home client 115. The assistant 180 on the home client 110 and the PIM 255 may be serviced such as to input data into the system 100 in internal data storage 260 (as illustrated) for execution by the processor 205.

One skilled in the art will recognize that the system 100 may also include additional memory, additional processors, connections, additional input/output lines for transferring information across a hardware channel, the Internet or an intranet, etc. One skilled in the art will also recognize that the programs and data may be received by and stored in the system 100 in alternative ways. For example, a computer-readable storage medium (CRSM) reader 245 such as a magnetic disk drive, hard disk drive, magneto-optical reader (CPU), etc. may be coupled to the communications channel 310 for reading a removable storage medium (CRSM) 270 such as a magnetic disk, a hard disk, a magneto-optical disk, RAM, etc. Accordingly, the system 100 may receive programs and data via the CRSM reader 245.

FIG. 3 is a block diagram illustrating details of the global server 105. The global server 105 includes a processor 305, such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor, coupled to a communications channel 310. The global server 105 further includes an input device 315 such as a keyboard and mouse, an output device 320 such as a CRT display, and an input/output device 325 such as a communications channel 310, and internal storage 330 such as a magnetic disk, and internal storage 335 such as RAM, each coupled to the communications channel 310. The workspace data 135 may be stored in data storage 330 for execution by processor 305. The workspace data 135 may be stored in data storage 330, loaded into internal storage 335 and executed by processor 305. The communications interface 310 to the computer network 125.

An operating system 340 controls processing by processor 305, and is typically stored in data storage 330 and loaded into internal storage 335 (as illustrated) for execution. Base synchronization agent 130, which cooperates with the base synchronization agent 130, may be stored in data storage 330 and loaded into internal storage 335 (as illustrated) for synchronizing local workspace data 135 with the workspace data 135 on the global server 105. One skilled in the art will recognize that the system 100 may include additional information, such as network connections, additional processors, additional input/output lines for transferring information across a hardware channel, the Internet or an intranet, etc.

6

425 couples the communications channel 410 to the computer network 125.

An operating system 440 controls processing by processor 405, and is typically stored in data storage 430 and loaded into internal storage 435 (as illustrated) for execution. The PIM 170 and assistant 185 may be stored in data storage 430 and loaded into internal storage 435 (as illustrated) for execution by the processor 405.

One skilled in the art will recognize that the system 100 may also include additional memory, additional processors, connections, additional input/output lines for transferring information across a hardware channel, the Internet or an intranet, etc. One skilled in the art will also recognize that the programs and data may be received by and stored in the system 100 in alternative ways. For example, a computer-readable storage medium (CRSM) reader 445 such as a magnetic disk drive, hard disk drive, magneto-optical reader, CPU, etc. may be coupled to the communications channel 410 for reading a removable storage medium (CRSM) 450 such as a magnetic disk, a hard disk, a magneto-optical disk, RAM, etc. Accordingly, the system 100 may receive programs and data via the CRSM reader 445.

FIG. 5 is a block diagram illustrating a PIM interface 500, which includes a header 505 and a selection window 510 for viewing and manipulating workspace data 135 as downloaded from the global server 105. That is, data 135 is typically sent from the global server 105 invoking the "borrow me" button 548 causes the corresponding assistant 175, 180 or 185 to communicate with the global server 105, to provide user identification and authentication information to the global server 105, to download application information to the global server 105, etc.

The "borrow me" button 545 enables a user to use a PIM 160, 165 or 170 for viewing and manipulating workspace data 135 as downloaded from the global server 105. The header 505 includes a synchronize button 540 and a "borrow me" button 548. That is, by invoking the synchronize button 540, the assistant 175, 180 or 185 need not provide its own data interface. Only a single interface is needed.

It will be appreciated that upon login, the base systems 140 and 150 will cooperate with the synchronization agent 130 to synchronize automatically the workspace data 135 and 155 with the global server 105 with the workspace data 135 and 155.

Accordingly, the user always has access to the most updated versions of workspace data 135 and 155 through the PIM 160, 165 or 170 having an assistant 175, 180 or 185 embodied thereon.

It will be appreciated that the synchronize button 540 is most helpful to the work client 110 and home client 115 since typically the work client 110 and home client 115 will set the preferences to configure automatic synchronization. Synchronization of the manipulated workspace data 135 at the remote client 120 will most often be effected through the remote client 120 using the "borrow me" button. Logout is described in greater detail with reference to the Outlook™ and Lotus Organizer examples shown and described below with reference to FIG. 7. Accordingly, the "borrow me" button 545 is most helpful to the remote client 120.

6,151,606

**7**

The selection window 510 provides a list of buttons 507, wherein each button 507 corresponds to a set of workspace elements, e.g., e-mails 515, contacts 520, files 525, calendar data 530 and bookmarks 535. A mouse-down on a virtual button 507 causes the selection of a corresponding workspace element set and the selection of a corresponding user interface for displaying and enabling manipulation of the workspace elements included in the set. For example, selection of button 515 selects the e-mail set, and selects a corresponding user interface for displaying, writing, forwarding, etc. e-mails. Selecting a button 507 causes the assistant 175, 180 or 185 to download the corresponding workspace data 135, and causes the PIM 160, 165 or 170 to display and enable manipulation of the downloaded data 135 on a workspace element set interface (shown and described with reference to FIG. 6).

FIG. 6 illustrates an example e-mail workspace element set user interface 600 (commonly referred to as the "In-Box") for displaying received e-mails. The user interface 600 includes a header 605, an e-mail list window 610 and a manipulation command window 650.

The header 605 lists the name of the workspace element set, namely, "E-Mail." The e-mail list window 610 comprises three columns, including an origin column 615 which provides the origin of each e-mail, a subject column 620 which provides the subject of each e-mail, and a date column 625 which provides the date each e-mail was received. The e-mail list window 610 may display e-mails stored in a local e-mail database (not shown), e-mails stored in the e-mail server (not shown) or e-mails downloaded from the global server 105. The e-mails shown include a first e-mail from Joe Smith, a second e-mail from Tom Jones, and a third e-mail from Roy White. If the user depressed the "borrow me" button 545 shown in FIG. 5, then the e-mail list displayed would be the e-mails stored and downloaded from the global server 105.

The manipulation window 650 includes available functions such as the conventional e-mail read function 630, e-mail reply function 635, e-mail forward function 640 and new e-mail write function 645. It will be appreciated that the columns and functions will vary based on the PIM.

FIG. 7 is a block diagram illustrating details of a generic assistant 700, which exemplifies each of the assistant 175, 180 and 185. The generic assistant 700 includes a communications module 705, locator modules 710, a general synchronization module 715, a content-based synchronization module 720, a security module 725, an instantiator 730, a data reader 735, a PIM Application Program Interface (API) 740 and a de-instantiator 745. The synchronization function of the assistant 700 uses the communications module 705, the locator modules 710, the general synchronization module 715, the content-based synchronization module 720, the security module 725 and the PIM API 740. The "borrow me" function of the assistant 700 uses the communications module 705, the locator modules 710, the security module 725, the instantiator 730, the data reader 735, the PIM API 740 and the de-instantiator 745.

The communications module 705 includes routines for compressing and decompressing data, and routines for communicating with the synchronization agent 130. The communications module 705 may apply Secure Socket Layer (SSL) technology to establish a secure communication channel. Examples of communications modules 705 may include TCP/IP stacks or the AppleTalk protocol.

The locator modules 710 include routines for identifying the memory locations of the workspace elements in the

**8**

workspace data 135. Workspace element memory location identification may be implemented using intelligent software, i.e., preset memory addresses or the system's registry, or using dialogue boxes to query the user. Accordingly, the locator modules 710 determine the memory addresses of the workspace elements in e-mail workspace data 135, in file workspace data 135, in calendar workspace data 135, etc.

The general synchronization module 715 examines the workspace data 135 on the global server 105 to determine whether it had been modified while the user manipulated the data on the client 110, 115 or 120. Further, the general synchronization module 715 determines whether the user manipulated any data on the client 110, 115 or 120. If the general synchronization module 715 determines that only the data on the client 110, 115 or 120 was manipulated, then the general synchronization module 715 computes and sends the changes to the synchronization agent 130 of the global server 105. The general synchronization module 715 is initiated when the synchronization button 540 is depressed and during the logout procedures of the "borrow me" function.

The synchronization agent 130 then updates a last synchronization signature to indicate to all base systems 140 and 150 that synchronization with workspace data 145 and synchronization with workspace data 155 are needed. If the general synchronization module 715 determines that changes were made only to the workspace data 135 on the global server 105, then the general synchronization module 715 instructs the synchronization agent 130 to compute and transmit the changes made to the client 110, 115 or 120 at the client's request. The client 110 or 120 then updates its information. It will be appreciated that sending only the changes reduces processor load and increases transmission line efficiency, although alternatively an entire manipulated workspace element can be sent to the global server 105.

If the general synchronization module 715 determines that the workspace data 135 on the global server 105 has been modified since download, and that the data on the client 110, 115 or 120 has been modified, then the general synchronization module 715 instructs the content-based synchronization module 720 to perform its duties. The content-based synchronization module 720 includes routines for reconciling two or more modified versions of a workspace element. The content-based synchronization module 720 may request a user to select the preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or by integrating the changes into a single preferred version which replaces each modified version at both stores.

The security module 725 includes routines for obtaining user identification and authentication using such techniques as obtaining login and password information, obtaining a response to a challenge, obtaining a public key certificate, etc. The security module 725 performs identification and authentication techniques to confirm authorization by the user to access the workspace data 135 stored on the global server 105. It will be appreciated that authorization may be granted only to portion of the workspace data 135 that belongs to the user.

The instantiator 730 is an application program interface 730 that creates a window for displaying and enabling manipulation of the workspace data 135 downloaded from the global server 105. In an object-oriented environment, the instantiator 730 may create a new instance for the workspace data 135. Alternatively, the instantiator 730 may store the

6,151,606

<table>
<tr><td>9</td><td>10</td></tr>
</table>

local data to a buffer (not shown) and use the current interface to display and enable manipulation of the workspace data 135.

The data reader 735 communicates with the synchronization agent 130 at the global server 105, and retrieves the workspace data 135 requested. For example, if the user depresses the "borrow me" button 545 (FIG 5) and depresses the e-mail button 515, then the data reader 735 retrieves the e-mail workspace elements of the workspace data 135, and delivers them to the PIM API 740.

The PIM API 740 translates and transfers the workspace data 135 received from the global server 105 to the PIM 160, 165 or 170 for display and enabling manipulation thereto. The PIM API 740 further translates and transfers the workspace data manipulated on the client 110, 115 or 120 from the PIM 160, 165 or 170 back to the global server 105.

The de-instantiator 745 returns the PIM 160, 165 or 170 to the state before the user selected the "borrow me" button 545. The user may initiate operations of the de-instantiator 745 by depressing an "unborrow me" button (not shown) that is presented after selection of the "borrow me" button 545. The de-instantiator 745 deletes any instance created by the instantiator 730, deletes all workspace data 135 and data created by the user on the client 110, 115 or 120 and automatically initiated synchronization of any manipulated downloaded data 135 with the workspace data 135 stored at the global server 105.

Operations of the instantiator 730, the data reader 735, the PIM API 740 and the de-instantiator 745 are described in greater detail with reference to the following examples:

#### OUTLOOK EXAMPLE

| Action | Global Data | Local Data |
|---|---|---|
| standby | — | local data → pst$^{local}$ |
| button depressed | — | pst$^{local}$ |
| enter login/ password | — | pst$^{local}$ |
| authenticate | | pst$^{local}$ |
| send global data | global data → pst$^{local}$ | local data → pst$^{buffer}$ |
| manipulate data | global data → global data 2 | pst$^{buffer}$ |
| logout | 1) Compute Δglobal data | |
| | 2) Synchronize Δglobal data with global server | |
| | 3) Delete global data 2 | |
| | 4) | local data → pst$^{local}$ |

As illustrated by the Outlook™ example above, during standby, the PIM 160, 165 or 170 stores the local data on the client 110, 115 or 120 in a personal folder store pst$^{local}$. The user then depresses the "borrow me" button 545. The security module 725 requests the user to enter a login and password, which the global server 105 authenticates. During these steps, it will be appreciated that the local data remains stored in pst$^{local}$. Upon user identification and authentication, the global server 105 sends the workspace data 135 (global data) to the requesting client 110, 115 or 120. The instantiator 730 on the client 110, 115 or 120 transfers the local data from pst$^{local}$ to a buffer pst$^{buffer}$, and stores the received global data into pst$^{local}$. The data reader 745 and PIM API 740 enable the user to manipulate the global data, the manipulated data being referred to herein as "global data 2." Upon logout, after an "unborrow me" button (not shown) is depressed, the global data 2 is synchronized with the workspace data 135. Namely, the general synchronization module 715 determines the changes

made (Δglobal data), and synchronizes Δglobal data with the workspace data 135. The de-instantiator 745 deletes global data 2 and Δglobal data, and returns the local data to pst$^{local}$.

#### LOTUS ORGANIZER EXAMPLE

| Action | Global Data | Local Data |
|---|---|---|
| standby | — | local.org |
| button | — | local.org |
| enter login/password | — | local.org |
| authenticate | new instance | local.org |
| send global data | open with global.org | local.org |
| manipulate data | global.org → global.org$^2$ | local.org |
| logout | 1) compute Δglobal.org | local.org |
| | 2) Synchronize Δglobal.org with global server | |
| | 3) delete global.org$^2$ | |

As illustrated by the Lotus Organizer example above, during standby, the PIM 160, 165 or 170 stores the local data on the client 110, 115 or 120 in local.org. The user then depresses the "borrow me" button 545. The security module 725 requests the user to enter a login and password, which the global server 105 authenticates. During these steps, it will be appreciated that the local data remains stored in local.org. Upon user identification and authentication, the global server 105 sends the workspace data 135 (global data) to the requesting client 110, 115 or 120. The instantiator 730 on the client 110, 115 or 120 creates a new instance, e.g., a new window, of PIM API 740 and stores the received global data into another file, i.e., global.org. The data reader 745 and PIM API 740 enable the user to manipulate the global data, the manipulated data being referred to herein as "global data 2." Upon logout, the global data 2 is synchronized with the workspace data 135. Namely, the general synchronization module 715 determines the changes made (Δglobal data), and synchronizes Δglobal data with the workspace data 135. The de-instantiator 745 deletes global data 2, Δglobal data and global.org

FIG 8 is a flowchart illustrating a method 800 of accessing data remotely in accordance with the present invention. The method 800 begins with the processor 405 in step 805 opening the PIM 160, 165 or 170 per user request, and the PIM 160, 165 or 170 opening a PIM interface 500 (FIG. 5). The PIM 160, 165 or 170 in step 810 receives a "borrow me" request from the user, i.e., the user depresses the "borrow me" button 545. The PIM API 740 in step 815 recognizes the request, and instructs the communications module 705 to create a communications link with the global server 105.

The security module 725 in step 820 requests and transmits identification and authentication information such as login and password information from the user to the global server 105 for examination. If the global server 105 fails to identify or authenticate the user, then the method 800 ends. Otherwise, the instantiator 730 in step 825 opens a PIM interface 500 to display and enable manipulation of the workspace data 135 downloaded from the global server 105. The data reader 735 in step 830 reads the workspace data 135 downloaded from the global server 105, and in step 835 translates the data to the appropriate format if necessary. That is, the data reader 735 translates the workspace data 135 from the format implemented by the global server 105 to the format implemented by the PIM 160, 165 or 170. The PIM API 740 in step 840 passes the translated workspace data 135 to the PIM interfaces 500 and 600

The PIM 160, 165 or 170 enables the user in step 845 to manipulate the workspace data 135 as necessary Manipu-

6,151,606

**11**

lation includes adding new data, deleting workspace data 135, editing workspace data 135, etc. For example, the user can depress the e-mail button 515 in interface 500 to select, review and manipulate e-mail in interface 600, and can depress the calendar button 530 in interface 500 to select, review ad manipulate calendar information (not shown) in an interface similar to the e-mail interface 600. In step 850, the PIM API 740 waits to receive an "end session" request. Until an "end session" request is received, the method 800 returns to step 830 to enable continued data review and manipulation.

Upon receiving an "end session" or "unborrow me" request, the de-instantiator 745 initiates the general synchronization module 715 in step 855 to synchronize the manipulated workspace data on the client 110, 115 or 120 with the workspace data 135 on the global server 105, if required. Synchronization is described in greater detail with reference to FIG. 9. The de-instantiator 745 in step 860 deletes the workspace data on the client 110, 115 or 120, and deletes all records of the matter. Method 800 then ends.

FIG. 9 is a flowchart illustrating a method 900 for synchronizing workspace data in a computer network 100. Method 900 begins with the communications module 705 in step 905 establishing a communications link with the synchronization agent 130 of the global server 105. The locator modules 710 in step 910 identify the memory locations of the workspace elements in the workspace data 135. It will be appreciated that workspace element memory location identification may be implemented using intelligent software or dialogue boxes.

The general synchronization module 715 in step 915 compares version information (not shown) for each workspace element in the workspace data (on the client 110, 115 or 120 and on the global server 105) against a last synchronization signature to determine which workspace elements have been modified. In this embodiment, a workspace element may have been modified if the date and time of the last modification is after the date and time of the downloading.

If the general synchronization module 715 locates no modified workspace elements in the workspace data on the client 110, 115 or 120, then the method 900 ends. Otherwise, the general synchronization module in step 920 determines whether the version of the same workspace element of the workspace data 135 on the global server 105 has been modified since the data 135 was downloaded.

If only the version on the client 110, 115 or 120 has been modified, then the general synchronization module 715 in step 925 stores the updated version of the workspace element at the global server 105. To store the updated version on the global server 105, the general synchronization module 715 may compute the changes made and forward the changes to the synchronization agent 130. The synchronization agent 130 enters the changes into the global server 105 version. The general synchronization module 715 in step 930 determines whether all workspace elements downloaded to the client 110, 115 or 120 have been examined. If not, then method 900 returns to step 915. Otherwise, the synchronization agent 130 in step 935 updates the last synchronization signature, and method 900 ends. Updating the last synchronization signature will instruct the base systems 140 and 150 to synchronize the workspace data 145 and 155 with the workspace data 135 on the global server 105, as described in the patent applications incorporated by reference above.

If the general synchronization module 715 in step 920 determines that both the version on the client 110, 115 or 120

**12**

and the version on the global server 105 have been modified, then the general synchronization module in step 935 instructs the content-based synchronization module 729 to reconcile the modified versions. Reconciliation may include requesting instructions from the user, or performing based on pre-selected preferences responsive actions such as storing both versions at the global server 105. The general synchronization module 715 in step 940 stores the preferred version on the global server 105. Method 900 then proceeds to step 930.

The foregoing description of the preferred embodiments of the present invention is by way of example only, and other variations and modifications of the above-described embodiments and methods are possible in light of the foregoing teaching. Although the network sites are being described as separate and distinct sites, one skilled in the art will recognize that these sites may be a part of an integral site, may each include portions of multiple sites, or may include combinations of single and multiple sites. Further, components of this invention may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. Connections may be wired, wireless, modem, etc. The embodiments described herein are not intended to be exhaustive or limiting. The present invention is limited only by the following claims.

What is claimed is:

1. A computer-based method, comprising the steps of:
   executing a workspace data manager on an untrusted client site;
   requesting the workspace data manager to access data temporarily from a remote site, the remote being connected via a network to untrusted client site;
   initiating a communications channel with the remote site;
   downloading data from the remote site;
   placing the data in temporary storage on the untrusted client site;
   using the workspace data manager to present the downloaded data; and
   automatically disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data.

2. The method of claim 1, further comprising the step of requesting the workspace data manager to provide an interface for enabling presentation of the downloaded data.

3. The method of claim 2, further comprising the steps of using the workspace data manager to manipulate the dow data, thereby creating manipulated data, using the workspace data manager interface to request synchronization, and synchronizing the manipulated data with the data at the remote site.

4. The method of claim 3, wherein the data at the remote site has not been modified after the step of downloading and before the step of synchronizing and therefore includes the downloaded data.

5. The method of claim 3, wherein the data at the remote site has been modified after the step of downloading and before the step of synchronizing, and therefore is different than the downloaded data.

6. The method of claim 2, wherein the workspace data manager provides an interface by creating an instance.

7. The method of claim 2, wherein the workspace data manager provides an interface by providing access to its only interface.

8. The method of claim 1, further comprising the step of translating the downloaded data from the format used by the remote site and the format used by the workspace data manager

6,151,606

13

9. The method of claim 1, further comprising the step of deleting the workspace data manager interface after it is no longer needed.

10. A system on an untrusted client site, comprising:

a communications module for download data from a remote site, the remote site being connected via a network to the untrusted client site;

program code for placing the downloaded data in temporary storage on the untrusted client site;

an application program interface coupled to the communications module for communicating with a workspace data manager to present the downloaded data; and

program code coupled to the application program interface for automatically disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data

11. The system of claim 10, further comprising an instantiator for requesting the workspace data manager to provide an interface for enabling presentation of the downloaded data.

12. The system of claim 11, wherein the workspace manager enables manipulation of the downloaded data to create manipulated data and the data manipulation interface enables a request to synchronize the data, and further comprising a synchronization module coupled to the communications module for enabling synchronization of the manipulated data with the data at the remote site.

13. The system of claim 12, wherein the data stored at the remote site has not been modified and therefore includes the downloaded data.

14. The system of claim 12, wherein the data stored at the remote site has been modified, and therefore is different than the downloaded data

15. The system of claim 14, further comprising a content-based synchronization module for synchronizing the data stored at the remote site with the manipulated data

16. The system of claim 11, wherein the workspace data manager creates another instance of the interface to enable presentation of the downloaded data

17. The system of claim 11, wherein the workspace data manager provides access to its only interface to enable presentation of the downloaded data.

14

18. The system of claim 11, further comprising a deinstantiator for deleting the interface after it is no longer required.

19. The system of claim 10, further comprising a data reader for translating the downloaded workspace data from the format used by the remote site to the format used by the workspace data manager.

20. A system comprising:

means for executing a workspace data manager on an untrusted client site;

means for requesting the workspace data manager to access data temporarily from a remote site, the remote site being connected via a network to the untrusted client site;

means for initiating a communications channel with the remote site;

means for downloading data from the remote site;

means for placing the data in storage on the untrusted client site;

means for using the workspace data manager to present the downloaded data; and

means for disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data.

21. A computer-readable storage medium storing program code for causing a computer to perform the steps of:

executing a workspace data manager on an untrusted client site;

requesting the workspace data manager to access data temporarily from a remote site, the remote site being connected via a network to the untrusted client site;

initiating a communications channel with the remote site;

downloading data from the remote site;

placing the data in temporary storage on the untrusted client site;

using the workspace data manager to present the downloaded data; and

automatically disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   6,151,606

DATED        :   November 21, 2000

INVENTOR(S) :   Daniel J. Mendez

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

Column 12, line 47, after "manipulate the" change the word "dow" to — downloaded —
Column 13, line 5, after "module for" change the word "download" to — downloading —
Column 13, line 23, before "manager" insert — data —
Column 14, line 18, after "placing the data in" insert — temporary —

Signed and Sealed this

Eighth Day of May, 2001

*Attest:*

*Nicholas P. Godici*

NICHOLAS P. GODICI

*Attesting Officer*                    *Acting Director of the United States Patent and Trademark Office*

# EXHIBIT D

US006023708A

# United States Patent [19]

## Mendez et al.

[11] **Patent Number:** 6,023,708

[45] **Date of Patent:** Feb. 8, 2000

[54] **SYSTEM AND METHOD FOR USING A GLOBAL TRANSLATOR TO SYNCHRONIZE WORKSPACE ELEMENTS ACROSS A NETWORK**

[75] Inventors: **Daniel J. Mendez**, Mountain View; **Mark D. Riggins**, San Jose; **Prasad Wagle**, Santa Clara; **Christine C. Ying**, Foster City, all of Calif.

[73] Assignee: **Visto Corporation**, Mountain View, Calif.

[21] Appl. No.: **08/865,075**

[22] Filed: **May 29, 1997**

[51] Int. Cl.⁷ ........................................ G06F 17/30

[52] U.S. Cl. .............. 707/203; 707/4; 707/201; 707/10; 395/200.35

[58] Field of Search ............ 707/10, 203, 201, 707/100, 4; 395/200 36, 200 48, 200 35

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,582 | 5/1989 | Miller et al | 707/104 |
| 4,897,781 | 1/1990 | Chang | 364/200 |
| 5,263,157 | 11/1993 | Janis | 707/9 |
| 5,386,564 | 1/1995 | Shearer et al. | 395/650 |
| 5,392,390 | 2/1995 | Crozier | 395/161 |
| 5,572,643 | 11/1996 | Judson | 395/793 |
| 5,581,749 | 12/1996 | Hossain et al. | 707/1 |
| 5,613,012 | 3/1997 | Hoffman et al. | 382/115 |
| 5,623,601 | 4/1997 | Vu | 395/187.01 |
| 5,627,658 | 5/1997 | Connors et al | 358/407 |
| 5,634,053 | 5/1997 | Noble et al. | 707/4 |
| 5,647,002 | 7/1997 | Brunson | 380/49 |
| 5,652,884 | 7/1997 | Palevich | 395/651 |
| 5,666,553 | 9/1997 | Crozier | 395/803 |
| 5,680,542 | 10/1997 | Mulchandani | 395/183.04 |

(List continued on next page)

OTHER PUBLICATIONS

Margaret J. Brown, "The Visto Briefcase Pro Puts Your PIM On The Internet", URL:http://www.zdnet.com/zdnn/stories/

zdnn__display/0,3440,341892,00.html, Aug. 13, 1998, 1 page

Web site entitled "Bookmark Translator 2.0: This Utility transform Microsoft Internet Explore's bookmarks in the format valid for Netscape Navigator and viceversa," Enzo Marinacci, Rome—Jul. 1997, URL=http://www.bns.it/emware/Bookmark Translator-uk htm, pp. 1–4

Article by Bellovin et al., entitled: "Network Firewalls" Published by IEEE Communications Magazine Sep. 1994, pp. 50–57.

Article by Steffen Stempel, entitled: "IPAccess—An Internet Service Access System for Firewall Installations" Published by IEEE Communications Magazine Feb. 16, 1995, pp. 31–41

Article by Braun et al., entitled: "Web Traffic Characterization: an assessment of the impact of caching documents from NCSA's web server" Published by Elsevier Science B.V. 1995 pp. 37–51

Article by Nelson et al., entitled: "Security for Infinite Networks" Published by IEEE Communications Magazine on Aug. 22, 1995, pp. 11–19

(List continued on next page)

Primary Examiner—Thomas G Black
Assistant Examiner—Charles L Rones
Attorney, Agent, or Firm—Graham & James LLP

[57] **ABSTRACT**

A system uses a global translator to automatically synchronize multiple copies of a workspace element across different formats between multiple sites in a secure network environment, independent of whether the sites are protected by site firewalls. The secure network environment includes a global server connected to multiple clients. The system includes a first store for storing a first workspace element in a first format, a second store for storing a second workspace element which is an independently modifiable copy of the first workspace element in a second format, a communications channel coupling the first store to the second store, synchronization means for synchronizing the first workspace element and the second workspace element, and a translator for translating between the first format and the second format.

**34 Claims, 7 Drawing Sheets**



**6,023,708**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,682,524 | 10/1997 | Freund et al. | 395/605 |
| 5,684,990 | 11/1997 | Boothby | 707/203 |
| 5,701,423 | 12/1997 | Crozier | 395/335 |
| 5,706,502 | 1/1998 | Foley et al. | 395/610 |
| 5,713,019 | 1/1998 | Keaten | 395/610 |
| 5,715,403 | 2/1998 | Stefik | 705/44 |
| 5,717,925 | 2/1998 | Harper et al | 395/613 |
| 5,721,914 | 2/1998 | DeVries | 395/615 |
| 5,729,735 | 3/1998 | Meyering | 395/610 |
| 5,745,360 | 4/1998 | Leone et al. | 364/140 |
| 5,752,246 | 5/1998 | Rogers et al. | 707/10 |
| 5,757,916 | 5/1998 | MacDoran et al | 380/25 |
| 5,758,150 | 5/1998 | Bell et al. | 395/610 |
| 5,758,354 | 5/1998 | Huang et al. | 707/201 |
| 5,758,355 | 5/1998 | Buchanan | 707/201 |
| 5,765,171 | 6/1998 | Gehani et al | 707/203 |
| 5,778,346 | 7/1998 | Frid-Nielsen et al. | 395/208 |
| 5,790,425 | 8/1998 | Wagle | 1/1 |
| 5,832,483 | 11/1998 | Barker | 707/8 |
| 5,870,759 | 2/1999 | Bauer et al. | 707/201 |
| 5,961,590 | 10/1999 | Mendez et al | 709/206 |

## OTHER PUBLICATIONS

Article by Greenwald et al., entitled: "Designing an Academic Firewall: Policy, Practice, and Experience with SURF" Published by IEEE Communications Magazine on Feb. 22, 1996, pp. 79–92.

Article by Kiuchi et al., entitled: "C–HTTP—The Development of a Secure, Closed HTTP–based Network on the Internet" Published by IEEE Proceedings of SNDSS on Feb 22, 1996, pp 64–75.

Article by S. Cobb, entitled: "Establishing Firewall Policy" Published by National Computer Security Assn. on Jun. 25–27, 1996, pp. 198–205.



FIG. 1



FIG. 2



FIG. 3



FIG. 4

Synchronization
Agent

124





FIG. 5



FIG. 6
(Global Format Bookmark
Example)

U.S. Patent          Feb. 8, 2000          Sheet 7 of 7          6,023,708



FIG. 7

6,023,708

1

# SYSTEM AND METHOD FOR USING A GLOBAL TRANSLATOR TO SYNCHRONIZE WORKSPACE ELEMENTS ACROSS A NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is related to and hereby incorporates by reference the co-pending patent application entitled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network," Ser. No. 08/835,997, filed on Apr. 11, 1997, by inventors Daniel J. Mendez, Mark D. Riggins, Prasad Wagle and Christine C. Ying. This related application has also been assigned to RoamPage, Inc.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to computer networks, and more particularly to a system and method for using a global translator to synchronize workspace elements such as files across a computer network

### 2. Description of the Background Art

Data consistency is a significant concern for computer users. For example, when maintaining multiple independently-modifiable copies of a document, a user risks using an outdated version. By the time the user notices an inconsistency, interparty miscommunication or data loss may have already resulted. The user must then spend more time attempting to reconcile the inconsistent versions and addressing any miscommunications

The problem of data inconsistency is exacerbated when multiple copies of a document are maintained at different network locations. For example, due to network security systems such as conventional firewall technology, a user may have access only to a particular one of these network locations Without access to the other sites, the user cannot confirm that the version on the accessible site is the most recent draft.

Data consistency problems may also arise when using application programs from different vendors For example, the Netscape Navigator™ web browser and the Internet Explorer™ web browser each store bookmarks for quick reference to interesting web sites. However, since each web browser uses different formats and stores bookmarks in different files, the bookmarks are not interchangeable In addition, one web browser may store a needed bookmark, and the other may not A user who, for example, runs the Internet Explorer™ web browser at home and runs the Netscape Navigator™ web browser at work risks having inconsistent bookmarks at each location

Therefore, a system and method are needed for providing users with data consistency, and more particularly for synchronizing multiple copies of a workspace element such as a document across a computer network

## SUMMARY OF THE INVENTION

The present invention provides a system and method for using a global translator to synchronize multiple copies of a workspace element in a secure network environment. The secure network environment includes a global server connected to multiple clients. Using the present system and method, the clients automatically synchronize workspace elements between multiple sites, independent of whether the sites are protected by site firewalls. Using the present system and method, the clients can automatically synchronize work-

2

space elements across different formats and can merge workspace element folders for cross use

The system includes a first store for storing first workspace elements in a first format, a second store for storing second workspace elements in a second format, a communications channel coupling the first store to the second store, synchronization means for synchronizing first workspace elements and second workspace elements, and a translator for translating between the first format and the second format

Similarly, the method includes the steps of accessing a first store storing a first workspace element in a first format, accessing a second store storing a second workspace element in a second format, synchronizing the first workspace element and the second workspace element, and translating between the first format and the second format.

The system and method advantageously use a trusted third party to enable the synchronization of workspace data among multiple sites. Accordingly, a client user who maintains a work site, a home site, an off-site and the global server site can synchronize the workspace data or portions thereof among all four sites. Further, the predetermined criteria (which control when the synchronization-start module initiates synchronization) may be set so that the general synchronization module synchronizes the workspace data upon user request, at predetermined times during the day such as while the user is commuting, or after a predetermined user action such as user log-off or user log-on. Because the system and method operate over the Internet, synchronization can occur over any distance. Since the system and method include format translation, merging of workspace elements between different application programs and different platforms is possible Further, because synchronization is initiated from within the firewall, the typical firewall which prevents inbound communications does not act as an impediment to workspace element synchronization. Also, since the user's preferences may be previously set, the present system and method may operate unattended by the client user.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating a computer network in accordance with the present invention;

FIG. 2 is a block diagram illustrating details of a FIG. 1 service server;

FIG. 3 is a block diagram illustrating details of the FIG. 1 desktop computer;

FIG. 4 is a block diagram illustrating details of a FIG. 1 base system;

FIG. 5 is a block diagram illustrating details of the FIG. 1 synchronization agent;

FIG. 6 is a graphical representation of an example bookmark in the global format; and

FIG. 7 is a flowchart illustrating a method for synchronizing multiple copies of a workspace element in a secure network.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 is a block diagram illustrating a computer network 100, comprising a first node such as a remote computer terminal 102 coupled via a communications channel 104 such as the Internet to a global server 106. The global server 106 is in turn coupled via a communications channel 108 such as the Internet to a second node such as a Local Area

6,023,708

**3**

Network (LAN) 110. The global server 106 is protected by a global firewall 112, and the LAN 110 is protected by a LAN firewall 114.

The LAN 110 includes a system bus 126 coupling the LAN firewall 114 to an e-mail server 128 having an e-mail folder 138 containing e-mails, to a file server 132 having a file folder 142 containing files, to a calendar server 130 having a calendar folder 140 containing calendar data, and to a desktop computer 134 having a web browser 152 and a bookmark folder 144 containing bookmarks. It will be appreciated that the e-mail folder 138, file folder 142, calendar folder 140 and bookmark folder 144 or portions thereof may be stored at different locations such as on the desktop computer 134. The e-mail folder 138, file folder 142, calendar folder 140 and bookmark folder 144 are exemplary, grouped by like information and are collectively referred to herein as "workspace data" 136. Those skilled in the art will recognize that the workspace data 136 may include other types of data such as an application program such as Microsoft Word 6.0 1 TM word processor and the documents created using them. It will be further appreciated that the e-mail folder 138, file folder 142, calendar folder 140 and bookmark folder 144 may each be divided into workspace elements, wherein each workspace element folder or each workspace element individually is identified by particular version information 255 (described below with reference to FIG. 2). Accordingly, each e-mail or e-mail folder, file or file folder, calendar or calendar folder, bookmark or bookmark folder, document or document folder, etc. may be referred to as "a workspace element."

Each workspace element of workspace data 136 in LAN 110 is maintained in a predetermined format, referred to as Format A, which is based on the service engine 245 (FIG 2) that created it. For example, the web browser 152 on the desktop computer 134 may be the Netscape Navigator™ web browser, and the bookmarks in the bookmark folder 144 created thereby are maintained in Format A. Although Format A is being described as a single format, one skilled in the art knows that Format A actually includes a format for each information type, e.g., there will be a Format A for bookmarks, a Format A for files, a Format A for calendar data, a Format A for e-mails, etc.

The remote terminal 102 stores service engines 154 for maintaining workspace data 116, which may include information common with information in the workspace data 136. The workspace data 116 is maintained in a format, referred to as Format B, which may be different from Format A. Format B is also based on the service engine 154 that create the workspace elements. For example, if one of the service engines 154 is the Internet Explorer™ web browser (not shown), then the bookmarks (not shown) created therewith are maintained in Format B. Although Format B is being described as a single format, one skilled in the art knows that Format B actually includes a format for each information type. Further, the workspace data 116 also includes version information 255 similar to version information 255 described below with reference to FIG. 2.

It will be appreciated that remote terminal 102 may include a smart telephone, a Personal Data Assistant (PDA) such as the PalmPilot TMPDA the U.S. Robotics, Inc., a laptop computer, etc. As a smart telephone, the workspace data 116 may include telephone numbers and e-mails. As a PDA, the workspace data 116 may include addresses, calendar data and e-mails. As a laptop computer, the workspace data 116 may include the same types of information as workspace data 136.

The global server 106 acts as a third party administrator. The global server 106 stores independently-modifiable cop-

**4**

ies of selected portions of the workspace data 136 and 116, collectively referred to herein as workspace data 120. Accordingly, the workspace data 120 includes an independently-modifiable copy of each workspace element in the selected portions of the workspace data 136 and 116 and an independently-modifiable copy of each corresponding version information 255 (FIG. 2) and 150. The version information copies are collectively referred to herein as version information 148, and are also described with reference to FIG 2.

The global server 106 maintains the workspace data 120 in a format, referred to as a "global format," which is selected to be easily translatable by the global translator 122 to and from Format A and to and from Format B. Although the global format is being described as a single format, one skilled in the art knows that the global format actually includes a global format for each information type, e.g., there will be a global format for bookmarks, a global format for files, a global format for calendar data, a global format for e-mails, etc. An example bookmark workspace element in the global format is described in detail below with reference to FIG. 6.

Network 100 further comprises synchronization means, which includes a base system 146 stored within the LAN 110 and for example on the desktop computer 134. Network 100 further includes a synchronization agent 124 stored outside the LAN firewall 114 and preferably on the global server 106. The base system 146 and the synchronization agent 124 cooperate to synchronize selected portions of the workspace data 136 with selected portions of the workspace data 120. The synchronization means may synchronize workspace elements individually, e.g., specific word processor documents, or may synchronize workspace element folders, e.g., a bookmark folder. Generally, the base system 146 manages the selected portion of the workspace data 136 within the LAN 110 and the synchronization agent 124 manages the selected portions of the workspace data 120 within the global server 106. It will be appreciated that the global translator 122 cooperates with the synchronization means to translate data formats to and from the global format. As described in greater detail below with reference to FIG. 4, the base system 190 preferably initiates and controls data synchronization. Other components and functions of the global server 106 are described in the cross-referenced patent application which is herein incorporated by reference.

The synchronization means may also include, stored on the remote terminal 102, a base system 118 which operates in a similar manner to the base system 146. The base system 118 on the remote terminal 102 cooperates with the synchronization agent 124 to synchronize selected portions of the workspace data 116 with selected portions of the workspace data 120. As described in greater detail below with reference to FIG. 4, the base system 118 on the remote terminal 102 also preferably initiates and controls data synchronization with the global server 106. Also, note that the distribution of labor between the base system 118 in the remote terminal 102 and the synchronization agent 124 in the global server 106 may vary. Sometimes, primarily when the remote terminal 102 is a relatively less computationally powerful device (such as a smart phone or a PDA), most of the actual computationally intensive work will occur within the synchronization agent 124 in the global server 106. In other situations, for example, when the remote terminal 102 is a fully configured PC, most of the computationally intensive work will occur locally on the base system 118 in the remote terminal 102.

6,023,708

5

Accordingly, the synchronization means independently synchronizes the selected portions of workspace data 116 and 136 with the selected portions of the workspace data 120 Thus, the synchronization means indirectly synchronizes workspace data 136 with workspace data 116.

FIG. 2 is a block diagram illustrating details of a service server 200, wherein each of the e-mail server 145, the file server 150, the calendar server 155 and the desktop computer 160 is an instance thereof. Service server 200 includes a Central Processing Unit (CPU) 205 such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor. An input device 210 such as a keyboard and mouse and an output device 215 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 220 to CPU 205 A communications interface 225 (such as an Ethernet port), a data storage device 230 (such as a magnetic disk), and Random-Access Memory (RAM) 235 are further coupled via signal bus 220 to the CPU 205.

An operating system 240 includes a program for controlling processing by the CPU 205, and is typically stored in the data storage device 230 and loaded into the RAM 235 for execution. A service engine 245 includes a program for performing a particular service such as maintaining an e-mail data base, a file data base, a calendar data base or a bookmarks data base. The service engine 245 may also be stored in the data storage device 230 and loaded into the RAM 235 for execution.

To perform a service, the service engine 245 creates service data 250 (e.g., an e-mail or an e-mail folder 138 containing e-mails, a file or a file folder 142 containing files, calendar data or a calendar folder 140 containing calendar data, a bookmark or a bookmark folder 144 containing bookmarks, etc.) in Format A according to predetermined protocols. The service engine 245 stores the data 250 in the data storage device 250. The service data 250 includes version information 255 indicating the date and time of the last modification and the status as of the last interaction with the global server 106.

For example, if service data 250 is created and selected to be merged with global server workspace data 120, then the version information 255 for the service data 250 may include the date of last modification and a null set indicating the status as of the last interaction with the global server 106. From the version information 255, the base system 146 determines that the service data 250 in its entirety has not been merged with the global server workspace data 120. Similarly, if the service data 255 included elements 1, 2 and 3 as of the last modification, then the previous status as of the last interaction will indicate that the service data 255 included elements 1, 2 and 3. If the service data 255 currently includes elements 2, 3 and 4, then the base system 140 will determine that, since last synchronization, element I has been deleted and element 4 has been added.

It will be appreciated that the version information 148 on the global server 106 includes information similar to version information 255. That is, the version information 148 will include information indicating the date and time the version was last modified and the status as of the last interaction with each client. The service engine 245 operates to update the version information 255 after modifications are made and after synchronization occurs.

FIG. 3 is a block diagram illustrating details of the desktop computer 160, which includes a CPU 305, an input device 310, an output device 315, a communications interface 325, a data storage device 330 and RAM 335, each coupled to a signal bus 320

6

An operating system 340 includes a program for controlling processing by the CPU 305, and is typically stored in the data storage device 330 and loaded into the RAM 335 for execution. A web browser 152 (i.e., a particular service engine 245, FIG. 2) includes a Format A service program for managing bookmark folder 144 (i.e., particular service data 250, FIG. 2) which includes, version information 350 (i.e., particular version information 255, FIG. 2) The web browser 152 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution. The bookmark folder 144 may be stored in the data storage device 330. As stated above with reference to FIG. 1, the base system 146 operates to synchronize the workspace data 136 (which includes the bookmark folder 144) with the workspace data 120. The base system 146 may be also stored in the data storage device 330 and loaded into the RAM 335 for execution.

FIG. 4 is a block diagram illustrating details of the base system 400, which exemplifies base systems 146 and 118. Base system 400 includes a communications module 405, a user interface module 410, locator modules 415, a synchronization-start ("synch-start") module 420, a general synchronization module 425 and a content-based synchronization module 430. For simplicity, each module is illustrated as communicating with one another via a signal bus 440

The communications module 405 includes routines for compressing data and routines for communicating via the communications interface 325 (FIG. 3) with the synchronization agent 124 (FIG. 1). The communications module 405 may further include routines for applying Secure Socket Layer (SSL) technology and user identification and authentication techniques (i.e., digital certificates) to establish a secure communication channel through the global firewall 112. Examples of communications modules 405 may include TCP/IP stacks or the AppleTalk™ protocol.

The user interface module 410 includes routines for communicating with a user, and may include a conventional Graphical User Interface (GUI). The user interface module 410 cooperates with the other system components as described herein.

The locator modules 415 include routines for identifying the memory locations of the workspace elements in the workspace data 136 or 116 and in the workspace data 120. Workspace element memory location identification may be implemented using intelligent software, i.e., preset memory addresses or the system's registry, or using dialogue boxes to query a user More particularly, the locator modules 415 in the base system 146 determine the memory addresses of the e-mail folder 138, the file folder 142, the calendar folder 140 and the bookmark folder 144 and the memory addresses of the workspace elements therein. The locator modules 415 also determine the corresponding memory addresses of the corresponding folders in the workspace data 120 and the corresponding workspace elements therein. Similarly, the locator modules 415 in the base system 118 determine the memory locations of the workspace elements of workspace data 116 and the memory locations of the corresponding workspace elements in the workspace data 120.

It will be appreciated that the locator modules 415 may include locator modules 415 specifically dedicated to each folder or workspace data type. That is, the locator modules 415 may include a locator module 415 dedicated to locating bookmarks, a locator module 415 dedicated to locating e-mails, a locator module 415 dedicated to locating files, a locator module 415 dedicated to locating calendar

6,023,708

7

appointments, etc. It will be further appreciated that the locator modules 415 may perform workspace element memory location identification upon system boot-up or after each communication with the global server 120 to maintain updated memory addresses of workspace elements.

The synchronization-start module 420 includes routines for determining when to initiate synchronization of workspace data 136 or 116 with workspace data 120. For example, the synchronization-start module 420 may initiate data synchronization upon user request, at a particular time of day, after a predetermined time period passes, after a predetermined number of changes, after a user action such as user log-off or upon like criteria. The synchronization-start module 420 initiates data synchronization by instructing the general synchronization module 425 (described below) to begin execution of its routines. It will be appreciated that communication with the synchronization agent 124 preferably initiates from within the LAN 10, because the typical firewall 114 prevents in-bound communications and allows out-bound communications.

The general synchronization module 425 includes routines for receiving version information 148 for modified versions from the synchronization agent 124 (FIG. 1), and routines for examining the version information 255 or 150 against a last synchronization signature 435 (such as a last synchronization date and time) to determine which versions have been modified. The general synchronization module 425 further includes routines for examining the version information 148 and the version information 255 or 150 to determine if one or both versions of a particular workspace element or workspace element folder have been modified.

Further, the general synchronization module 425 includes routines for performing an appropriate synchronizing responsive action. Appropriate synchronizing responsive actions may include, if only one version of a workspace element in workspace data 136 or 116 has been modified, then forwarding the modified version (as the preferred version) to the other store(s) or determining and forwarding only the changes made. Computing the changes made may be performed by examining the current status against the previous status as of the last synchronization or by comparing the two versions. It will be appreciated that no content-based review of the changes is needed. It will be appreciated that one store preferably forwards only the changes to the other store for optimizing use of processor power and minimizing the data communications across the communications channel 108 or 104.

Other appropriate synchronizing responsive actions may include, if two versions of a workspace element have been modified independently, then instructing the content-based synchronization module 430 (described below) to execute its routines. That is, if two versions of the same workspace element have been modified independently, then a content-based review of the changes is preferable. Upon completion of the data synchronization, the general synchronization module 425 updates the last synchronization signature 435.

The content-based synchronization module 430 includes routines for reconciling two or more modified versions of a workspace element. For example, if a user has independently modified the original and the copy of a workspace element since the last synchronization, then the content-based synchronization module 430 determines an appropriate responsive action. The content-based synchronization module 430 may request the user to select a preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or

8

preferably by integrating the modified versions into a single preferred version which replaces each modified version at both stores.

The content-based synchronization module 430 examines the changes made to each version and determines if conflicts exist. When implementing version integration, a conflict may arise if inconsistent modifications such as deleting a paragraph in one version and modifying the same paragraph in the other version have been made. If a conflict exists, then the content-based synchronization module 430 attempts to reconcile the conflict, e.g., by requesting user selection or by storing both versions at both stores. Otherwise, if no conflict exists, then the content-based synchronization module 430 integrates the changes to each of the versions and updates the version information 148, 150 or 255 accordingly.

FIG. 5 is a block diagram illustrating details of the synchronization agent 124, which includes a communications module 505 (similar to the communications module 405 described above with reference to FIG. 4) and a general synchronization module 515 (similar to the general synchronization module 425 described above also with reference to FIG. 4).

The communications module 505 includes routines for compressing data, and routines for communicating via the communications channel 108 with the base system 146 or via the communications channel 104 with the base system 118. The communications module 505 may further include routines for establishing a secure communications channel through the global firewall 112 and through the LAN firewall 114 with the communications module 405.

Similar to the general synchronization module 425, the general synchronization module 515 includes routines for examining the version information 148 and the last synchronization signature 435 (FIG. 4) to determine which versions have been modified and the changes made. It will be appreciated that the general synchronization module 515 may maintain its own last synchronization signature 435 copy (not shown) or may request the last synchronization signature 435 from the base system 146 or 118. The general synchronization module 515 further includes routines for forwarding workspace data 120 determined to be modified to the general synchronization module 425, and routines for receiving preferred versions of workspace elements of workspace data 136 or 116 or just the changes from the general synchronization module 425.

FIG. 6 illustrates an example bookmark workspace element in the global format. The global translator 122 incorporates all the information needed by both formats (Format A and Format B) to create the Global Format. For example, if a bookmark in Format A needs elements X, Y and Z and a bookmark in Format B needs elements W, X and Y, the global translator 122 incorporates elements W, X, Y and Z to create a bookmark in the Global Format. Further, the global translator 122 incorporates the information which is needed by the synchronization means such as the last modified date. Accordingly, a bookmark in the Global Format includes a user identification (ID) 605, an entry ID 610, a parent ID 615, a folder ID flag 620, a name 625, a description 630, the Uniform Resource Locator (URL) 635, the position 640, a deleted ID flag 645, a last modified date 650, a created date 655 and a separation ID flag 660.

FIG. 7 is a flowchart illustrating a method 700 for using a global translator 122 to synchronize multiple copies of a workspace element in a secure network 100. Method 700 begins with the user interface module 410 in step 705 enabling a user to select workspace elements of workspace

6,023,708

**9**

data 136 and 118 for the synchronization means to synchronize. The locator modules 415 in step 710 identify the memory locations of the workspace elements in workspace data 136 and 116 and the corresponding memory locations in workspace data 120. If a selected workspace element does not have a corresponding memory location, such as in the case of adding a new workspace elements to the global server 106, then one is selected. The selected memory location may be a preexisting workspace element or a new workspace element. As stated above, workspace element memory location identification may be implemented using intelligent software or dialogue boxes. The general synchronization module 425 and general synchronization module 515 in step 715 set the previous status of the workspace elements equal to the null set. Setting the previous status to the null set indicates that all information of the workspace element has been added.

The synchronization-start module 420 in step 720 determines whether predetermined criteria have been met which indicate that synchronization of the workspace elements selected in step 705 should start. If not, then the synchronization-start module 420 in step 725 waits and loops back to step 720. Otherwise, the communications module 405 and communications module 505 in step 730 establish a secure communications channel therebetween.

The general synchronization module 425 and the general synchronization module 515 in step 735 determine whether any workspace elements have been modified. That is, the general synchronization module 425 in step 740 examines the version information 255 or 150 of each selected workspace element in the workspace data 136 or 116 against the last synchronization signature 435 to locate modified workspace elements. This comparison may include comparing the date of last modification with the date of last synchronization, or may include a comparison between the current status and the previous status as of the last interaction. Similarly, the general synchronization module 515 examines the version information 148 of each corresponding workspace element in workspace data 120 and the last synchronization signature 435 to locate modified workspace elements.

If in step 735 no modified workspace elements or folders are located, then the general synchronization modules 425 and 515 in step 760 update the last synchronization signature. 435 and method 700 ends. Otherwise, the general synchronization module 425 in step 740 determines whether more than one version of a workspace element has been modified since the last synchronization.

If only one version has been modified, then the corresponding general synchronization module 425 or 515 in step 745 determines the changes made. As stated above, determining the changes made may be implemented by comparing the current status of the workspace element against the previous status of the workspace element as of the last interaction therebetween. If the changes were made only to the version in the workspace data 120, then the global translator 122 in step 750 translates the changes to the format used by the other store, and the general synchronization module 515 in step 755 forwards the translated changes to the general synchronization module 425 for updating the outdated workspace element in the workspace data 136 or 116. If the updated version is a workspace element in the workspace data 136 or 116, then the general synchronization module 425 sends the changes to the updated version to the global translator 122 for translation and then to the general synchronization module 515 for updating the outdated workspace element in the workspace

**10**

data 120. The general synchronization module 425 and the general synchronization module 515 in step 757 update the previous state of to reflect the current state as of this interaction. Method 700 then returns to step 735.

If the general synchronization module 425 in step 740 determines that multiple versions have been modified, then the general synchronization module 425 in step 765 computes the changes to each version and in step 770 instructs the content-based synchronization module 430 to examine content to determine if any conflicts exist. For example, the content-based synchronization module 430 may determine that a conflict exists if a user deletes a paragraph in one version and modifies the same paragraph in another version. The content-based synchronization module 430 may determine that a conflict does not exist if a user deletes different paragraphs in each version. If no conflict is found, then method 700 jumps to step 750 for translating and forwarding the changes in each version to the other store. However, if a conflict is found, then the content-based synchronization module 430 in step 775 reconciles the modified versions. As stated above, reconciliation may include requesting instructions from the user or based on preselected preferences performing responsive actions such as storing both versions at both stores. Method 700 then proceeds to step 750.

It will be appreciated that in step 7 10 new workspace elements and preexisting workspace elements to which new workspace elements will be merged are set to "modified" and the previous status is set to the null set. Thus, the general synchronization module 425 in step 740 will determine that more that one version has been modified and the content-based synchronization module 430 in step 770 will determine that no conflict exists. The changes in each will be translated and forwarded to the other store Accordingly, the two versions will be effectively merged and stored at each store.

For example, if a first bookmark folder was created by the web browser 152 on the desktop computer 134, a second folder was created by a web browser (not shown) on the remote terminal 102, no preexisting folder existed on the global server 106 and the user selected each of these folders for synchronization, then the synchronization means will effectively merge the first and second folders. That is, the general synchronization module 425 on the desktop computer 134 will determine that the first folder has been modified and the previous status is equal to the null set. The general synchronization module 425 will determine and send the changes, i.e., all the workspace elements in the first folder, to a new global folder on the global server 106. Similarly, the general synchronization module 425 on the remote terminal 102 will determine that, as of its last interaction, the previous status of each of the second and the global folders is the null set. The general synchronization module 425 will instruct the content-based synchronization module 430 to examine the changes made to each folder to determine whether a conflict exists. Since no conflicts will exist, the general synchronization module 425 will forward the changes to the global folder and the general synchronization module 515 will forward its changes to the second store, thereby merging the workspace elements of the first and second folders in the global and second folders The general synchronization module 425 will inform the general synchronization module 515 that the global folder has been modified relative to the last interaction, and will forward the new changes to the first folder Thus, the first and second folders will be merged and stored at each store.

For a second example, the user may select an exemplary document in the LAN 110 to be synchronized. The general

6,023,708

| 11 | 12 |

synchronization module 425 will forward the document to the global server 106. Similarly, the user may select the same document for synchronization on the remote terminal 102. The general synchronization module 515 will forward the document to the remote terminal 102. If changes were made to the documents independently, then the content-based synchronization module 430 will examine the content of the documents to determine if a conflict exists. If no conflict exists, then as described above, the general synchronization modules 425 and 515 will merge the documents. Otherwise, if a conflict does exist, the content-based synchronization module 430 will reconcile the changes and then the general synchronization modules 425 and 515 will forward the reconciled changes to each other.

The foregoing description of the preferred embodiments of the invention is by way of example only, and other variations of the above-described embodiments and methods are provided by the present invention. For example, although the global server 106 is illustrated as a single device, the global server 106 may include several computers networked together. Components of this invention may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. The embodiments described herein have been presented for purposes of illustration and are not intended to be exhaustive or limiting. Many variations and modifications are possible in light of the foregoing teaching. The system is limited only by the following claims.

What is claimed is:

1. A system, comprising:

a first store for storing a first workspace element in a first format;

a second store for storing a second workspace element which is an independently modifiable copy of the first workspace element in a second format;

a communications channel coupling the first store to the second store;

synchronization means for synchronizing the first workspace element and the second workspace element; and

a translator for translating between the first format and the second format.

2. The system of claim 1, wherein the first format is the same as the second format.

3. The system of claim 1 wherein the second format includes HTML.

4. The system of claim 1, wherein the first store is in a LAN.

5. The system of claim 1, further comprising a firewall for protecting the first store.

6. The system of claim 1, further comprising a firewall for protecting the second store.

7. The system of claim 1, wherein the synchronization means includes

a first general synchronization module for examining the first workspace element at the first store to determine whether it has been modified; and

a second general synchronization module for examining the second workspace element at the second store to determine whether it has been modified.

8. The system of claim 7, wherein

the first workspace element and the second workspace element each include version information, and

the first and second general synchronization modules each examine the version information of each workspace element to a last synchronization signature to determine whether the workspace element was modified.

9. The system of claim 1, wherein the synchronization means includes a synchronization-start module for determining when to initiate synchronization.

10. The system of claim 1, wherein the first workspace element includes a first folder and the second workspace element includes a second folder.

11. The system of claim 10, further comprising a content-based synchronization module for examining content of the first workspace element and of the second workspace element when the first workspace element and the second workspace element have both been modified since the last synchronization.

12. The system of claim 11, wherein the content-based synchronization module determines if any conflicts exist, and if so then the content-based synchronization module reconciles the conflicts.

13. The system of claim 11, wherein the content-based synchronization module determines if any conflicts exist, and if not then the content-based synchronization module integrates the changes made to each workspace element.

14. The system of claim 1, further comprising a third store coupled to the second store for storing a third workspace element in a third format.

15. The system of claim 14, wherein the translator translates between the second format and the third format.

16. The system of claim 8, wherein the version information indicates the status of each workspace element as of the last synchronization.

17. A method, comprising:

accessing a first store storing a first workspace element in a first format;

accessing a second store storing a second workspace element which is an independently modifiable copy of the first workspace element in a second format;

synchronizing the first workspace element and the second workspace element; and

translating between the first format and the second format.

18. The method of claim 17, wherein the first format is the same as the second format.

19. The method of claim 17, wherein the second format includes HTML.

20. The method of claim 17, wherein the first store is in a LAN.

21. The method of claim 17, wherein the first store is protected by a firewall.

22. The method of claim 17, wherein the second store is protected by a firewall.

23. The method of claim 17, further comprising

examining, the first workspace element to determine whether it has been modified; and

examining the second workspace element to determine whether it has been modified.

24. The method of claim 23, wherein the first workspace element and the second workspace element each include version information; and

further comprising the step of comparing the version information of each workspace element to a last synchronization signature to determine whether the workspace element was modified.

25. The method of claim 17, further comprising the step of determining when to initiate synchronization.

26. The method of claim 17, wherein the first workspace element includes a first folder and the second workspace element includes a second folder.

6,023,708

13

27. The method of claim 26, further comprising the step of examining, content of the first workspace element and of the second workspace element when the first workspace element and the second workspace element have both been modified since the last synchronization.

28. The method of claim 27, further comprising the step of determining if any conflicts exist, and if so then reconciling the conflicts

29. The method of claim 27, further comprising the step of determining if any conflicts exist, and if not then integrating the changes made to each workspace element

30. The method of claim 17, further comprising the step of accessing a third store coupled to the second store storing, a third workspace element in a third format.

31. The method of claim 30, wherein further comprising the step of translating between the second format and the third format.

32. The method of claim 24, wherein the version information indicates the status of each workspace element as of the last synchronization.

33. A system, comprising:

means for accessing a first store storing a first workspace element in a first format;

14

means for accessing a second store storing a second workspace element which is an independently-modifiable copy of the first workspace element in a second format;

means for synchronizing the first workspace element and the second workspace element; and

means for translating between the first format and the second format.

34. A computer-readable storage medium storing program code for causing a computer to perform the steps of:

accessing a first store storing a first workspace element in a first format;

accessing a second store storing a second workspace element which is an independently modifiable copy of the first workspace element in a second format;

synchronizing the first workspace element and the second workspace element; and

translating between the first format and the second format

*   *   *   *   *

# EXHIBIT E



US006708221B1

(12) **United States Patent**
Mendez et al.

(10) Patent No.: **US 6,708,221 B1**
(45) Date of Patent: **Mar. 16, 2004**

(54) **SYSTEM AND METHOD FOR GLOBALLY AND SECURELY ACCESSING UNIFIED INFORMATION IN A COMPUTER NETWORK**

(75) Inventors: **Daniel J. Mendez**, Menlo Park, CA (US); **Mark D. Riggins**, Mercer Island, WA (US); **Prasad Wagle**, Santa Clara, CA (US); **Hong Q. Bui**, Cupertino, CA (US); **Mason Ng**, Mountain View, CA (US); **Sean Michael Quinlan**, San Francisco, CA (US); **Christine C. Ying**, Foster City, CA (US); **Christopher R. Zuleeg**, San Jose, CA (US); **David J. Cowan**, Menlo Park, CA (US); **Joanna A. Aptekar-Strober**, Menlo Park, CA (US); **R. Stanley Bailes**, San Jose, CA (US)

(73) Assignee: **Visto Corporation**, Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl No.: 09/666,877

(22) Filed: **Sep. 20, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 08/903,118, filed on Jul. 30, 1997, and a continuation-in-part of application No. 08/865, 075, filed on May 29, 1997, now Pat. No. 6,023,708, and a continuation-in-part of application No. 08/835,997, filed on Apr. 11, 1997, now Pat. No. 6,085,192, and a continuation-in-part of application No. 08/841,950, filed on Apr. 8, 1997, which is a continuation-in-part of application No. 08/766, 307, filed on Dec. 13, 1996, now Pat. No. 6,131,116.

(51) Int. Cl.[7] ........................................ G06F 15/16

(52) U.S. Cl. .............................. 709/248; 709/204

(58) Field of Search ....................... 709/203, 219, 709/248, 245, 204, 205

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,388,255 A | * | 2/1995 | Pytlik et al. ................. 707/4 |
| 5,544,320 A | * | 8/1996 | Konrad .................... 709/203 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2210763 | 1/1999 |
| EP | 0801478 | 10/1997 |
| WO | WO 99/05620 | 2/1999 |
| WO | WO 99/45451 | 9/1999 |

OTHER PUBLICATIONS

US 5,373,559, 12/1994, Kaufman et al. (withdrawn)

(List continued on next page.)

Primary Examiner—Mehmet B. Geckil
(74) Attorney, Agent, or Firm—Squire, Sanders & Dempsey L.L.P.

(57) **ABSTRACT**

A client stores a first set of workspace data, and is coupled via a computer network to a global server. The client may be configured to synchronize portions of the first set of workspace data with the global server, which stores independently modifiable copies of the portions. The global server may also store workspace data which is not downloaded from the client, and thus stores a second set of workspace data. The global server may be configured to identify and authenticate a user seeking global server access from a remote terminal, and is configured to provide access to the first set or to the second set. Further, services may be stored anywhere in the computer network. The global server may be configured to provide the user with access to the services. The system may further include a synchronization-start module at the client site (which may be protected by a firewall) that initiates interconnection and synchronization with the global server when predetermined criteria have been satisfied.

**14 Claims, 15 Drawing Sheets**



US 6,708,221 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,588,132 | A | * | 12/1996 | Cardoza ............... 711/148 |
| 5,752,246 | A | | 5/1998 | Rogers et al. |
| 5,764,902 | A | * | 6/1998 | Rothrock ............... 345/753 |
| 5,812,773 | A | * | 9/1998 | Norin ............... 345/753 |
| 5,835,601 | A | * | 11/1998 | Shimbo et al. ....... 709/201 |
| 5,862,346 | A | * | 1/1999 | Kley et al. ............... 380/29 |
| 5,878,230 | A | | 3/1999 | Weber et al. |
| 5,924,103 | A | * | 7/1999 | Ahmed et al. ....... 707/201 |
| 5,928,329 | A | | 7/1999 | Clark et al. |
| 5,943,676 | A | * | 8/1999 | Boothby ............... 707/201 |
| 5,974,238 | A | * | 10/1999 | Chase, Jr. ............... 709/248 |
| 5,999,932 | A | | 12/1999 | Paul |
| 5,999,947 | A | * | 12/1999 | Zollinger et al ....... 707/203 |
| 6,020,885 | A | * | 2/2000 | Honda ............... 345/757 |
| 6,021,427 | A | | 2/2000 | Spagna et al. |
| 6,023,700 | A | | 2/2000 | Owens et al. |
| 6,023,708 | A | * | 2/2000 | Mendez et al. ....... 707/203 |
| 6,034,621 | A | | 3/2000 | Kaufman |
| 6,073,165 | A | | 6/2000 | Narasimhan et al |
| 6,094,477 | A | | 7/2000 | Nada et al. |
| 6,108,709 | A | | 8/2000 | Shinomura et al. |
| 6,118,856 | A | | 9/2000 | Paarsmarkt et al. |
| 6,125,281 | A | | 9/2000 | Wells et al. |
| 6,131,096 | A | * | 10/2000 | Ng et al. ............... 707/10 |

| | | | | |
|---|---|---|---|---|
| 6,131,116 | A | * | 10/2000 | Riggins et al ....... 709/219 |
| 6,138,146 | A | | 10/2000 | Moon et al. |
| 6,212,529 | B1 | * | 4/2001 | Boothby et al. ....... 707/201 |
| 6,249,805 | B1 | | 6/2001 | Fleming, III |
| 6,295,541 | B1 | | 9/2001 | Bodnar et al. |
| 6,343,313 | B1 | * | 1/2002 | Salesky et al ....... 345/751 |
| 6,510,455 | B1 | | 1/2003 | Chen et al. |

## OTHER PUBLICATIONS

Kohl, John T., et al.; "The Evolution of the *Kerberos* Authentication Service"; 1991; pp. 1–15; This paper is a revision of a paper presented at the Spring 1991 EurOpen Conference in Tromso, Norway.

Adams, Charlotte; "Multilevel Secure Networking Charges Ahead"; Federal Computer Week; Apr. 12, 1993; 5 pages.

Jaeger, Trent and Atul Prakash; "Implementation of a Discretionary Access Control Model for Script-based Systems"; IEEE Jun. 1995; 15 pages.

Research Disclosure; "Provide Auto–Forwarding Based on Criteria Selected by the User"; Oct. 1, 1989; 1 page; No. 306; Kenneth Mason Publications; XP000085405; ISSN; 0374–4353

* cited by examiner



FIG. 1

FIG. 2



FIG. 3

Synchronization
Agent
145



405

## Communications Module

410

## General Synchronization
Module

**FIG. 4**



Global Format
Bookmark
(example)
500

| | |
|---|---|
| User ID | 505 |
| Entry ID | 510 |
| Parent ID | 515 |
| Is Folder? | 520 |
| Name | 525 |
| Description | 530 |
| URL | 535 |
| Position | 540 |
| Is Deleted | 545 |
| Last Modified Date | 550 |
| Created Date | 555 |
| Separation After? | 560 |

**FIG. 5**

Configuration
and user data
356





**FIG. 6**



FIG. 7

Base System 170

805 Communications Module

810 User Interface Module

815 Locator Modules

840

820 Synch-start Module

825 General Synchronization Module

835 Last Synchronization Signature

830 Content-based Synchronization Module

FIG. 8



**FIG. 9**



**FIG. 10**



Create link
between client
& server
1005



**FIG. 11**



FIG. 12



**FIG. 13**



**FIG. 14**



**FIG. 15**

US 6,708,221 B1

1

# SYSTEM AND METHOD FOR GLOBALLY AND SECURELY ACCESSING UNIFIED INFORMATION IN A COMPUTER NETWORK

## CROSS-REFERNCE TO RELATED APPLICATIONS

This application is a continuation and claims priority to and incorporates by reference U.S. patent application Ser. No. 08/903,118, entitled "System and Method For Globally and Securely Accessing Unified Information in a Computer Network" filed Jul. 30, 1997 of Daniel J Mendez, Mark D. Riggins, Prasad Wagle, Hong Q. Bui, Mason Ng, Sean Michael Quinlan, Christine C Ying, Christopher R. Zuleeg, David J. Cowan, Joanna A. Aptekar-Strober and R. Stanley Bailes, which is a continuation-in-part of U.S. patent application Ser. No. 08/766,307, entitled "System and Method for Globally Accessing Computer Services," filed on Dec. 13, 1996 now U.S. Pat. No. 6,131,116 by inventors Mark D. Riggins, R. Stanley Bailes, Hong Q. Bui, David J. Cowan, Daniel J. Mendez, Mason Ng, Sean Michael Quinlan, Prasad Wagle, Christine C. Ying, Christopher R. Zuleeg and Joanna A. Aptekar-Strober; and of co-pending U.S. patent application Ser No. 08/841,950 entitled "System and Method for Enabling Secure Access to Services in a Computer Network," filed on Apr. 8, 1997 by inventor Mark Riggins; and of U.S. patent application Ser. No. 08/835.997 entitled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network," filed on Apr 11, 1997 now U.S. Pat. No. 6,085,192, by inventors Daniel J. Mendez, Mark J. Riggins, Prasad Wagle and Christine C. Ying; and of U.S. patent application Ser. No. 08/865,075 entitled "System and Method for Using a Global Translator to Synchronize Workspace Elements Across a Network," filed on May 29, 1997 now U.S. Pat No. 6,023,708 by inventors Daniel J. Mendez, Mark D. Riggins, Prasad Wagle and Christine C. Ying. These applications have been commonly assigned to RoamPage, Inc. and are incorporated herein by reference as if copied verbatim hereafter. Benefit of the earlier filing dates is claimed on all common subject matter

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to computer networks, and more particularly provides a system and method for globally and securely accessing unified information in a computer network

### 2. Description of the Background Art

The internet currently interconnects about 100,000 computer networks and several million computers. Each of these computers stores numerous application programs for providing numerous services, such as generating, sending and receiving e-mail, accessing World Wide Web sites, generating and receiving facsimile documents, storing and retrieving data, etc.

A roaming user, i.e., a user who travels and accesses a workstation remotely, is faced with several problems. Program designers have developed communication techniques for enabling the roaming user to establish a communications link and to download needed information and needed service application programs from the remote workstation to a local computer. Using these techniques, the roaming user can manipulate the data on the remote workstation and, when finished, can upload the manipulated data back from the remote workstation to the local computer. However, slow

2

computers and slow communication channels make downloading large files and programs a time-consuming process. Further, downloading files and programs across insecure channels severely threatens the integrity and confidentiality of the downloaded data

Data consistency is also a significant concern for the roaming user. For example, when maintaining multiple independently modifiable copies of a document, a user risks using an outdated version. By the time the user notices an inconsistency, interparty miscommunication or data loss may have already resulted. The user must then spend more time attempting to reconcile the inconsistent versions and addressing any miscommunications.

The problem of data inconsistency is exacerbated when multiple copies of a document are maintained at different network locations. For example, due to network security systems such as conventional firewall technology, a user may have access only to a particular one of these network locations. Without access to the other sites, the user cannot confirm that the version on the accessible site is the most recent draft.

Data consistency problems may also arise when using application programs from different vendors. For example, the Netscape Navigator™ web engine and the Internet Explorer™ web engine each store bookmarks for quick reference to interesting web sites. However, since each web engine uses different formats and stores bookmarks in different files, the bookmarks are not interchangeable In addition, one web engine may store a needed bookmark, and the other may not. A user who, for example, runs the Internet Explorer™ web engine at home and runs the Netscape Navigator™ web engine at work risks having inconsistent bookmarks at each location

Therefore, a system and method are needed to enable multiple users to access computer services remotely without consuming excessive user time, without severely threatening the integrity and confidentiality of the data, and without compromising data consistency.

## SUMMARY OF THE INVENTION

The present invention provides a system and methods for providing global and secure access to services and to unified (synchronized) workspace elements in a computer network. A user can gain access to a global server using any terminal, which is connected via a computer network such as the Internet to the global server and which is enabled with a web engine.

A client stores a first set of workspace data, and is coupled via a computer network to a global server. The client is configured to synchronize selected portions of the first set of workspace data (comprising workspace elements) with the global server, which stores independently modifiable copies of the selected portions. The global server may also store workspace data not received from the client, such as e-mail sent directly to the global server. Accordingly, the global server stores a second set of workspace data. The global server is configured to identify and authenticate a user attempting to access it from a remote terminal, and is configured to provide access based on the client configuration either to the first set of workspace data stored on the client or to the second set of workspace data stored on the global server. It will be appreciated that the global server can manage multiple clients and can synchronize workspace data between clients.

Service engines for managing services such as e-mail management, accessing bookmarks, calendaring, network

US 6,708,221 B1

| 3 | 4 |

access, etc. may be stored anywhere in the computer network, including on the client, on the global server or on any other computer. The global server is configured to provide the user with access to services, which based on level of authentication management or user preferences may include only a subset of available services. Upon receiving a service request from the client, the global server sends configuration information to enable access to the service.

Each client includes a base system and the global server includes a synchronization agent. The base system and synchronization agent automatically establish a secure connection therebetween and synchronize the selected portions of the first set of workspace data stored on the client and the second set of workspace data stored on the global server. The base system operates on the client and examines the selected portions to determine whether any workspace elements have been modified since last synchronization. The synchronization agent operates on the global server and informs the base system whether any of the workspace elements in the second set have been modified. Modified version may then be exchanged so that an updated set of workspace elements may be stored at both locations, and so that the remote user can access an updated database. If a conflict exists between two versions, the base system then performs a responsive action such as examining content and generating a preferred version, which may be stored at both locations. The system may further include a synchronization-start module at the client site (which may be protected by a firewall) that initiates interconnection and synchronization when predetermined criteria have been satisfied.

A method of the present invention includes establishing a communications link between the client and the global server. The method includes establishing a communications link between the client and a service based upon user requests. The method receives configuration data and uses the configuration data to configure the client components such as the operating system, the web engine and other components. Configuring client components enables the client to communicate with the service and provides a user-and-service-specific user interface on the client. Establishing a communications link may also include confirming access privileges

Another method uses a global translator to synchronize workspace elements. The method includes the steps of selecting workspace elements for synchronization, establishing a communications link between a client and a global server, examining version information for each of the workspace elements on the client and on the global server to determine workspace elements which have been modified since last synchronization. The method continues by comparing the corresponding versions and performing a responsive action. Responsive actions may include storing the preferred version at both stores or reconciling the versions using content-based analysis.

The system and methods of the present invention advantageously provide a secure globally accessible third party, i.e. the global server. The system and methods provide a secure technique for enabling a user to access the global server and thus workspace data remotely and securely. Because of the global firewall and the identification and security services performed by the global server, corporations can store relatively secret information on the global server for use by authorized clients. Yet, the present invention also enables corporations to maintain only a portion of their secret information on the global server, so that there would be only limited loss should the global server be compromised. Further, the global server may advanta-

geously act as a client proxy for controlling access to services, logging use of keys and logging access of resources.

A client user who maintains a work site, a home site, an off-site and the global server site can securely synchronize the workspace data or portions thereof among all four sites. Further, the predetermined criteria (which control when the synchronization-start module initiates synchronization) may be set so that the general synchronization module synchronizes the workspace data upon user request, at predetermined times during the day such as while the user is commuting, or after a predetermined user action such as user log-off or user log-on. Because the system and method operate over the Internet, the system is accessible using any connected terminal having a web engine such as an internet-enabled smart phone, television settop (e.g., web TV), etc. and is accessible over any distance. Since the system and method include format translation, merging of workspace elements between different application programs and different platforms is possible. Further, because synchronization is initiated from within the firewall, the typical firewall, which prevents in-bound communications and only some protocols of out-bound communications, does not act as an impediment to workspace element synchronization.

Further, a roaming user may be enabled to access workspace data from the global server or may be enabled to access a service for accessing workspace data from a client. For example, a user may prefer not to store personal information on the global server but may prefer to have remote access to the information. Further, the user may prefer to store highly confidential workspace elements on the client at work as added security should the global server be compromised.

The present invention may further benefit the roaming user who needs emergency access to information. The roaming user may request a Management Information Systems (MIS) director controlling the client to provide the global server with the proper keys to enable access to the information on the client. If only temporary access is desired, the keys can then be later destroyed either automatically or upon request. Alternatively, the MIS director may select the needed information as workspace elements to be synchronized and may request immediate synchronization with the global server. Accordingly, the global server and the client can synchronize the needed information, and the user can access the information from the global server after it has completed synchronization.

The present invention also enables the system and methods to synchronize keys, available services and corresponding service addresses to update accessibility of workspace data and services. For example, if the user of a client accesses a site on the Internet which requires a digital certificate and the user obtains the certificate, the system and methods of the present invention may synchronize this newly obtained certificate with the keys stored on the global server. Thus, the user need not contact the global server to provide it with the information. The synchronization means will synchronize the information automatically

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating remote data-synchronizing remotely accessible network in accordance with the present invention;

FIG. 2 is a block diagram illustrating details of a FIG. 1 remote terminal;

FIG. 3 is a block diagram illustrating details of a FIG. 1 global server;

US 6,708,221 B1

5

FIG. 4 is a block diagram illustrating details of a FIG. 1 synchronization agent;

FIG. 5 is a graphical representation of an example bookmark in global format;

FIG. 6 is a graphical representation of the FIG. 3 configuration data;

FIG. 7 is a block diagram illustrating the details of a FIG. 1 client;

FIG 8 is a block diagram illustrating the details of a FIG. 1 base system;

FIG 9 illustrates an example services list;

FIG. 10 is a flowchart illustrating a method for remotely accessing a secure server;

FIG. 11 is a flowchart illustrating details of the FIG. 10 step of creating a link between a client and global server;

FIG. 12 is a flowchart illustrating details of the FIG. 10 step of providing access to a service in a first embodiment;

FIG. 13 is a flowchart illustrating details of the FIG. 10 step of providing access to a service in a second embodiment;

FIG. 14 is a flowchart illustrating details of the FIG. 10 step of providing access to a service in a third embodiment; and

FIG. 15 is a flowchart illustrating a method for synchronizing multiple copies of a workspace element over a secure network

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 is a block diagram illustrating a network 100, comprising a first site such as a remote computer terminal 105 coupled via a communications channel 110 to a global server 115. The global server 115 is in turn coupled via a communications channel 120 to a second site such as a Local Area Network (LAN) 125 and via a communications channel 122 to a third site such as client 167. Communications channel 110, communications channel 120 and communications channel 122 may be referred to as components of a computer network such as the Internet. The global server 115 is protected by a global firewall 130, and the LAN 125 is protected by a LAN firewall 135

The LAN 125 comprises a client 165, which includes a base system 170 for synchronizing workspace data 180 (e-mail data, file data, calendar data, user data, etc.) with the global server 115 and may include a service engine 175 for providing computer services such as scheduling, e-mail, paging, word-processing or the like. Those skilled in the art will recognize that workspace data 180 may include other types of data such as application programs. It will be further appreciated that workspace data 180 may used to be divided into workspace elements, wherein each workspace element may be identified by particular version information 782 (FIG. 7). For example, each e-mail, file, calendar, etc. may be referred to as "a workspace element in workspace data." For simplicity, each workspace element on the client 165 is referred to herein as being stored in format A. It will be further understood that the workspace data 180 or portions thereof may be stored at different locations such as locally on the client 165, on other systems in the LAN 125 or on other systems (not shown) connected to the global server 115

The client 167 is similar to the client 165. However, workspace data stored on the client 167 is referred to as being stored in format B, which may be the same as or

6

different than format A. All aspects described above and below with reference to the client 165 are also possible with respect to the client 167. For example, client 167 may include services (not shown) accessible from remote terminal 105, may include a base system (not shown) for synchronizing workspace elements with the global server 115, etc.

The global server 115 includes a security system 160 for providing only an authorized user with secure access through firewalls to services. The security system 160 may perform identification and authentication services and may accordingly enable multiple levels of access based on the level of identification and authentication The global server 115 further includes a configuration system 155 that downloads configuration data 356 (FIGS. 3 and 6) to the remote terminal 105 to configure remote terminal 105 components such as the operating system 270 (FIG. 2), the web engine 283 (FIG. 2), the applet engine 290 (FIG. 2), etc. The configuration system 155 uses the configuration data 356 to enable the remote terminal 105 to access the services provided by the service engine 175 and to provide a user-and-service-specific user interface.

The global server 115 stores workspace data 163, which includes an independently modifiable copy of each selected workspace element in the selected portions of the workspace data 180. Accordingly, the workspace data 163 includes an independently modifiable copy of each corresponding version information 782 (FIG. 7). The workspace data 163 may also include workspace elements which originate on the global server 115 such as e-mails sent directly to the global server 115 or workspace elements which are downloaded from another client (not shown). The global server 115 maintains the workspace data 163 in a format, referred to as a "global format," which is selected to be easily translatable by the global translator 150 to and from format A and to and from format B. As with format A and format B, one skilled in the art knows that the global format actually includes a global format for each information type For example, there may be a global format for bookmarks (FIG. 5), a global format for files, a global format for calendar data, a global format for e-mails, etc.

The global server 115 also includes a synchronization agent 145 for examining the workspace elements of workspace data 163. More particularly, the base system 170 and the synchronization agent 145, collectively referred to herein as "synchronization means," cooperate to synchronize the workspace data 163 with the selected portions of the workspace data 180. The synchronization means may individually synchronize workspace elements (e.g., specific word processor documents) or may synchronize workspace element folders (e.g., a bookmark folder). Generally, the base system 170 manages the selected portions of the workspace data 180 within the LAN 125 and the synchronization agent 145 manages the selected portions of workspace data 163 within the global server 115 It will be appreciated that the global translator 150 cooperates with the synchronization means to translate between format A (or format B) and the global format It will be further appreciated that the global server 115 may synchronize the workspace data 163 with workspace data 180 and with the workspace data (not shown) on the client 167 Accordingly, the workspace data 163 can be easily synchronized with the workspace data (not shown) on the client 167.

The remote terminal 105 includes a web engine 140, which sends requests to the global server 115 and receives information to display from the global server 115. The web engine 140 may use HyperText Transfer Protocol (HTTP)

US 6,708,221 B1

7

and HyperText Markup Language (HTML) to interface with the global server 115. The web engine 140 may be enabled to run applets, which when executed operate as the security interface for providing access to the global server 115 and which operate as the application interface with the requested service. Using the present invention, a user can operate any remote client 105 connected to the Internet to access the global server 115, and thus to access the services and the workspace data on or accessible by the global server 115

FIG. 2 is a block diagram illustrating details of the remote terminal 105, which includes a Central Processing Unit (CPU) 210 such as a Motorola Power PC™ microprocessor or an Intel Pentium™ microprocessor. An input device 220 such as a keyboard and mouse, and an output device 230 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 235 to CPU 210. A communications interface 240, a data storage device 250 such as Read Only Memory (ROM) and a magnetic disk, and a Random-Access Memory (RAM) 260 are further coupled via signal bus 235 to CPU 210. The communications interface 240 is coupled to a communications channel 110 as shown in FIG. 1.

An operating system 270 includes a program for controlling processing by CPU 210, and is typically stored in data storage device 250 and loaded into RAM 260 (as shown) for execution Operating system 270 further includes a communications engine 275 for generating and transferring message packets via the communications interface 240 to and from the communications channel 110 Operating system 270 further includes an Operating System (OS) configuration module 278, which configures the operating system 270 based on OS configuration data 356 (FIG. 3) such as Transmission Control Protocol (TCP) data, Domain Name Server (DNS) addresses, etc. received from the global server 115

Operating system 270 further includes the web engine 140 for communicating with the global server 115. The web engine 140 may include a web engine (WE) configuration module 286 for configuring elements of the web engine 140 such as home page addresses, bookmarks, caching data, user preferences, etc. based on the configuration data 356 received from the global server 115 The web engine 140 may also include an encryption engine 283 for using encryption techniques to communicate with the global server 115. The web engine 140 further may include an applet engine 290 for handling the execution of downloaded applets including applets for providing security. The applet engine 290 may include an Applet Engine (AE) configuration module 295 for configuring the elements of the applet engine 290 based on configuration data 356 received from the global server 115.

FIG. 3 is a block diagram illustrating details of the global server 115, which includes a Central Processing Unit (CPU) 310 such as a Motorola Power PC™ microprocessor or an Intel Pentium™ microprocessor. An input device 320 such as a keyboard and mouse, and an output device 330 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 335 to CPU 310 A communications interface 340, a data storage device 350 such as Read Only Memory (ROM) and a magnetic disk, and a Random-Access Memory (RAM) 370 are further coupled via signal bus 335 to CPU 310. As shown in FIG. 1, the communications interface 340 is coupled to the communications channel 110 and to the communications channel 120

An operating system 380 includes a program for controlling processing by CPU 310, and is typically stored in data storage device 350 and loaded into RAM 370 (as illustrated)

8

for execution The operating system 380 further includes a communications engine 382 for generating and transferring message packets via the communications interface 340 to and from the communications channel 345. The operating system 380 also includes a web page engine 398 for transmitting web page data 368 to the remote terminal 105, so that the remote terminal 105 can display a web page 900 (FIG. 9) listing functionality offered by the global server 115 Other web page data 368 may include information for displaying security method selections

The operating system 380 may include an applet host engine 395 for transmitting applets to the remote terminal 105. A configuration engine 389 operates in conjunction with the applet host engine 395 for transmitting configuration applets 359 and configuration and user data 356 to the remote terminal 105. The remote terminal 105. executes the configuration applets 359 and uses the configuration and user data 356 to configure the elements (e.g., the operating system 270, the web engine 140 and the applet engine 290) of the remote terminal 105. Configuration and user data 356 is described in greater detail with reference to FIG. 6

The operating system 380 also includes the synchronization agent 145 described with reference to FIG. 1. The synchronization agent 145 synchronizes the workspace data 163 on the global server 115 with the workspace data 180 on the client 165. As stated above with reference to FIG. 1, the global translator 150 translates between format A used by the client 165 and the global format used by the global server 115.

The operating system 380 may also includes a security engine 392 for determining whether to instruct a communications engine 382 to create a secure communications link with a client 165 or terminal 105, and for determining the access rights of the user. For example, the security engine 392 forwards to the client 165 or remote terminal 105 security applets 362, which when executed by the receiver poll the user and respond back to the global server 115. The global server 115 can examine the response to identify and authenticate the user

For example, when a client 165 attempts to access the global server 115, the security engine 384 determines whether the global server 115 accepts in-bound communications from a particular port. If so, the security engine 392 allows the communications engine 382 to open a communications channel 345 to the client 165. Otherwise, no channel will be opened. After a channel is opened, the security engine 392 forwards an authentication security applet 362 to the remote terminal 105 to poll the user for identification and authentication information such as for a user ID and a password. The authentication security applet 362 will generate and forward a response back to the global server 115, which will use the information to verify the identity of the user and provide access accordingly.

It will be appreciated that a "request-servicing engine" may be the configuration engine 389 and the applet host engine 395 when providing services to a remote terminal 105 or client 165. The request-servicing engine may be the web page engine 398 when performing workspace data 163 retrieval operations directly from the global server 115 The request-servicing engine may be the configuration engine 389 and the applet host engine 395 when performing workspace data 180 retrieval operations from the client 165 or from any other site connected to the global server 115. The request-servicing engine may be security engine 392 when performing security services such as user identification and authentication. The request-servicing engine may be the

9

synchronization agent when the performing synchronization with the client 165. Further, the request-servicing engine may be any combination of these components.

FIG. 4 is a block diagram illustrating details of the synchronization agent 145, which includes a communications module 405 and a general synchronization module 410. The communications module 405 includes routines for compressing data and routines for communicating via the communications channel 120 with the base system 170. The communications module 405 may further include routines for communicating securely channel through the global firewall 130 and through the LAN firewall 125.

The general synchronization module 410 includes routines for determining whether workspace elements have been synchronized and routines for forwarding to the base system 170 version information (not shown) of elements determined to be modified after last synchronization. The general synchronization module 410 may either maintain its own last synchronization signature (not shown), receive a copy of the last synchronization signature with the request to synchronize from the base system 170, or any other means for insuring that the workspace data has been synchronized. The general synchronization module 410 further includes routines for receiving preferred versions of workspace data 180 workspace elements from the base system 170 and routines for forwarding preferred versions of workspace data 180 workspace elements to the base system 170.

FIG. 5 illustrates an example bookmark workspace element in the global format The translator 150 incorporates all the information needed to translate between all incorporated formats. For example, if for a first client a bookmark in format A needs elements X, Y and Z and for a second client a bookmark in format B needs elements W, X and Y, the global translator 150 incorporates elements W, X, Y and Z to generate a bookmark in the global format. Further, the translator 150 incorporates the information which is needed by the synchronization means (as described below in the FIG. 4) such as the last modified date Accordingly, a bookmark in the Global Format may include a user identification (ID) 505, an entry ID 510, a parent ID 515, a folder ID flag 520, a name 525, a description 530, the Uniform Resource Locator (URL) 535, the position 540, a deleted ID flag 545, a last modified date 550, a created date 555 and a separation ID flag 560.

FIG. 6 is a block diagram illustrating details of the configuration and user data 356. Configuration data 356 includes settings 605 such as TCP data and the DNS address, web browser settings such as home page address, bookmarks and caching data, applet engine settings, and applet configuration data such as the user's e-mail address name and signature block. It will be appreciated that applet-specific configuration and user data 356 is needed, since the service may not be located on the user's own local client 165. Configuration and user data 356 further includes predetermined user preferences 610 such as font, window size, text size, etc.

Configuration data 356 further includes the set of services 615, which will be provided to the user. Services 615 include a list of registered users and each user's list of user-preferred available services 615. Services may also include a list of authentication levels needed to access the services 615. Configuration and user data 137 further includes service addresses 620 specifying the location of each of the services 615 accessible via the global server 115.

FIG. 7 is a block diagram illustrating details of the client 165, which includes a CPU 705, an input device 710, an

10

output device 725, a communications interface 710, a data storage device 720 and RAM 730, each coupled to a signal bus 740.

An operating system 735 includes a program for controlling processing by the CPU 705, and is typically stored in the data storage device 720 and loaded into the RAM 730 (as illustrated) for execution. A service engine 175 includes a service program for managing workspace data 180 that includes version information (not shown). The service engine 175 may be also stored in the data storage device 720 and loaded into the RAM 730 (as illustrated) for execution. The workspace data 180 may be stored in the data storage device 330 As stated above with reference to FIG. 1, the base system 170 operates to synchronize the workspace data 180 on the client 165 with the workspace data 163 on the global server 115. The base system 170 may be also stored in the data storage device 720 and loaded into the RAM 730 (as shown) for execution. The base system 170 is described in greater detail with reference to FIG. 8.

FIG. 8 is a block diagram illustrating details of the base system 170, which includes a communications module 805, a user interface module 810, locator modules 815, a synchronization-start ("synch-start") module 820, a general synchronization module 825 and a content-based synchronization module 830. For simplicity, each module is illustrated as communicating with one another via a signal bus 840. It will be appreciated that the base system 170 includes the same components as included in the synchronization agent 145

The communications module 805 includes routines for compressing data, and routines for communicating via the communications interface 710 (FIG. 7) with the synchronization agent 145 (FIG. 1). The communications module 805 may include routines for applying Secure Socket Layer (SSL) technology and user identification and authentication techniques (i.e., digital certificates) to establish a secure communication channel through the LAN firewall 135 and through the global firewall 130. Because synchronization is initiated from within the LAN firewall 135 and uses commonly enabled protocols such as HyperText Transfer Protocol (HTTP), the typical firewall 135 which prevents in-bound communications in general and some outbound protocols does not act as an impediment to e-mail synchronization. Examples of communications modules 805 may include TCP/IP stacks or the AppleTalk™ protocol.

The user interface 810 includes routines for communicating with a user, and may include a conventional Graphical User Interface (GUI). The user interface 810 operates in coordination with the client 165 components as described herein.

The locator modules 815 include routines for identifying the memory locations of the workspace elements in the workspace data 180 and the memory locations of the workspace elements in the workspace data 163. Workspace element memory location identification may be implemented using intelligent software, i.e., preset memory addresses or the system's registry, or using dialogue boxes to query a user. It will be appreciated that the locator modules 815 may perform workspace element memory location identification upon system boot-up or after each communication with the global server 115 to maintain updated memory locations of workspace elements

The synchronization-start module 820 includes routines for determining when to initiate synchronization of workspace data 163 and workspace data 180. For example, the synchronization-start module 820 may initiate data synchro-

US 6,708,221 B1

11                                                                          12

nization upon user request, at a particular time of day, after
a predetermined time period passes, after a predetermined
number of changes, after a user action such as user log-off
or upon like criteria. The synchronization-start module 820
initiates data synchronization by instructing the general
synchronization module 825 to begin execution of its rou-
tines. It will be appreciated that communications with syn-
chronization agent 145 preferably initiate from within the
LAN 125, because the typical LAN firewall 125 prevents
in-bound communications and allows out-bound communi-
cations.

The general synchronization module 825 includes rou-
tines for requesting version information from the synchro-
nization agent 145 (FIG. 1) and routines for comparing the
version information against a last synchronization signature
835 such as a last synchronization date and time to deter-
mine which versions have been modified. The general
synchronization module 825 further includes routines for
comparing the local and remote versions to determine if only
one or both versions of a particular workspace element have
been modified and routines for performing an appropriate
synchronizing responsive action. Appropriate synchronizing
responsive actions may include forwarding the modified
version (as the preferred version) of a workspace element in
workspace data 180 or forwarding just a compilation of the
changes to the other store(s). Other appropriate synchroniz-
ing responsive actions may include, if reconciliation
between two modified versions is needed, then instructing
the content-based synchronization module 830 to execute its
routines (described below).

It will be appreciated that the synchronization agent 145
preferably examines the local version information 124 and
forwards only the elements that have been modified since
the last synchronization signature 835. This technique
makes efficient use of processor power and avoids transfer-
ring unnecessary data across the communications channel
712. The general synchronization module 825 in the LAN
135 accordingly compares the data elements to determine if
reconciliation is needed. Upon completion of the data
synchronization, the general synchronization module 825
updates the last synchronization signature 835.

The content-based synchronization module 830 includes
routines for reconciling two or more modified versions of
workspace data 163, 180 in the same workspace element.
For example, if the original and the copy of a user workspace
element have both been modified independently since the
last synchronization, the content-based synchronization
module 830 determines the appropriate responsive action.
The content-based synchronization module 830 may request
a user to select the preferred one of the modified versions or
may respond based on preset preferences, i.e., by storing
both versions in both stores or by integrating the changes
into a single preferred version which replaces each modified
version at both stores. When both versions are stored at both
stores, each version may include a link to the other version
so that the user may be advised to select the preferred
version.

It will be appreciated that any client 165 that wants
synchronization may have a base system 170. Alternatively,
one base system 170 can manage multiple clients 165. It will
be further appreciated that for a thin client 165 of limited
computing power such as a smart telephone, all synchroni-
zation may be performed by the global server 115.
Accordingly, components of the base system 170 such as the
user interface module 810, the locator modules 815, the
general synchronization module 825 and the content-based
synchronization module 830 may be located on the global

server 115. To initiate synchronization from the client 165,
the client 165 includes the communications module 805 and
the synch-start module 820.

FIG. 9 illustrates an example list 900 of accessible ser-
vices provided by a URL-addressable HyperText Markup
Language (HTML)-based web page, as maintained by the
web page engine 398 of the global server 115. The list 900
includes a title 910 "Remote User's Home Page," a listing
of the provided services 615 and a pointer 970 for selecting
one of the provided services 615. As illustrated, the provided
services may include an e-mail service 920, a calendaring
service 930, an internet access service 940, a paging service
950, a fax sending service 960, a user authentication service
963 and a workspace data retrieval service 967. Although
not shown, other services 615 such as bookmarking,
QuickCard™, etc. may be included in the list 900. Although
the web page provides the services 615 in a list 900, other
data structures such as a pie chart or table may alternatively
be used.

FIG. 10 is a flowchart illustrating a method 1000 for
enabling a user to access the services 615 in the computer
network system 100. Method 1000 begins by the remote
terminal 105 in step 1005 creating a communications link
with the global server 115. The global server 115 in step
1010 confirms that the user has privileges to access the
functionality of the global server 115. Confirming user
access privileges may include examining a user certificate,
obtaining a secret password, using digital signature
technology, performing a challenge/response technique, etc.
It will be appreciated that the security engine 392 may cause
the applet host engine 395 to forward via the communica-
tions channel 345 to the remote terminal 105 an authenti-
cation security applet 362 which when executed communi-
cates with the global server 115 to authenticate the user.

After user access privileges are confirmed, the web page
engine 398 of the global server 115 in step 1015 transmits
web page data 368 and configuration and user data 356 to the
remote terminal 105. The web engine 140 of the remote
terminal 105 in step 1020 uses the web page data 368 and the
configuration and user data 356 to display a web page,
service list 900 (FIG. 9) on the output device 230, and to
enable access to the services 615 which the global server 115
offers. An example service list 900 is shown and described
with reference to FIG. 9. Configuration of the remote
terminal 105 and of the web page 700 is described in detail
in the cross-referenced patent applications.

From the options listed on the web page 900, the user in
step 1025 selects a service 615 via input device 220. In
response, the request-servicing engine (described with ref-
erence to FIG. 3) provides the selected service 615. For
example, the applet host engine 395 of the global server 115
in step 1030 may download to the remote terminal 105 a
corresponding applet 359 and configuration and user data
356 for executing the requested service 615. Alternatively,
the web page engine 398 may use, for example, HTTP and
HTML to provide the selected service 615. As described
above with reference to FIG. 6, the configuration and user
data 356 may include user-specific preferences such as
user-preferred fonts for configuring the selected service 615.
Configuration and user data 356 may also include user-
specific and service-specific information such as stored
bookmarks, calendar data, pager numbers, etc. Alternatively,
the corresponding applet 359 and the configuration and user
data 356 could have been downloaded in step 1015. Pro-
viding access to the service by an applet 359 is described in
greater detail below with reference to FIGS. 12–14.

The applet engine 290 of the remote terminal 105 in step
1035 initiates execution of the corresponding downloaded

**13**

applet The global server 115 in step 1040 initiates the selected service 615 and in step 1045 selects one of three modes described with reference to FIGS. 12–14 for accessing the service 615. For example, if the user selects a service 615 on a service server (e.g., the client 165) that is not protected by a separate firewall, then the global server 115 may provide the user with direct access. If the user selects a service 615 provided by a service server within the LAN 125, then the global server 115 may access the service 615 as a proxy for the user It will be appreciated that each firewall 130 and 135 may store policies establishing the proper mode of access the global server 115 should select. Other factors for selecting mode of access may include user preference, availability and feasibility The global server 115 in step 1050 uses the selected mode to provide the remote terminal 105 user with access to the selected service 615.

FIG. 11 is a flowchart illustrating details of step 1005, which begins by the remote terminal 105 in step 1105 using a known Uniform Resource Locator (URL) to call the global server 115. The global server 115 and the remote terminal 105 in step 1107 create a secure communications channel therebetween, possibly by applying Secure Sockets Layer (SSL) technology. That is, the security engine 392 of the global server 115 in step 1110 determines if in-bound secure communications are permitted and, if so, creates a communications channel with the remote terminal 105. The web engine 140 of the remote terminal 105 and the security engine 392 of the global server 115 in step 1115 negotiate secure communications channel parameters, possibly using public key certificates. An example secure communications channel is RSA with RC4 encryption. Step 1115 thus may include selecting an encryption protocol which is known by both the global server 115 and the remote terminal 105. The encryption engine 283 of the remote terminal 105 and secure communications engine 392 of the global server 115 in step 1120 use the secure channel parameters to create the secure communications channel. Method 505 then ends.

FIG. 12 is a flowchart illustrating details of step 1050 in a first embodiment, referred to as step 1050a, wherein the global server 115 provides the remote terminal 105 with a direct connection to a service 615. Step 1050a begins by the applet engine 290 in step 1205 running a configuration applet 359 for the selected service 615 that retrieves the service address 620 from data storage device 380 and the authentication information from the keysafe 365 The communications interface 340 in step 1210 creates a direct and secure connection with the communications interface 340 of the global server 115 at the retrieved service address 620, and uses the authentication information to authenticate itself. The applet in step 1215 acts as the I/O interface with the service 615. Step 1050a then ends.

FIG. 13 is a flowchart illustrating details of step 1050 in a second embodiment, referred to as step 1050b, wherein the global server 115 acts for the remote terminal 105 as a proxy to the service 615 Step 1050b begins with a configuration applet 359 in step 1305 requesting the service address 620 for the selected service 615, which results in retrieving the service address 620 directing the applet 359 to the global server 115. The applet 359 in step 1310 creates a connection with communications interface 340 of the global server 115. The global server 115 in step 1315 retrieves the service address 620 of the selected service 615 and the authentication information for the selected service 615 from the keysafe 365 The communications interface 340 of the global server 115 in step 1320 negotiates secure channel parameters for creating a secure channel with the service server 1014. The communications interface 340 in step 1320 also authenticates itself as the user

**14**

Thereafter, the applet 359 in step 1325 acts as the I/O interface with the communications interface 340 of the global server 115. If the global server 115 in step 1330 determines that it is unauthorized to perform a remote terminal 105 user's request, then the global server 115 in step 1345 determines whether the method 1050b ends, e.g., whether the user has quit. If so, then method 1050b ends. Otherwise, method 1050b returns to step 1325 to obtain another request. If the global server 115 in step 1330 determines that it is authorized to perform the remote terminal 105 user's request, then the global server 115 in step 1340 acts as the proxy for the remote terminal 105 to the service 615. As proxy, the global server 115 forwards the service request to the selected service 615 and forwards responses to the requesting applet 359 currently executing on the remote terminal 105. Method 1050b then jumps to step 1345.

FIG. 14 is a flowchart illustrating details of step 1050 in a third embodiment, referred to as step 1050c, wherein the service 615 being requested is located on the global server 115. Step 1050 begins with an applet in step 1405 retrieving the service address 620 for the selected service 615, which results in providing the configuration applet 359 with the service address 620 of the service 615 on the global server 115. Thus, the applet in step 1410 creates a secure connection with the global server 115 No additional step of identification and authentication is needed since the remote terminal 105 has already identified and authenticated itself to the global server 115 as described with reference to step 1010 of FIG. 10.

In step 1415, a determination is made whether the service 615 is currently running. If so, then in step 1425 a determination is made whether the service 615 can handle multiple users. If so, then the global server 115 in step 1430 creates an instance for the user, and the applet in step 1440 acts as the I/O interface with the service 615 on the global server 115. Method 1050c then ends. Otherwise, if the service 615 in step 1425 determines that it cannot handle multiple users, then method 1050c proceeds to step 1440. Further, if in step 1415 the global server 115 determines that the service 615 is not currently running, then the global server 115 in step 1420 initializes the service 615 and proceeds to step 1425.

FIG. 15 is a flowchart illustrating a method 1500 for using a global translator 150 to synchronize workspace data 163 and workspace data 180 in a secure network 100. Method 1500 begins with the user interface 900 in step 1505 enabling a user to select workspace elements of workspace data 163 and workspace data 180 for the synchronization means to synchronize. The locator modules 815 in step 1510 identify the memory locations of the workspace elements in workspace data 163 and workspace data 180 If a selected workspace element does not have a corresponding memory location, such as in the case of adding new workspace elements to the global server 115, then one is selected. The selected memory location may be a preexisting workspace element or a new workspace element. As stated above, workspace element memory location identification may be implemented using intelligent software or dialogue boxes The general synchronization module 825 in step 1515 sets the previous status of the workspace elements equal to the null set, which indicates that all information of the workspace element has been added.

The synchronization-start module 820 in step 1520 determines whether predetermined criteria have been met which indicate that synchronization of the workspace elements selected in step 1505 should start. If not, then the

US 6,708,221 B1

15

synchronization-start module 820 in step 1525 waits and loops back to step 1520. Otherwise, the communications module 805 and the communications module 405 in step 1530 establish a secure communications channel therebetween.

The general synchronization module 825 in step 1535 determines whether any workspace elements have been modified. That is, the general synchronization module 825 in step 1535 examines the version information of each selected workspace element in the workspace data 180 against the last synchronization signature 435 to locate modified workspace elements. This comparison may include comparing the date of last modification with the date of last synchronization, or may include a comparison between the current status and the previous status as of the last interaction. Similarly, the general synchronization module 815 examines the version information of each corresponding workspace element in workspace data 163 and the last synchronization signature 435 to locate modified workspace elements.

If in step 1535 no modified workspace elements or folders are located, then the general synchronization module 825 in step 1560 updates the last synchronization signature 435 and method 1500 ends. Otherwise, the general synchronization module 825 in step 1540 determines whether more than one version of a workspace element has been modified since the last synchronization.

If only one version has been modified, then the corresponding general synchronization module 825 in step 1545 determines the changes made. As stated above, determining the changes made may be implemented by comparing the current status of the workspace element against the previous status of the workspace element as of the last interaction therebetween. If the changes were made only to the version in the workspace data 163, then the global translator 150 in step 1550 translates the changes to the format used by the other store, and the general synchronization module 410 in step 1555 forwards the translated changes to the general synchronization module 825 for updating the outdated workspace element in the workspace data 180. If the updated version is a workspace element in the workspace data 180, then the general synchronization module 825 sends the changes to the updated version to the global translator 150 for translation and then to the general synchronization module 410 for updating the outdated workspace element in the workspace data 163. The general synchronization module 825 and the general synchronization module 410 in step 1557 update the previous state of the workspace element to reflect the current state as of this interaction. Method 1500 then returns to step 1535.

If the general synchronization module 825 in step 1540 determines that multiple versions have been modified, then the general synchronization module 825 in step 1565 computes the changes to each version and in step 1570 instructs the content-based synchronization module 830 to examine content to determine if any conflicts exist. For example, the content-based synchronization module 830 may determine that a conflict exists if a user deletes a paragraph in one version and modified the same paragraph in another version. The content-based synchronization module 830 may determine that a conflict does not exist if a user deletes different paragraphs in each version. If no conflict is found, then method 1500 jumps to step 1550 for translating and forwarding the changes in each version to the other store. However, if a conflict is found, then the content-based synchronization module 830 in step 1575 reconciles the modified versions. As stated above, reconciliation may

16

include requesting instructions from the user or based on previously selected preferences performing responsive actions such as storing both versions at both stores. It will be appreciated that a link between two versions may be placed in each of the two versions, so that the user will recognize to examine both versions to select the preferred version. Method 1500 then proceeds to step 1550.

It will be further appreciated that in step 1510 new workspace elements and preexisting workspace elements to which new workspace elements will be merged are set to "modified" and the previous status is set to the null set. Thus, the general synchronization module 825 in step 1540 will determine that more that one version has been modified and the content-based synchronization module 830 in step 1570 will determine that no conflict exists. The changes in each will be translated and forwarded to the other store. Accordingly, the two versions will be effectively merged and stored at each store.

For example, if a first bookmark folder was created by the web engine 140 on the client 165, a second folder was created by a web engine 140 on the remote terminal 105, no preexisting folder existed on the global server 115 and the user selected each of these folders for synchronization, then the synchronization means will effectively merge the first and second folders. That is, the general synchronization module 825 on the client 165 will determine that the first folder has been modified and the previous status is equal to the null set. The general synchronization module 825 will determine and send the changes, i.e., all the workspace elements in the first folder, to a new global folder on the global server 115. Similarly, the general synchronization module (not shown) on the remote terminal 105 will determine that, as of its last interaction, the previous status of each of the second and the global folders is the null set. The general synchronization module 825 will instruct the content-based synchronization module 830 to examine the changes made to each folder to determine whether a conflict exists. Since no conflicts will exist, the general synchronization module 825 will forward the changes to the global folder and the general synchronization module 410 will forward its changes to the second store, thereby merging the workspace elements of the first and second folders in the global and second folders. The general synchronization module 410 will inform the general synchronization module 825 that the global folder has been modified relative to the last interaction, and will forward the new changes to the first folder. Thus, the first and second folders will be merged and stored at each store.

The foregoing description of the preferred embodiments of the invention is by way of example only, and other variations of the above-described embodiments and methods are provided by the present invention. For example, a server can be any computer which is polled by a client. Thus, the remote terminal 105 may be referred to as a type of client. Although the system and method have been described with reference to applets, other downloadable executables such as Java™ applets, Java™ applications or ActiveX™ control developed by the Microsoft Corporation can alternatively be used. Components of this invention may be implemented using a programmed general-purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. Connections may be wired, wireless, modem, etc. The embodiments described herein have been presented for purposes of illustration and are not intended to be exhaustive or limiting. Many variations and modifications are possible in light of the foregoing teaching. The invention is limited only by the following claims

US 6,708,221 B1

17

What is claimed is:

1. A method for synchronizing workspace data, comprising:

storing first workspace data on a first device;

storing second workspace data on a second device;

determining differences between the first workspace data and the second workspace data;

storing the differences at a global server; and

sending the differences from the global server to the second device.

2. The method of claim 1, wherein the first workspace data comprise a workspace data element from a first user of the first device to a second user of the second device.

3. The method of claim 2, wherein the workspace data element includes data selected from a group including email data, file data, calendar data, user data and bookmark data.

4. The method of claim 1, wherein at least one of the first device and the second device is selected from a group including a smart phone, a television settop box and a personal computer.

5. The method of claim 1, further comprising continuing to store the differences at the global server is continued after the sending.

6. The method of claim 1, further comprising storing at the server version-indicating information corresponding to the differences.

7. The method of claim 1, further comprising merging, by the second device, the differences with third workspace data stored on the second device.

8. A system for synchronizing workspace data, comprising:

18

means for storing first workspace data on a first device;

means for storing second workspace data on a second device;

means for determining differences between the first workspace data and the second workspace data;

means for storing the differences at a global server; and

means for sending the differences from the global server to the second device.

9. The system of claim 8, wherein the first workspace data comprises a workspace data element from a first user of the first device to a second user of the second device.

10. The system of claim 9, wherein the workspace data element includes data selected from a group including email data, file data, calendar data, user data and bookmark data.

11. The system of claim 8, wherein at least one of the first device and the second device is selected from a group including a smart phone, a television settop box and a personal computer.

12. The system of claim 8, further comprising means for continuing to store the differences at the global server is continued after the sending.

13. The system of claim 8, further comprising means for storing at the server version-indicating information corresponding to the differences.

14. The system of claim 8, further comprising means for merging, by the second device, the differences with third workspace data stored on the second device

* * * * *